# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JUL 1 1 2002

Michael N. Milby, Clerk

C.H.

| | | |
|---|---|---|
| PAMELA M. TITTLE, ET AL., | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO. H-01-3913 |
| | § | (CONSOLIDATED) |
| vs. | § | |
| | § | |
| ENRON CORP., ET AL., | § | |
| | § | |
| Defendants. | § | |

## ENRON CORP.'S MOTION TO DISMISS
## THE FIRST CONSOLIDATED AND AMENDED COMPLAINT

Stephen D. Susman
State Bar No. 19521000
S.D. Admissions No. 03257
Kenneth S. Marks
State Bar No. 12995500
S.D. Admissions No. 02767
Jonathan J. Ross
Texas State Bar No. 00791575
S.D. Admissions No. 18293
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Attorneys for Enron Corp.

#370

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.  PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  SUMMARY OF THE COMPLAINT'S ALLEGATIONS THAT ENRON
WAS AN ERISA FIDUCIARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.  COUNT I FAILS TO STATE A CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.  The Settlor Doctrine Precludes Claims Based Upon
    Enron's Design of the Savngs Plan or the ESOP. . . . . . . . . . . . . . . . . . . . . . 7

        1.  The Savings Plan is designed to allow participants
        the ability to purchase Enron stock with their contributions. . . . . . . . . . 8

        2.  The Savings Plan is designed to allow Enron's
        matching contribution in the form of Enron stock. . . . . . . . . . . . . . . . . . 9

        3.  The Savings Plan and ESOP are designed to place age and
        other restrictions on the ability of participants to sell Enron
        stock received through Enron's contributions. . . . . . . . . . . . . . . . . . . . 10

        4.  The settlor doctrine precludes claims based upon
        Enron's failure to amend the Savings Plan or the ESOP. . . . . . . . . . . . . 12

    B.  Plaintiffs' Claims Based Upon Allegedly Misleading Statements
    About Enron's Business and Financial Condition are not
    Actionable Under ERISA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  The fiduciary duty standards set forth in ERISA do not include an
        affirmative duty to disclose plan sponsor's business or financial
        condition. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.  The allegedly misleading statements were made in Enron's
        corporate, non-fiduciary capacity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IV.  COUNT II FAILS TO STATE A CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

A.  Plaintiffs Lack Standing to Assert a Claim Based Upon the Changeover of Third-Party Administrators.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.  Enron Is Not Liable for the Alleged "Lockdown" of the ESOP Because the "Lockdown" Occurred Inside the Regularly Scheduled Monthly Holding Period. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

C.  Plaintiffs Had Adequate Notice of the Blackout Period As a Matter of Law. . . . 23

V.  COUNT III FAILS TO STATE A CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

A.  The Savings Plan Does Not Require Diversification Away From Enron Stock. . 25

B.  The Savings Plan Offered Participants a Wide Array of Investment Options. . . 22

VI.  COUNT IV FAILS TO STATE A CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

A.  The Cash Balance Plan Was Designed With An Offset Based Upon The Market Price Of Enron Stock Being Simultaneously Released To The Participants Under The ESOP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

   1.  Design of the Cash Balance Plan is not a fiduciary act.  . . . . . . . . . . . . . 32

   2.  Calculation of the offset under the Cash Balance Plan constituted a ministerial function of the Cash Balance Plan Administrative Committee, and the committee had no discretion to override the calculation methodology specified in the plan. . . . . . . . . 34

B.  The Complaint's Express Allegations Negate Any Injury To Participants In The Cash Balance Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   1.  The complaint demonstrates that when the ESOP offset calculation was made, the participants had the Enron shares in their ESOP accounts and were free to sell them.  . . . . . . . . . . . . . . . . . . . . . . . . . . 36

   2.  Count IV is merely an effort to recast plaintiffs' claims with respect to the Enron ESOP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

C.  Count IV Is An Impermissible Claim For Benefits Under The Cash Balance Plan, Not A Claim For Breach Of Fiduciary Duty . . . . . . . . . . . . . . . . 38

VII.  COUNT V FAILS TO STATE A CLAIM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

A.     The Complaint Fails To Allege Facts Sufficient To State A Claim That Enron Breached Its Fiduciary Duties Under ERISA In Its Appointment And Monitoring Of The ESOP Administrative Committee, Cash Balance Plan Administrative Committee And Northern Trust And In Failing To Make Disclosure To Them Of Non-Public Information . . . . . . . . . . . . . . . . . 40

B.     The Complaint Fails To Allege Facts Sufficient To State A Claim That Enron Appointed Members Of The Savings Plan Administrative Committee Who Were Not Qualified. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

C.     The Complaint Fails To Allege Facts Sufficient To State A Claim That Enron Failed To Monitor Adequately The Fiduciaries' Investment Of Plan Assets And Implementation Of Plan Terms. . . . . . . . . . . . . . . . . . . . . . . . 44

D.     Enron Had No Duty Under ERISA To Disclose Business Or Financial Condition Information To The Administrative Committee. . . . . . . . . . . . . . . . 46

VIII.   PLAINTIFFS FAIL TO MAKE ANY FACTUAL ALLEGATIONS IN SUPPORT OF THEIR ASSERTION THAT THE SAVINGS PLAN DOES NOT QUALIFY AS A SECTION 404(C) PLAN. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

IX.     THE COMPLAINT FAILS TO ALLEGE SUFFICIENT FACTS TO STATE A CLAIM FOR CO-FIDUCIARY LIABILITY AGAINST ENRON . . . . . . . . 50

X.      CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

# TABLE OF AUTHORITIES

**Cases**

*Acceptance Insurance Co. v. Walkingstick,*
    1995 U.S. Dist. LEXIS 7619 (S.D.Tex. Ap. 25, 1995) . . . . . . . . . . . . . . . . . . . . . . . 28

*Akers v. Palmer,*
    71 F.3d 226 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Atwood v. Burlington Indus. Equity, Inc,*
    1994 WL 698314, at 6 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Borst v. Chevron Corp.,*
    36 F.3d 1308 (5th Cir. 1994), cert. denied, 514 U.S. 1066 (1995) . . . . . . . . . . . . . 20

*Brengettsy v. LTV Steel (Republic) Hourly Pension Plan,*
    241 F.3d 609 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Childers v. Northwest Airlines, Inc.,*
    688 F. Supp. 1357 (D. Minn. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Coker v. Coker,*
    650 S.W.2d 391 (Tex. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Donovan v. Daugherty,*
    550 F. Supp. 390 (S. D. Ala. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Ehlmann v. Karser Foundation Health Plan,*
    198 F.3d 552 (5th Cir.), *cert. dism'd,* 530 U.S. 1291 (2000) . . . . . . . . . . . . . . . . . 14

*Fernandez-Montes v. Allied Pilots Association,*
    987 F.2d 278 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 51

*In re Fruehauf Trailer Corp.,*
    250 B.R. 168 (D. Del. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Guardian Trust Co. v. Bauereisen,*
    121 S.W.2d 579 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Guidry v. Bank of LaPlace,*
    954 F.2d 278 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 49, 51

*Fitch v. Chase Manhattan Bank, N.A.,*
    64 F. Supp.3d 212, 229 (W.D.N.Y.1999) ............................... 35

*Haber v. Brown,*
    774 F. Supp. 877 (S.D.N.Y. 1991) ...................................... 51

*Harms v. Cavenham Forest Industrial, Inc.,*
    984 F.2d 686 (5th Cir.), *cert. denied*, 510 U.S. 944 (1993) ................... 38

*Hughes Aircraft Co. v. Jacobson,*
    525 U.S. 432, 119 S. Ct. 755 (1999) ........................... 8, 11, 32, 33

*Independent Association of Publishers' Employees, Inc. v. Dow Jones &*
    *Company, Inc.,*
    671 F. Supp. 1365 (S.D.N.Y. 1987) ...................................... 5

*Izzarelli v. Rexene Products Co.,*
    24 F.3d 1506 (5th Cir. 1994) ....................................... 33, 42

*Jeanmarie v. United States,*
    242 F.3d 600 (5th Cir. 2001) .......................................... 41

*Johnson v. Georgia-Pacific Corp.,*
    19 F.3d 1184 (7th Cir. 1994) .......................................... 12

*Jones v. Kodak Medical Assistance Plan,*
    169 F.3d 1287 (10th Cir. 1999) ......................................... 8

*Landgraff v. Columbia/HCA Healthcare Corp. of America,*
    2000 WL 33726564, at 19 (M.D. Tenn. May 24, 2000) ................... 44

*Lenape Resources Corp. v. Tennessee Gas Pipeline Co.,*
    925 S.W.2d 565 (Tex. 1996) .......................................... 28

*Lockheed Corp. v. Spink,*
    517 U.S. 882, 116 S. Ct. 1783 (1996) ......................... 7, 8, 32, 33

*Martin v. Harline,*
    15 Empl. Ben. Cas. (BNA) 1138, 1992 U.S. Dist. LEXIS 8778 (D. Utah Mar.
    30, 1992) ......................................................... 42

*Metzler v. Graham,*
    112 F.3d 207 (5th Cir. 1997) .......................................... 29

*Montgomery v. Aetna Plywood, Inc.*,
    39 F. Supp. 2d 915 (N.D.Ill. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Pegram v. Herdrich*,
    530 U.S. 211, 120 S. Ct. 2143 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 11, 16, 42

*Reich v. King*,
    867 F. Supp. 341 (D. Md. 1994), *aff'd*, 98 F.3d 147 (4th Cir. 1996) . . . . . . . . . . . 29

*Richman v. Aetna Life Insurance Co.*,
    1992 U.S. App. LEXIS 20949 (4th Cir. Aug. 31, 1992) . . . . . . . . . . . . . . . . . . . . . 51

*Roeder v. Alpha Industrial, Inc.*,
    814 F.2d 22 (1st Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Schwartz v. Gordon*,
    1983 U.S. Dist. LEXIS 20130 (S.D.N.Y. Jan. 11, 1983) . . . . . . . . . . . . . . . . . . . . . 47

*Sengpiel v. B.F. Goodrich Co.*,
    156 F.3d 660 (6th Cir. 1998), *cert. denied*, 526 U.S. 1016 (1999) . . . . . . . . . . . . 17

*Sweeney v. Kroger Co.*,
    773 F. Supp. 1266 (E.D. Mo. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 46

*United States Postal Service v. American Postal Workers Union*,
    922 F.2d 256 (5th Cir.), *cert. denied*, 502 U.S. 906 (1991) . . . . . . . . . . . . . . . . . . 28

*Varity Corp. v. Howe*,
    516 U.S. 489, 116 S. Ct. 1065 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 21

*Vulcan Material Co. v. City of Tehuacana*,
    238 F.3d 382 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Watson v. Deaconess Waltham Hospital*,
    141 F. Supp. 2d 145 (D. Mass. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Weingarten Realty Investors v. Albertsons, Inc.*,
    66 F. Supp. 2d 825 (S.D. Tex. 1999), *aff'd*, 234 F.3d 28 (5th Cir. 2000) . . . . . . . . 27

*Williams v. WMX Techs, Inc.*,
    112 F.3d 175 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

**Statutes**

29 U.S.C. § 1002(18) (emphasis supplied) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5, 31

29 U.S.C. §§ 1021-1025 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

29 U.S.C. §§ 1021-1030 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13, 14

29 U.S.C. § 1104(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25, 34, 35, 47

29 U.S.C. 1105(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 3, 50

29 U.S.C. § 1107(d)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    25

29 U.S.C. § 1108(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    42

29 U.S.C. § 1144(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    14

**Rules**

29 C.F.R. §2509.75-8, D-2    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 42

29 C.F.R. 2509.96-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

29 C.F.R. 2550.404c-1(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

**Miscellaneous**

3 Arthur Corbin, *Corbin on Contracts*, § 24.21 (2001) . . . . . . . . . . . . . . . . . . . . . . 27, 28

H.R. Rep. No. 93-1280, at 317 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038,
    5097 (emphasis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

U.S. Code Congressional and Administrative News, pp. 5085-86 . . . . . . . . . . . . . . . . 48

U.S. Dep't of Labor, Op. No. 94-42A, 1994 WL 728564 (ERISA) (Dec. 9, 1994) . . . . . 31

In accordance with the Order Regarding Motion to Lift the Automatic Stay Pursuant to 11 U.S.C. § 362 signed by Judge Gonzalez on February 25, 2002, and this Court's February 27, 2002 Scheduling Order, Enron Corp. ("Enron") was served with the First Consolidated and Amended Complaint (the "complaint") in this case on June 21, 2002. Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Enron now moves to dismiss the complaint for failure to state a claim.

## I.    PRELIMINARY STATEMENT

Enron is a defendant in the five counts of the complaint brought under ERISA. In these counts, plaintiffs accuse Enron of breaching fiduciary duties to the Enron Corp. Savings Plan (the "Savings Plan"), the Enron Corp. Employee Stock Ownership Plan (the "ESOP"), the Enron Corp. Cash Balance Plan (the "Cash Balance Plan"), and in one instance to certain participants in the Cash Balance Plan. In certain counts, plaintiffs include a general allegation that Enron is liable as a co-fiduciary under 29 U.S.C. § 1105.

Each of the claims alleged against Enron must be dismissed as a matter of law. Many of the claims are legally insufficient because they are based upon the way the Savings Plan, the ESOP, or the Cash Balance Plan were designed by Enron years ago. For example, Enron is accused of "imposing . . . age and other restrictions" on the ability of participants in the Savings Plan and the ESOP to transfer assets out of Enron stock (TC Count I, ¶ 740)[1] These age and other restrictions were "imposed" upon the participants by the design of the plans, as set forth in the respective documents creating them.

---

[1] References to the First Consolidated and Amended Complaint are made by "TC" followed by the paragraph number(s) of the complaint.

Similarly, plaintiffs accuse Enron of "allowing" Savings Plan participants to invest their own money in Enron stock and of "allowing" the Savings Plan to accept Enron's matching contributions in the form of Enron stock. *Id.* In both instances, insofar as Enron is concerned, these acts were "allowed" to happen because the Savings Plan was designed to permit such investments and contributions. The legal flaw in these claims and others like them in the complaint is that the courts have clearly held that plan sponsors such as Enron do not act as fiduciaries in creating or designing ERISA plans, or in amending them.

Other claims against Enron are legally inadequate because they are based upon mis-constructions of the plans and their provisions. A good example is plaintiffs' accusation that Enron breached a fiduciary duty to the Savings Plan by not diversifying the assets held by the plan. (TC Count III) The sole basis for this claim is that section 15.3(c) of the Savings Plan supposedly demands diversification of investments. *Id.* at ¶ 764. In making this claim, plaintiffs ignore the very specific provision in section 19.5 of the Savings Plan which expressly provides that it is "authorized to acquire and hold up to 100% of its assets" in Enron stock.

Likewise, Enron is sued on behalf of the ESOP for allowing the change in third-party administrators to proceed in the fall of 2001 (the alleged "lockdown" claim). (TC Count II) Yet, under the unambiguous terms of the ESOP the "lockdown" occurred entirely within the regular monthly holding period during which ESOP participants are not able to transfer assets out of the plan. In other words, had there never been a change in third-party administrators in the fall of 2001, the ESOP participants would not have been able to sell their Enron stock from October 20 to November 30.

Another category of claims against Enron which must be dismissed are those apparently

tossed in by plaintiffs in the final ERISA count for which there are no supporting factual allegations. For example, plaintiffs allege that Enron breached fiduciary duties to all three plans by appointing unqualified fiduciaries to manage their assets. (TC Count V, ¶ 780) The only "facts" alleged in support of this claim are that Cindy Olson, Jim Prentice, and other unnamed members of the Administrative Committee were unqualified "as evidenced in part by their blatant breaches of their duties and utter lack of understanding of their role as fiduciaries as detailed in part below." *Id.* at ¶ 673. The allegations which follow this unsupported statement pertain only to Ms. Olson and Mr. Prentice – not to any of the other ten members of the Administrative Committee sued by plaintiffs in this case. Even as to Ms. Olson and Mr. Prentice, however, nothing in the succeeding allegations sets forth *facts* about their qualifications; what follows are paragraphs in which plaintiffs *argue* that they must have been unqualified because they did not perform as plaintiffs wish. *E.g.,* TC at ¶ 679-80 (recounting Ms. Olson's knowledge of an article on Enron in *Fortune* magazine and arguing that she must be unqualified to serve on the Administrative Committee because "she did nothing with respect to the information contained" in the article).

Similarly, the non-descript allegations of "co-fiduciary" liability against Enron are devoid of any factual support. In any complaint, but particularly in one which was prepared over many months and consumes 297 pages, the failure to allege facts in support of claims is fatal to those claims.

A final category of claims which must be dismissed are those based upon allegations that Enron mislead participants in the plans into acquiring Enron stock by making false statements about Enron's financial condition and business operations. *E.g.,* TC Count I, ¶ 740. The

essence of these claims is that Enron committed securities fraud by falsely representing its income and overstating its assets in disclosures made to investors, including those investing in Enron stock through the plans. *See, e.g., id.* at ¶¶ 2, 3, 7, 8, 197 ("To make Enron appear more attractive to employees and investors and to secure better credit ratings to decrease the cost of capital, defendants caused Enron to falsify its financial statements, eliminating unprofitable and debt-ridden subsidiaries from Enron's financial statements."). Indeed, the class period for this case begins on January 20, 1998, when Enron announced its results for 1997 to the investing public over the PR Newswire – not when Enron took any action with respect to the ERISA plans. *Id.* at ¶¶ 6, 204, 726.

These claims must be dismissed because the statements on which they are based were not made by Enron or its officers in an ERISA fiduciary capacity. Most of the allegedly misleading statements cited by plaintiffs in the complaint are taken from S.E.C. filings made by Enron or press releases issued by the company. *E.g., id.* at ¶¶ 204-39 (citing to allegedly false and misleading financial results reported in Enron's 10-K's, 10-Q's and press releases issued over the PR Newswire). Other of the allegedly misleading statements were made at "all-employee" meetings at Enron or in in-house publications. *Id.* at ¶¶ 240-72. There is no doubt, however, that a company which makes statements about its financial condition or business operations in the ordinary course of business is acting in its corporate/employer capacity, not as an ERISA fiduciary. Even if those statements have an adverse impact upon an ERISA plan or its participants, liability under ERISA can not be found.

In addition, these claims are not based upon the disclosure requirements in ERISA; rather, they are claims for alleged violations of the federal securities laws repackaged under the general

fiduciary duty provision of ERISA. Courts have been understandably reluctant to incorporate into ERISA disclosure obligations beyond those expressly contained in the statute. Particularly in this case, where the claims of plan participants are largely encompassed by the federal securities laws, and many of the participants are expressly included in the putative securities class in *Newby v. Enron Corp.*, the disclosure requirements of ERISA should not be expanded beyond their express terms.

## II.   SUMMARY OF THE COMPLAINT'S ALLEGATIONS THAT ENRON WAS AN ERISA FIDUCIARY

Enron was the "plan sponsor" of all three plans, meaning it was the employer that established the plans. (TC ¶ 43)  *See* 29 U.S.C. § 1002(16)(B) (ERISA section defining "plan sponsor" as "the employer in the case of an employee benefit plan established or maintained by a single employer"). Simply by virtue of being the plan sponsor, Enron did not owe fiduciary duties to the plans or their participants. *In re Fruehauf Trailer Corp.*, 250 B.R. 168, 205 (D. Del. 2000) ("[T]he corporate sponsor of a benefit plan . . . is generally not a fiduciary."); *Independent Ass'n of Publishers' Employees, Inc. v. Dow Jones & Company, Inc.*, 671 F.Supp. 1365, 1367 (S.D.N.Y. 1987) ("An employer does not fall under [ERISA section 3(21)(A) defining 'fiduciary'] by merely creating and financing a plan, i.e., by being the 'plan sponsor.'").

The complaint does *not* allege that Enron was a "named fiduciary" of the plans. *See* TC ¶¶ 43-46 (identifying Enron as the plan sponsor and the Administrative Committee as the "named fiduciary" for each of the plans).

The complaint also does *not* allege that Enron was responsible under the plan documents for management of the plans or for investment of plan assets. According to the complaint, these responsibilities were vested in others, such as the Administrative Committee. *Id.* at ¶¶ 672, 676-

77. Paragraph 672 of the complaint alleges that "the Administrative Committee was charged with the day-to-day or 'general administration' of the [Savings] Plan." More specifically, the complaint alleges that the Administrative Committee was responsible for making investment options available to participants in the Savings Plan (*id.* at ¶ 676) and "monitor[ing] the continued prudence of allowing the plan sponsor (Enron) to [provide the company matching contribution in Enron stock]." *Id.* at ¶ 677.

Further, the complaint does *not* allege that in practice Enron performed duties or functions with respect to management of the plans or investment of assets held by the plans, rendered investment advice for a fee in connection with the plans, or, except for the power to appoint and remove the members of the Administrative Committee, had discretionary authority in the administration of the plans.

What the complaint does allege is that Enron was an ERISA fiduciary to the plans because Enron, as plan sponsor, was responsible for appointing, removing and monitoring the plan fiduciaries, such as the Administrative Committee. (TC ¶¶ 674, 777)

## III.     COUNT I FAILS TO STATE A CLAIM.

Count I of the complaint alleges that Enron breached fiduciary duties to the Savings Plan and the ESOP by, in the case of the Savings Plan, allowing participants to purchase Enron stock and allowing the matching contribution from Enron to take the form of Enron stock, and, in the case of both the Savings Plan and the ESOP, imposing age and other restrictions on the ability of participants to sell Enron stock, and inducing participants to purchase or maintain Enron stock in their accounts.

The first set of these claims challenges the structure of the Savings Plan and the ESOP –

that the Savings Plan was designed to allow participants to purchase Enron stock with their

contributions, that the Savings Plan was designed to permit Enron to supply its matching

contribution with Enron stock, and that the Savings Plan and the ESOP required that participants

reach a certain age and satisfy other requirements before they could sell Enron stock received

from Enron's contributions. It is well-established, however, that plan sponsors such as Enron are

not acting as ERISA fiduciaries when they establish pension and other employee welfare plans.

In the absence of fiduciary status under ERISA, Enron cannot be held liable for the design

features of the Savings Plan or the ESOP.    The second set of claims in Count I are in the nature

of securities fraud – that Enron wrongfully induced participants in the Savings Plan and the

ESOP to acquire and maintain investments in Enron stock. These claims are legally insufficient

because they are based upon statements made by Enron in the ordinary course of its business – in

S.E.C. filings and press releases and in company-wide meetings and publications. Statements of

this nature are the nonfiduciary functions of a publicly held corporation in its corporate capacity;

they are not made in connection with the management or administration of an ERISA plan.

Moreover, ERISA provides for specific disclosure obligations, none of which are implicated by

plaintiffs' claims. There is no sound basis for allowing what are essentially claims for violation

of the federal securities laws to be actionable under ERISA.

### A.    The Settlor Doctrine Precludes Claims Based Upon Enron's Design of the Savngs Plan or the ESOP.

"In every case charging breach of ERISA fiduciary duty, . . . the threshold question is . . .

whether [the defendant] was acting as a fiduciary (that is, was performing a fiduciary function)

when taking the action subject to complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226, 120 S.Ct.

2143, 2152-53 (2000); *see also Lockheed Corp. v. Spink,* 517 U.S. 882, 888, 116 S.Ct. 1783,

1788 (1996) ("But in order to sustain an alleged transgression of § 406(a), a plaintiff must show

that a fiduciary caused the plan to engage in the allegedly unlawful transaction.  Unless a plaintiff

can make that showing, there can be no violation of § 406(a)(1) to warrant relief under the

enforcement provisions.").  Unless plaintiffs in this case can demonstrate that Enron was acting

as a fiduciary when it took the actions complained of in the complaint, there can be no claim for

breach of fiduciary duty under ERISA.

It is black letter law that employers and plan sponsors such as Enron are not acting as

fiduciaries when designing, adopting, amending, or even terminating ERISA plans.  *Hughes*

*Aircraft Co. v. Jacobson,* 525 U.S. 432, 444, 119 S.Ct. 755, 763 (1999) ("ERISA's fiduciary duty

requirement simply is not implicated where Hughes, acting as the Plan's settlor, makes a decision

regarding the form or structure of the Plan . . . "); *Lockheed Corp. v. Spink,* 116 S.Ct. at 1789

("Plan sponsors who alter the terms of a plan do not fall into the category of fiduciaries.").  As

the Court explained in *Lockheed Corp. v. Spink,* employers who undertake "to adopt, modify or

terminate welfare plans . . . do not act as fiduciaries, but are analogous to the settlors of a trust."

*Id.  See also Jones v. Kodak Medical Assistance Plan,* 169 F.3d 1287, 1292 (10th Cir. 1999)

("Indeed, an employer may draft a benefits plan any way it wishes; it does not act as a fiduciary

when it sets the terms of the plan.").  In short, Enron cannot be sued for breaching ERISA

fiduciary duties based upon the design of the Savings Plan or the ESOP.

**1.    The Savings Plan is designed to allow participants
the ability to purchase Enron stock with their contributions.**

In Count I of the complaint, Enron is sued for "allowing Savings Plan participants the

ability  to direct the Plan's fiduciaries to purchase Enron stock and have such stock allocated to

their individual accounts in exchange for monies participants contributed to the Plan as

deductions from their salaries." (TC ¶ 740) Participants in the Savings Plan were "allowed" to buy Enron stock with their contributions because the Savings Plan was designed to let them do so.

Under article 5.17 of the Savings Plan, each participant was allowed to designate the investment of his or her contributions "from among the Investment Funds made available from time to time by the [Administrative] Committee." (Joint Appendix, Tab A.1, at V-1)[2] The Savings Plan expressly authorized the Administrative Committee to make Enron stock one of the investment options for plan participants. Under article 19.5 of the Savings Plan, "[t]he Plan is specifically authorized to acquire and hold up to 100% of its assets in 'qualifying employer securities,' as such term is defined in Section 407(d)(5) of [ERISA]." *Id.* at XIX-2.

Enron cannot be liable for designing the Savings Plan to allow participants to invest in Enron stock.

### 2. The Savings Plan is designed to allow Enron's matching contribution in the form of Enron stock.

In Count I of the complaint, plaintiffs also accuse Enron of breaching ERISA fiduciary duties by "causing and allowing the Savings Plan to purchase or accept Enron's matching contributions to the Savings Plan in the form of Enron stock." (TC ¶ 740) The very design of the Savings Plan, however, permitted Enron to make its matching contribution in Enron stock. Article 5.16 of the Savings Plan directed that "the Company Contribution Accounts of the Participants *shall* be invested primarily in shares of Enron stock." (Joint Appendix, Tab A.1, at

---

[2] Citations to the plan documents are to the copies contained in the Joint Appendix in Support of Defendants' Motions to Dismiss the Amended and Consolidated Complaint ("Joint Appendix").

V-1) (emphasis added)  Moreover, under article 19.5, the Savings Plan was "specifically authorized to acquire and hold up to 100% of its assets" in Enron stock.  *Id.* at XIX-2.  Enron was not a fiduciary when it designed the Savings Plan so that Enron's matching contributions "shall be invested primarily in shares of Enron stock" and, further, "specifically authorized" the Plan to put all of its assets in Enron stock.

> **3.    The Savings Plan and ESOP are designed to place age and other restrictions on the ability of participants to sell Enron stock received through Enron's contributions.**

Also in Count I of the complaint, plaintiffs allege that Enron violated ERISA fiduciary duties by "imposing and maintaining age and other restrictions on the ability of the participants to direct the Savings Plan's fiduciaries to transfer Savings Plan and ESOP assets out of Enron stock." (TC ¶ 740)  As the wording of this allegation clearly indicates, it is directed at the design of the Savings Plan and ESOP (by "imposing" age and other restrictions) and thus cannot give rise to a claim against Enron under ERISA.

Under the Savings Plan, a participant's own contributions to the plan were completely under his or her investment control and could be allocated "among the Investment Funds made available from time to time by the Committee."  Savings Plan, art. V.17.  (Joint Appendix, Tab A.1, at V-1)  Only the Enron matching contribution under the Savings Plan was subject to the restriction that it "shall be invested primarily in shares of Enron stock." *Id.*  However, article 5.16(b) provided that

> upon a Participant's attainment of age fifty, such Participant may designate, in accordance with the procedures established from time to time by the Committee, the manner in which the amounts allocated to the Participant's Company Contribution Account are to be invested among the Investment Funds made available from time to time by the Committee.

*Id.* Thus, by design, the Savings Plan required participants to wait until age fifty before they could invest the Enron matching contribution in their accounts other than in Enron stock. Since this feature of the Savings Plan was created by Enron as the settlor of the plan, it is not subject to attack under ERISA.

The ESOP also contained restrictions on the ability of participants to transfer their accounts out of Enron stock. By definition, the ESOP is an employee stock ownership plan for Enron stock. Article II of the ESOP clearly explains that

> [t]he purpose of the Plan is to enable Members to acquire an ownership interest in Enron Corp. As a means of accomplishing such purpose, the assets of the Plan will at all times be invested primarily in Company stock.
> . . . .
>
> The Plan is also designed to provide a technique of corporate finance to the Company.

(Joint Appendix, Tab A.2, at II-1)

Effective January 1, 1996, the ESOP gave participants control over the Enron stock in their ESOP accounts. Article 13.2 of the ESOP permitted participants who were at least 50 years old and had five or more years of service to withdraw all of the Enron stock in their account. *Id.* at XIII-1. Other ESOP participants who did not meet these age and service requirements could withdraw Enron stock in their accounts at the rate of 20% per year beginning on January 15, 1996. *Id.* Since the ESOP was closed to employees hired after 1995 (article IV), by January 2000 all ESOP participants had the ability to withdraw all Enron stock in their accounts and invest it in other assets.

Under the settlor doctrine, Enron was not acting as a fiduciary when it designed these features of the ESOP, and therefore plaintiffs cannot bring an ERISA claim against Enron.



     **4.**     **The settlor doctrine precludes claims based upon**
                   **Enron's failure to amend the Savings Plan or the ESOP.**

"[A]n employer's *decisions* about the content of a plan are not themselves fiduciary acts."

*Pegram v. Herdrich,* 120 S.Ct. at 2153 (emphasis added); *see Hughes Aircraft Co.,* 119 S.Ct. at

763 ("ERISA's fiduciary duty requirement simply is not implicated where Hughes, acting as the

Plan's settlor, *makes a decision* regarding the form or structure of the Plan . . . .") (emphasis

added); *Johnson v. Georgia-Pacific Corp.,* 19 F.3d 1184, 1188 (7th Cir. 1994) ("One subject

conspicuously missing from [the definition of 'fiduciary' in ERISA] § 1002(21)(A) is the

establishment and amendment of the plan itself.").   For the same reason that an employer's

decision to amend an ERISA plan is not a fiduciary act – it is the decision of a settlor and does

not fall within the statutory definition of "fiduciary," an employer's decision *not* to amend the

plan is also not the act of a fiduciary.

To the extent that plaintiffs complain that Enron, as the plan sponsor, should have

amended the Savings Plan or the ESOP to disallow participants the ability to buy Enron stock

with their contributions, to disallow Enron's matching contributions to be in Enron stock, or to

remove age or other restrictions on the ability of participants to sell Enron stock, these are

decisions about the content of the Savings Plan or the ESOP and are not fiduciary acts.

    **B.**     **Plaintiffs' Claims Based Upon Allegedly Misleading Statements**
              **About Enron's Business and Financial Condition are not**
              **Actionable Under ERISA.**

        **1.**     **The fiduciary duty standards set forth in ERISA do not include an**
                   **affirmative duty to disclose plan sponsor's business or financial**
                   **condition.**

The essence of plaintiffs' claims is  that their Enron stock, over which plaintiffs largely

exercised investment control pursuant to the Savings Plan and the ESOP, declined precipitously

                                        

in value following the disclosure of negative information concerning Enron's financial condition. These allegations state claims, if at all, under the federal securities laws. However, plaintiffs have repackaged these claims in a complaint alleging violations of ERISA's general fiduciary provision. Courts have uniformly rejected similar efforts to expand the scope of the disclosure duties under ERISA to information beyond that expressly required under ERISA. *See* ERISA §§ 101-105, 29 U.S.C. §§ 1021-1025 (requiring disclosure of an annual statement of a plan's assets, liabilities, receipts and disbursements; and, upon request, a statement of a participant's or beneficiary's total accrued benefits and total non-forfeitable pension benefits).

The limitations on the duty under ERISA to disclose non-public financial information were underscored by the court in *Sweeney v. Kroger Co.*, 773 F. Supp. 1266 (E.D. Mo. 1991). In *Kroger Co.*, a former employee of Kroger, a publicly-traded company, elected to receive the value of his stock under the Kroger ESOP in cash. Prior to the date he received his distribution, the Haft family expressed interest in acquiring Kroger or control of Kroger. Plaintiff claimed that Kroger, as well as the Kroger ESOP, breached their fiduciary duties under ERISA by permitting him and other purported members of the class to sell their stock without full disclosure of the Haft family's interest and "for an amount known to be inadequate." *Id.* at 1268. Specifically, plaintiff contended that "ERISA imposes a fiduciary duty requiring the disclosure of information where such information is in the interest of the participants and the disclosure of information pertaining to the true value of his stock in connection with the Plan administrative transactions involving the stock." *Id.*

In granting defendants' motion to dismiss, the court concluded that plaintiff's disclosure claims "are not actionable under the ERISA fiduciary duty provision." *Id.* at 1269. The court

reasoned as follows:

> The Court notes that plaintiff does not allege that defendants violated the express disclosure requirements contained within ERISA, 29 U.S.C. §§ 1021-1030, but instead, his disclosure claims are asserted as a breach of fiduciary duty based upon defendants' failure to inform him of Kroger's condition with respect to the possibility of corporate restructuring and prospects with respect to the potential acquisition of Kroger or control of Kroger. The Court further concludes that plan administrators are not required to inform all Plan participants and beneficiaries of every corporate event, especially contingent events, that might impact the value of the company's common stock.

*Id. See also Childers v. Northwest Airlines, Inc.*, 688 F. Supp. 1357, 1361 (D. Minn. 1988) ("the plan administrator is required to disclose only the information specified in §§ 1021 through 1025 or in a plan's trust agreement"); *Watson v. Deaconess Waltham Hosp.*, 141 F. Supp. 2d 145, 149-50 (D. Mass. 2001) (same); *cf. Ehlmann v. Karser Found. Health Plan*, 198 F.3d 552, 555 (5th Cir.) (addressing duty to disclose physician compensation plans, the Circuit Court cautioned "[i]t is for Congress to determine whether to impose such a duty to disclose under ERISA and this court will not encroach on that authority by imposing a duty which Congress has not chosen to impose"), *cert. dism'd*, 530 U.S. 1291 (2000).

In contrast to ERISA, the federal securities laws establish a comprehensive statutory framework setting forth the circumstances in which an issuer of securities has a duty to disclose information – positive or adverse information – to shareholders. *See, e.g., Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 27 (1st Cir. 1987). As a general rule, purchasers of securities are entitled to the protections afforded by the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act" and collectively the "federal securities laws"). In particular, Rule 10b-5, promulgated under the Exchange Act, makes it unlawful "to make any untrue statement of a material fact or to omit to state a material fact necessary in order

to make the statements made, in light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." ERISA § 514(d), 29 U.S.C. § 1144(d), explicitly provides that "nothing in this title shall be construed to alter, amend, modify, invalidate, impair, or supercede any law of the United States or any rule or regulation issued under any such law." This clause demonstrates the clear Congressional intent in enacting ERISA to defer to established bodies of law, such as the federal securities laws. As a result, the court must look to the federal securities laws – not ERISA – to determine whether Enron has violated its disclosure duties owed to security holders, including plan participants.

That plaintiffs' claims that defendants failed to disclose material information concerning its financial condition are in reality claims for violation of the federal securities laws is easily demonstrated. First, the definition of the putative securities class in *Newby v. Enron* expressly includes "Enron employees who purchased Enron stock individually or for their 401(k) retirement plans." *Newby* Consolidated Complaint for Violation of the Securities Laws, ¶ 986 Second, the allegations of the complaint in this case plainly purport to allege securities fraud. To cite just a few examples:

¶ 6.    Beginning on January 20, 1998, when Enron reported its financial results for the year ending December 31, 1997, the Company systematically misrepresented its reported financial results by entering into elaborate transactions with related parties to obscure its actual financial results.

¶ 205.  On March 31, 1998, Enron filed its annual report on Form 10-K with the SEC. This Form 10-K contained the same false and misleading financial information as of January 20, 1998 press release, and was false and misleading for the same reasons.

¶ 213.  On March 31, 1999, Enron filed its annual report on Form 10-K with the SEC. This Form 10-K contained the same false and misleading financial information as the January 19, 1999 press

release, and was false and misleading for the same reasons.
Further, the assets and shareholders' equity figures were materially
overstated and the amount of debt carried by Enron was materially
understated, as detailed more fully in Section VII, *infra*.

¶ 424.  In addition to disclosing the nature and amounts of the
related party transactions in the Company's financial statements,
SEC regulations required Enron to make detailed disclosures about
any transactions with Enron's management in the non-financial
sections of any registration statements or annual reports.

*See also* complaint ¶¶ 225, 232 (asserting identical allegations with respect to Forms 10-K filed

on March 30, 2000 and April 2, 2001).  As made clear by these allegations, plaintiffs here are

doing nothing more than attempting to repackage alleged violations of the securities laws as

ERISA claims.  Third, the class period in this case is tied to Enron's public disclosures regarding

its business and financial condition – not to any action taken in connection with the ERISA

plans.  *See* complaint ¶¶ 6,204, 726 (class period begins on January 20, 1998, when Enron

announced its results for 1997 to the public over the PR Newswire).

### 2.    The allegedly misleading statements were made in Enron's corporate, non-fiduciary capacity.

Since there is no fiduciary duty under ERISA requiring corporate plan sponsors to

disclose information about their business operations or financial condition, plaintiffs must argue

that such a duty arises in Enron's case because of alleged misleading statements made by Enron.

However, a fiduciary duty based upon allegations of misleading statements arises only in limited

circumstances that are not alleged in this case.

As explained previously at pages 7-8, *supra*, Enron cannot be held liable for a breach of

fiduciary duty in allegedly making misleading statements about its financial condition unless it

was acting in a fiduciary capacity in making such statements.  *See Pegram*, 530 U.S. at 226, 120

S. Ct. at 2152-53. Thus, an initial determination must be made as to the capacity in which the employer's actions – in this case the allegedly misleading statements -- were made. As Justice Thomas observed, "The untruthfulness of a statement cannot magically transform it from a nonfiduciary representation into a fiduciary one; the determinative factor is not truthfulness but the capacity in which the statement is made." *Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 1088 (1996) (Thomas, J., dissenting). In making this determination, the focus is on the nature of the action taken by the employer/plan sponsor – not whether the action adversely effected an ERISA plan or its participants. *Sengpiel v. B.F. Goodrich Co.,* 156 F.3d 660, 666 (6th Cir. 1998) ("[T]he fact that an action taken by an employer to implement a business decision may ultimately affect the security of employees' welfare benefits does not automatically render the action subject to ERISA's fiduciary duties."), *cert. denied,* 526 U.S. 1016 (1999); *Akers v. Palmer,* 71 F.3d 226, 231 (6th Cir. 1995) ("ERISA does not require that day-to-day corporate business transactions, which may have a collateral effect on prospective, contingent employee benefits, be performed solely in the interest of plan participants.") (citations omitted).

Plaintiffs accuse Enron of misleading plan participants into acquiring and maintaining investments in Enron stock by making false statements about Enron's business operations and financial condition. (TC ¶ 740) According to plaintiffs, these allegedly misleading statements were made over the PR Newswire (*id.* ¶¶ 204, 223, 230, 233, 235), in Enron's quarterly and annual reports filed with the S.E.C. (*e.g., id.* ¶¶ 205, 213, 225, 232), in conference calls with securities analysts and institutional investors (*id.* ¶¶ 209, 239), and in registration statements filed with the S.E.C. (*id.* ¶¶ 206, 211, 216, 224, 226231). Each of these press releases, filings with the S.E.C., and statements made in conference calls with analysts and institutional investors were

made in Enron's corporate, nonfiduciary capacity. All were made in the ordinary course of Enron's business and had no connection with the management or administration of an ERISA plan – let alone the discretionary control by Enron of such a plan.

Plaintiffs also accuse Enron of making misleading statements about the company's financial situation in "all-employee" meetings and in company-wide publications. According to plaintiffs, in these statements Enron officers Lay, Skilling, Olson and others "consistently represented to employees that Enron's financial condition was strong and improving and that Enron's stock price was likely to increase." *Id.* ¶ 240. Yet, with one exception, not one of the statements made at "all-employee" meetings or in in-house publications had any connection with the ERISA plans at Enron.[3] In fact, most of the statements made to Enron employees contained little more than the information reported by the company in its public communications. *E.g., id.* ¶¶ 247 (reporting to employees that net income was up 53 percent and Enron stock was up 50 percent for the year), 248 (reporting to employees that revenues for the year are up 24 percent, net income is up 32 percent, and opining that "we've constructed something very, very special over the last decade"), 257 (reporting that revenues for the second quarter were up 75 percent and net income was up 30 percent). Enron made these statements in its corporate, nonfiduciary capacity. These statements were not made in connection with Enron's administration or management of the Savings Plan, the ESOP or the Cash Balance Plan.

---

[3]   According to plaintiffs' complaint, the one instance at which an ERISA plan was mentioned during the "all-employee" meetings or in the Enron in-house publication was at an "all-employee" meeting on December 1, 1999. (TC ¶ 250)  At that meeting, plaintiffs allege that Cindy Olson told employees that investing their 401(k) accounts in Enron stock was a good idea. *Id.* Whatever Ms. Olson's comment was intended to mean, and she has heartedly disputed plaintiffs' characterization of it, standing alone it cannot be sufficient to convert the entire contents of these meetings and publications from corporate, nonfiduciary communications to ERISA fiduciary communications.

The statements about Enron's financial condition and stock prices made by Enron executives at meetings of employees and in internal publications are very different from those found to be actionable under ERISA in *Varity Corp. v. Howe,* 516 U.S. 491, 116 S.Ct. 1065 (1996). In that case, Varity Corp. attempted to eliminate its obligation "to pay medical and other nonpension benefits to employees of Massey-Ferguson's money-losing divisions." *Id.* at 1068. Rather than do this directly by terminating these benefits outright, Varity attempted to achieve the same end by "inducing the failing divisions' employees to switch employers and thereby voluntarily release Massey-Ferguson from its obligation to provide them benefits." *Id.* at 1068-69. At a special meeting called by Varity to persuade the Massey-Ferguson employees to make the switch, "[t]he thrust of Varity's remarks . . . was that the employees' benefits would remain secure if they voluntarily transferred to Massey Combines." *Id.* at 1069.

The Supreme Court held that Varity's statements were made in its capacity as an ERISA fiduciary – not as plan sponsor/employer – because

> the key meeting, to a considerable extent, was about benefits, for the documents described them in detail, explained the similarity between past and future plans in principle, and assured the employees that they would continue to receive similar benefits in practice. The District Court concluded that the basic message conveyed to the employees was that transferring from Massey-Ferguson to Massey Combines would not significantly undermine the security of their benefits. And, given this view of the facts, we believe that the District Court reached the correct legal conclusion, namely, that Varity spoke, in significant part, in its capacity as plan administrator.

*Id.* at 1072. In reaching this conclusion, the Court made clear, however, that making statements to employees about a company's financial condition is not sufficient to transform an employer/plan sponsor into an ERISA fiduciary.

> We do not hold, as the dissent suggests, *post,* at 1086-87, that Varity acted

19

as a fiduciary simply because it made statements about its expected
financial condition or because 'an ordinary business decision turn[ed] out
to have an adverse impact on the plan.' *Post,* at 1091. Instead, we accept
the undisputed facts found, and factual inferences drawn, by the District
Court, namely, that Varity *intentionally* connected its statements about
Massey Combines' financial health to statements it made about the future
of benefits, so that its intended communication about the security of
benefits was rendered materially misleading. And we hold that making
intentional representations about the future of plan benefits in that context
is an act of plan administration.

*Id.* at 1074 (emphasis in original).

Unlike the key meeting in *Varity,* which was called for the purpose of and did discuss

medical and other benefits under the ERISA plan of the new company, the "all-employee"

meetings at Enron did not, with one possible exception, even mention the Savings Plan, the

ESOP or the Cash Balance Plan. Likewise, the in-house publications referred to in the complaint

make no mention of the company's ERISA plans. There was, in short, no mention of ERISA

plans or of plan benefits in the meetings and publications at Enron; accordingly, there is no basis

for concluding that Enron was acting as a plan fiduciary in making statements about its past and

future financial condition.

No court of which we are aware has held that an employer/plan sponsor is liable

as an ERISA fiduciary solely for making statements about its financial condition, even if

recipients of the statements include participants in an ERISA plan. At least one member of the

Supreme Court clearly has indicated that such statements are made in the nonfiduciary capacity

of a corporation and that ERISA liability should not attach to them:

An employer will also make countless representations in the course of
managing a business about the current and expected financial condition of
the corporation. Similarly, an employer may make representations that
either directly or indirectly evince an intention to increase, decrease or
maintain employee welfare benefits. Like the decision to terminate or

> modify welfare benefits, the decision to make, or not to make, such representations is made in the employer's 'corporate nonfiduciary capacity as plan sponsor or settlor,' *Borst v. Chevron Corp.,* 36 F.3d 1308, 1323 n.28 (5th Cir. 1994), cert. denied, 514 U.S. 1066 (1995), and ERISA's fiduciary rules do not apply. Such communications simply are not made in the course of implementing the plan or executing its terms. Rather, they are the necessary incidents of conducting a business, and Congress determined that employers would not be burdened with fiduciary obligations to the plan when engaging in such conduct. *See* § 3(21)(A)(iii).

*Varity Corp. v. Howe,* 116 S.Ct. at 1086-87 (Thomas, J., dissenting).

## IV.     COUNT II FAILS TO STATE A CLAIM.

Count II alleges that Enron breached its fiduciary duties by not postponing a transition of the ESOP and Savings Plan's third-party administrators and by failing to give sufficient notice of the resulting blackout period.  (TC ¶¶ 750-56.)

Count II fails to state a claim for three reasons: First, plaintiffs fail to fulfill the "injury in fact" requirement to maintain standing because they do not allege that they would have sold Enron stock prior to or during the blackout period absent the alleged misconduct.  Second, with respect to the ESOP, plaintiffs *could not* have suffered injury because there was no ESOP "lockdown" outside of the regularly scheduled monthly holding period.  Finally, plaintiffs' own allegations demonstrate that, as a matter of law, plaintiffs received adequate notice of the transition and resulting blackout period.

### A.     Plaintiffs Lack Standing to Assert a Claim Based Upon the Changeover of Third-Party Administrators.

None of the plaintiffs can demonstrate that he or she suffered any constitutionally sufficient "personal injury" from the transition of third-party administrators in the fall of 2001.



Therefore, plaintiffs lack standing to pursue claims related to the changeover.  To avoid

unnecessary duplication and burden upon the Court, Enron incorporates by reference the fuller

explanation of this argument contained in Section II.A of the Memorandum of Law in Support of

Motion to Dismiss on Behalf of Certain Administrative Committee Defendants and Mikie Rath.

**B.      Enron Is Not Liable for the Alleged "Lockdown" of the ESOP Because the "Lockdown" Occurred Inside the Regularly Scheduled Monthly Holding Period.**

Even if plaintiffs have standing to assert the "lockdown" claim, Count II fails insofar as it

seeks damages based on the alleged ESOP "lockdown."  Plaintiffs cannot demonstrate injury

with respect to the ESOP lockdown because no such lockdown occurred.

Plaintiffs acknowledge that the terms of the ESOP required participants to submit their

requests to sell assets held in the ESOP by the twentieth day of *any* month to be effective that

month.  (TC ¶¶ 180, 751)  *See* ESOP  ¶ 13.2(d) (Joint Appendix, Tab A.2, at XIII-1).[4]  That is,

participants could make investment decisions in a particular month only if their requests were

filed by the 20th day of that same month.  *Id.*  Any investment request received after the

twentieth would not be acted upon until the last day of the following month.  *Id.*  Thus, in

October 2001 – as in any other month – ESOP participants who did not provide a directive to sell

---

[4]   Paragraph 13.2(d) of the ESOP provides:

> All withdrawals pursuant to this Section 13.2 shall be made only as the last day of any month by executing and filing with the Committee the form prescribed by the Committee.  A withdrawal will be effective and the amount thereof determined as of the last day of a month if such form is filed on or before the twentieth day of such month.  If such form is filed after the twentieth day of a month, the requested withdrawal shall be effective and the amount thereof determined as of the last day of the next succeeding month.

ESOP ¶ 13.2(d) (Joint Appendix, Tab A.2, at XIII-1).

to Northern Trust Company by October 20th could not dispose of Enron stock until the end of November. *Id.*

Plaintiffs, however, allege they were *forced* to hold onto company stock because of the "lockdown" resulting from the change of third-party administrators. *See, e.g.*, TC ¶¶ 181 ("Each ESOP participant who did not provide a written distribution request to Northern Trust by October 20, 2001 was forced to hold onto the stock until November 14, 2001."), 712. Yet, according to the allegations of the complaint, the "lockdown" began on October 26th and ended on November 14, 2001, all of which occurred *entirely within* the window of the monthly plan-mandated holding period. *See id.* ¶¶ 751, 753. That is, the "lockdown" of which plaintiffs complain did not prevent plaintiffs from making any investment decisions they otherwise could have made according to the express terms of the ESOP. Accordingly, Count II should be dismissed insofar as plaintiffs seek damages relating to the alleged lockdown of the ESOP.

C.    **Plaintiffs Had Adequate Notice of the Blackout Period As a Matter of Law.**

Count II also fails to the extent that it alleges inadequate notice of the transition of third-party administrators and resulting blackout period. TC ¶ 756. Plaintiffs' own allegations demonstrate that, as a matter of law, defendants afforded plaintiffs sufficient notice of the blackout period.

Plaintiffs state that Enron had decided to transition to a new third-party administrator "sometime in 2001" and began planning for the transition in July of that year. *Id.* ¶ 710. Notice of the transition was given to plan participants well in advance of its start. Plaintiffs acknowledge that on October 8, 2001, a letter was sent to all ESOP participants advising them that unless their distribution request forms were received by Northern Trust on October 20 their

ESOP assets would remain in Enron stock until November 20. *Id.* ¶ 751. In response to such notices, plaintiffs filed "a slew of complaints . . . to Northern Trust urging Northern Trust to postpone the Lockdowns." *Id.* ¶ 715. Plaintiffs allege that they filed such complaints prior to October 17, 2001, after which time Enron contemplated their requests and engaged in an inquiry as to the feasibility of postponing the transition. *Id.* ¶¶ 710, 718. Plaintiffs further admit that *subsequently*, on October 25th, Enron sent its employees *one final reminder* of the approaching blackout. *Id.* ¶¶ 720-21. The blackout period did not begin until the next day, October 26. *Id.* ¶ 753.

Although plaintiffs attempt to portray the final notice as the *only* notice of the pending blackout, the allegations of the complaint clearly prove otherwise. On October 8, twelve days before the routine monthly deadline for ESOP participants to transfer funds and eighteen days before the blackout period began, notice was given of the impending switch of third-party administrators and of the date by which ESOP participants had to submit requests for asset transfers. That notice, among others which plaintiffs' complaint fails to mention, clearly was sufficient, as it allegedly prompted a "slew" of complaints from participants about the impending blackout period.[5] A second notice was given on October 25. Furthermore, plaintiffs admit that

_____

[5] In addition to the notices of the blackout period which plaintiffs admit were sent to participants on October 8 and 25, 2001, at least three other similar notices were sent: A pamphlet entitled "Money in Motion" was mailed to all Savings Plan participants on October 4, 2001. Under the heading "Transition Action Items," that pamphlet advised plan participants that October 26 was the last date for transfers of investment funds. It also explained that "during the transition period, you will NOT have access to your funds." On October 16, 2001, an e-mail was sent to Enron employees reminding them of the transition of third-party administrators and that October 26 was the last date for investment fund transfers under the Savings Plan. On October 22, 2001, another e-mail was sent to Enron employees reminding them that "October 26 is fast approaching" and that Friday, October 26, was the last day to transfer investment fund balances in the Savings Plan. True and correct copies of the "Money in Motion" pamphlet and the e-mails sent on October 16 and 22 are attached to this motion as Exhibits A, B, and C. Given that at least five separate notices of the

Enron responded to the complaints with an "inquiry" and *subsequently re-informed its employees of the pending blackout period.*    Presumably, if notice of the impending transition had been inadequate, plaintiffs would not have had sufficient time or information to file complaints; nor would the company have had the opportunity to research the feasibility of postponing the transition.  Accordingly, Count II should be dismissed insofar as plaintiffs seek damages relating to insufficient notice of the blackout period.

## V.    COUNT III FAILS TO STATE A CLAIM.

In Count III, plaintiffs assert that Enron breached its fiduciary duties by allowing assets in the Savings Plan to be "dangerously over-weighted in Enron stock," in violation of a plan provision allegedly requiring diversification of investments.  (TC ¶¶764-65)  Strikingly, however, plaintiffs never mention the key plan provision regarding diversification:  that the plan is authorized to hold all of its assets in Enron stock.  *See* Savings Plan ¶ 19.5 (Joint Appendix, Tab A.1, at XIX-2)

Moreover, plaintiffs concede, as they must, that in fact the Savings Plan offered participants a wide array of investment options, which undermines their assertion that the plan was not diversified.

### A.    The Savings Plan Does Not Require Diversification Away From Enron Stock.

Plaintiffs admit that ERISA exempts defined contribution plans, such as the Savings Plan, from a statutory diversification requirement to the extent that the plan invests in company stock.

---

transition were provided and that transfers of funds in the Savings Plan could be made on a daily basis, plaintiffs' claim of inadequate notice of the "lockdown" should be dismissed.

(TC ¶ 696) *See* ERISA § 404(a)(2), 29 U.S.C. § 1104(a)(2).[6]  They contend, however, that the

Enron Savings Plan requires diversification because it contains a provision repeating ERISA's

diversification language[7], and does not qualify this language, as ERISA section 404(a)(1) allows.

(TC ¶ 764)  In essence, plaintiffs plead that Enron, by statute, does not have to satisfy any

diversification requirements with regard to investments in Enron stock, but by Savings Plan

language has brought this requirement upon itself.

Plaintiffs reading of the Savings Plan language is incomplete and wrong.  Plaintiffs fail to

acknowledge the Savings Plan's unambiguous language regarding the acquisition of company

stock:

> **XIX.5  Acquisition and Holding of Company Stock.**  The Plan is specifically
> authorized to acquire and hold up to 100% of its assets in "qualifying employer
> securities," as such term is defined in Section 407(d)(5) of the Act.

Savings Plan ¶ 19.5 (Joint Appendix, Tab A.1, at XIX-2).

Not only does this language unambiguously allow for the Savings Plan to hold all of its

assets in company stock, it tracks the language of ERISA ("qualifying employer securities") that

is found in ERISA's exception to the diversification requirement, section 404(a)(2).  Plaintiffs

ignore this provision of the Savings Plan because they have to.  It completely undermines their

contention that the Savings Plan does not qualify, with regard to company stock, the application

---

[6] "In the case of an eligible individual account plan . . . the diversification requirement of paragraph (1)(C) . . . is not violated by acquisition or holding of . . . qualifying employer securities. . . ." 29 U.S.C. § 1104(a)(2).  Plaintiffs admit that the Enron Savings Plan was an eligible individual account plan (TC § 158), and ERISA defines "qualifying employer securities" to include company stock.  ERISA § 407(d)(5), 29 U.S.C. § 1107(d)(5).

[7] Section 15.3 of the Savings Plan sets forth the four aspects of fiduciary duty that are found in ERISA § 404(a)(1).  The duty of diversification set forth in section 15.3(c) is taken from the standard set forth in ERISA § 404(a)(1)(c), with virtually the same language.

of the general fiduciary duty of diversification. This provision unambiguously qualifies that requirement: if you can hold up to 100% of Plan assets in company stock, there is no diversification requirement with respect to Enron stock.

Plaintiffs' wholesale reliance on the fiduciary duties section of the Savings Plan, and failure to account for the very specific provision allowing 100% of the assets to be invested in Enron stock, flies in the face of standard statutory construction.[8] No one phrase or provision should be considered apart from other provisions. *See generally Weingarten Realty Investors v. Albertsons, Inc.*, 66 F. Supp. 2d 825, 839 (S.D. Tex. 1999), *aff'd*, 234 F.3d 28 (5th Cir. 2000) (citing *Guardian Trust Co. v. Bauereisen*, 121 S.W.2d 579, 583 (1938); 3 Arthur Corbin, *Corbin on Contracts*, § 24.21 (2001). All provisions must be considered with reference to the entire document. *See generally Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Thus, the Savings Plan's diversification requirement must be read in conjunction with the provision allowing the Savings Plan to invest 100% of its assets in company stock. It must also be read in conjunction with other provisions of the plan that make clear that Enron stock was to be a major component of the plan. *See, e.g.*, Savings Plan ¶ V.16(a) (investment of company contributions shall be made primarily in Enron stock) (Joint Appendix, Tab A.1, at V-1). The 100% provision was plainly added to allow the plan more authority under ERISA than it otherwise would have. The legislative history of ERISA makes clear that language in plan

---

[8] The Savings Plan provides that its provisions shall be construed in accordance with the laws of Texas except to the extent preempted by federal law. Savings Plan ¶ 19.10 (Joint Appendix, Tab A.1, at XIX-2).

documents authorizing the plan to hold "up to" a specified percentage of employer securities means that diversification principles do not apply to holdings of that percentage.[9]

Even if one read into the Savings Plan a conflict between its inclusion of a diversification requirement in its general definition of fiduciary duty and the provision specifically allowing the Savings Plan to invest 100% of its assets in company stock, the specific provision trumps the general. *See, e.g., United States Postal Serv. v. American Postal Workers Union*, 922 F.2d 256, 260 (5th Cir.), *cert. denied*, 502 U.S. 906 (1991); *Acceptance Ins. Co. v. Walkingstick*, 1995 U.S. Dist. LEXIS 7619, *9 (S.D.Tex. Ap. 25, 1995) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). *See generally* 3 Arthur Corbin, *Corbin on Contracts*, § 24.23 (2001). Section 19.5's admonition that up to 100% of the assets of the plan can be invested in Enron stock is clearly a more specific provision than Section 15.3's general admonition of fiduciary duties. The former trumps the latter; therefore, the Savings Plan can only be read as allowing unlimited investment in Enron's stock, as allowed under ERISA § 404(a)(2).

A final pertinent principle of contract construction is that all provisions of a contract should be given effect so that no one provision is rendered meaningless. *See generally Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 575 (Tex. 1996); 3 Arthur Corbin, *Corbin on Contracts*, § 24.22 (2001). Plaintiffs interpretation of the diversification

---

[9] The Conference Report states that diversification requirements do not restrict investment in employer securities "if the plan explicitly provides for the relevant amount of acquisition or holding of qualifying employer securities" and gives an indistinguishable example of such an explicit provision: "For example, if a profit-sharing plan is to be able to invest half of its assets in qualifying employer securities, the plan must specifically provide that *up to* 50 percent of plan assets may be so invested. In this way, the persons responsible for asset management, as well as participants and beneficiaries, will clearly know the exten[t] to which the plan can acquire and hold these assets." *See* H.R. Rep. No. 93-1280, at 317 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5097 (emphasis added).

clause, limiting (in fact, eliminating) investment in Enron stock, renders meaningless the

provision allowing for 100% of Savings Plan assets to be invested in Enron stock. Enron's

interpretation of the 100% provision, however, does not render meaningless the diversification

clause. That clause requires the Savings Plan to offer a wide array of investment options to

facilitate diversification. As discussed below, plaintiffs make no allegation that Enron failed to

do so.

**B.      The Savings Plan Offered Participants a Wide Array of Investment Options.**

Nowhere in the complaint do plaintiffs allege a lack of investment funds from which to

choose, or a lack of information regarding their choices. In fact, they concede (as they must) that

a multitude of diverse options were offered. (TC ¶¶ 161, 167) Plaintiffs only "complaint"

regarding diversification is that too many of the plan's assets were invested in Enron stock.

Specifically, plaintiffs complain that as of January 1, 2001, the plan participants had invested

more than 62% of their assets in Enron stock. *Id.* ¶ 273.

Plaintiffs, of course, are measuring the value of Enron stock at the height of its stock

price, a price that they further allege was grossly inflated and not close to its true value. Be that

as it may, the allegation has nothing to do with diversification of assets, but rather a combination

of the participants' enthusiasm for the stock and, according to plaintiffs, the artificially high

price.[10] These factors, not a lack of other investment opportunities, lead to plaintiffs' 62%

figure.[11]

---

[10] While plaintiffs do allege that Enron and others breached fiduciary duties in encouraging investment in the stock, that allegation is relevant only to Count I of the Complaint. It is irrelevant to plaintiffs' diversification arguments in Count III.

[11] In any event, concentrations at this level and higher have been held *insufficient* to support a claim that a diversification duty had been breached. *See, e.g., Metzler v. Graham*, 112 F.3d 207

In fact, participants in the Savings Plan had a wide array of investment choices. While plaintiffs' complaint acknowledges that the Savings Plan offered "alternative investments," the truth is that the Savings Plan offered 19 diverse investment funds that participants could trade in and out of on a daily basis. (Testimony of James Prentise before Senate Comm. on Health, Education, Labor and Pensions) (Joint Appendix, Tab C.1, at page 50 0f 61). Attached to this motion as Exhibit D is a summary of the many investment options offered to participants in the Savings Plan. The Savings Plan offered a wide array of investment options, which is why plaintiffs entirely fail to make any factual allegations regarding a lack of diversification.

## VI.    COUNT IV FAILS TO STATE A CLAIM.

### A.    The Cash Balance Plan Was Designed With An Offset Based Upon The Market Price Of Enron Stock Being Simultaneously Released To The Participants Under The ESOP.

In Count IV, plaintiffs assert that Enron, along with the Enron ERISA Defendants and the Cash Balance Plan,[12] breached their fiduciary duties by calculating the offset specified in the Cash Balance Plan utilizing the actual market price of Enron stock for the years 1998 through 2000 rather than what plaintiffs contend was the "true value" of the stock – some theoretical lower value. (TC ¶¶ 772, 775) The offset arrangement provisions in the Cash Balance Plan, as amended on October 12, 1995 and effective January 1, 1996, provide for the offset of pension

---

(5th Cir. 1997) (rejecting DOL challenge to investment of 63% of plan assets in a single piece of undeveloped real estate); *Reich v. King*, 867 F. Supp. 341 (D. Md. 1994), *aff'd*, 98 F.3d 147 (4th Cir. 1996) (rejecting DOL challenge to admittedly non-diversified investment of 77% of plan assets in residential mortgages, and 70% of those assets in a single county).

[12] The Cash Balance Plan itself is not named as a defendant in the Complaint. *See* TC, ¶¶ 43-156. Furthermore, although neither the Administrative Committee nor the ESOP Administrative Committee had any responsibility for the Cash Balance Plan, plaintiffs purport to bring Count IV against those committees as "Enron ERISA Defendants." *See* TC ¶¶ 44, 45, 62; at 258 (heading of Count IV).

benefits accrued from January 1, 1987 to December 31, 1994 to be fixed over a five-year period commencing in 1996 and ending in 2000.  As one-fifth of the Enron stock held in each participant's account in the ESOP was released on an annual release date – enabling the participant to convert such shares to cash or other investments – the offset amount in the Cash Balance Plan was fixed based upon the quoted price of Enron stock on the New York Stock Exchange composite tape on each respective release date.  Cash Balance Plan, Art. V (Joint Appendix, Tab A.3, at V-3); TC ¶ 186.

Plaintiffs do not complain that the amendment and restatement of the Enron Corp. Retirement Plan ("Retirement Plan") into the Cash Balance Plan effective January 1, 1996 (including the phaseout of the Enron ESOP offset) was improper or otherwise invalid.[13]  Nor do plaintiffs complain about the calculation of offsets in 1996 and 1997.  Rather, plaintiffs allege

---

[13]  Indeed, there would be no legal basis to complain that the amendment and restatement were improper as it cannot be disputed that Enron, as the sponsor of the Cash Balance Plan and its predecessor, the Retirement Plan, properly reserved its right to amend the plan and that right could be exercised "from time to time."  Retirement Plan, § 16.1; Cash Balance Plan, § 21.1 (Joint Appendix, Tab A.3, at XXI-1).  Moreover, both the U.S. Department of Labor and the Internal Revenue Service, the agencies with concurrent jurisdiction in the oversight of qualified pension plans, determined that the amendment and restatement were consistent with both ERISA and the Internal Revenue Code.  See U.S. Dep't of Labor, Op. No. 94-42A, 1994 WL 728564 (ERISA) (Dec. 9, 1994) (finding that proposed amendment of the Cash Balance Plan and Enron ESOP to progressively terminate the floor-offset arrangement over a five- year period would not render the grandfather provision contained in Section 9345(a)(3) of Omnibus Budget Reconciliation Act of 1987 inapplicable during the period that the arrangement was being terminated); IRS Determination Letter for "Enron Corp Cash Balance Plan Formerly Enron Corp Retirement" (Jan. 22, 1997) (making a "favorable determination" as to the qualified status of the Cash Balance Plan under the Internal Revenue Code with specific reference to the "10-12-95" amendment, which included the phaseout of the Enron ESOP offset).  Finally, the Cash Balance Plan's use of the actual market price of Enron stock on the New York Stock Exchange is entirely consistent with ERISA.  Under ERISA, "adequate consideration" for purposes "of a security for which there is a generally recognized market" is defined as "the price of the security prevailing on a national securities exchange which is registered under section 6 of the Securities Exchange Act of 1934."  ERISA § 3(18), 29 U.S.C. § 1002(18) (emphasis supplied).

that defendants breached their fiduciary duties by using the "artificially inflated market price" rather than the "true value" of Enron stock in computing the fixed offsets from 1998 through 2000. (TC ¶ 773)

Despite plaintiffs' efforts to present a claim of breach of fiduciary duty in the application of the offset provision, Count IV is nothing more than a challenge to the original plan design of the offset feature of the Cash Balance Plan. That plan design, however, plainly constitutes a settlor function and does not, as a matter of law, implicate any fiduciary duty under ERISA. Moreover, a challenge to the implementation of such plan design cannot be sustained against Enron since Enron had no responsibility for calculating the offset amount under the Cash Balance Plan, and, in any event, the calculation of the offset amount was a ministerial function that did not implicate any fiduciary duties. Finally, the calculation of the offset by any means other than by reference to the market price of Enron stock would be a breach of fiduciary duty under Section 404(a)(1)(D) of ERISA because such a calculation would be inconsistent with the terms of the Cash Balance Plan.

### 1.    Design of the Cash Balance Plan is not a fiduciary act.

As explained previously at pages 7-8, *supra,* under settled case law, conduct relating to the formation or structure of an ERISA plan are matters of "plan design" and, therefore, are undertaken by an employer in its capacity as a "settlor" of the plan, not as a "fiduciary." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 443-45, 119 S. Ct. 755, 763 (1999); *Lockheed Corp. v. Spink*, 517 U.S. 882, 889-91, 116 S. Ct. 1783, 1789-90 (1996).

In *Hughes Aircraft Co.*, the Supreme Court reaffirmed the settlor-fiduciary distinction. The Hughes defined benefit pension plan was initially designed to require contributions from

both Hughes and its employees, which resulted in a substantial plan surplus. Hughes, acting in

its own corporate interests, suspended its own contributions to the plan while maintaining the

mandatory employee contributions and amended the plan to exploit that surplus by: (i) providing

that new participants could not contribute to the plan and would thereby receive fewer benefits

and (ii) requiring existing participants to maintain their contribution levels to keep the existing

benefit levels or opt to be treated as new participants and receive lower benefits. The

amendments were challenged on breach of fiduciary duty grounds, based on the contention that

the surplus was being depleted to fund the noncontributory structure of the plan to the benefit of

Hughes and detriment of existing participants and beneficiaries. *Id.* at 525 U.S. at 436-37, 119 S.

Ct. at 759-60.

The Supreme Court held that the amendments were made by Hughes in its capacity as a

settlor and, therefore, not subject to ERISA's fiduciary standards:

> In general, an employer's decision to amend a pension plan concerns the
> composition or design of the plan itself and does not implicate the employer's
> fiduciary duties which consist of such actions as the administration of the plan's
> assets. . . . ERISA's fiduciary duty requirement simply is not implicated where
> Hughes, acting as the Plan's settlor, makes a decision regarding the form or
> structure of the Plan such as who is entitled to receive Plan benefits and in what
> amounts, or how such benefits are calculated.

*Id.* at 444, 119 S. Ct. at 763 (emphasis supplied).

Here, as in *Hughes Aircraft Co.*, the decision to fix the offset in the Cash Balance Plan by

reference to the market price of Enron stock as quoted on the New York Stock Exchange was a

decision regarding "how such benefits are calculated" and "concerns the composition or design

of the plan itself and does not implicate the employer's fiduciary duties." *Id. See also Izzarelli v.

Rexene Products Co.*, 24 F.3d 1506, 1522-25 (5th Cir. 1994) (holding that employer, which

amended pension plan to re-value shares as high a value as possible and to ensure that as few

shares as possible were allocated to participants in connection with an impending sale, was not

acting as a fiduciary and "'thus cannot violate its fiduciary duty'") (emphasis in original).

> 2.   **Calculation of the offset under the Cash Balance Plan constituted a ministerial function of the Cash Balance Plan Administrative Committee, and the committee had no discretion to override the calculation methodology specified in the plan.**

Plaintiffs seek to avoid these controlling Supreme Court precedents regarding the non-

fiduciary character of plan design decision by alleging that defendants should have ignored the

applicable plan provisions relating to the precise method for making offset calculations and

substituted some other offset amount. This contention is wrong as a matter of law. As a

preliminary matter, only the Cash Balance Plan Administrative Committee – and not Enron – had

the responsibility for calculating the offset. See Cash Balance Plan, §§ 17.7, 19.2 (Joint

Appendix, Tab A.3, at XVII-2, XIX-1). The Cash Balance Plan Administrative Committee had

the responsibility for making the offset calculation in accordance with the plain language of the

plan document. See ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (fiduciaries must

discharge their duties in accordance with the documents and instruments governing the plan).

The calculation of the offset amount was set forth in a mathematical formula in the plan

document. See Cash Balance Plan, Art. V; Exhibits I through IV (Joint Appendix, Tab A.3, at

Exhibits I - IV). The Cash Balance Plan Administrative Committee had no authority or

discretion to override the offset provision of the Plan. Id., § 5.5 ("Exhibits I through IV to this

Plan provides examples of the calculations to apply the provisions of this Article V and such

examples shall constitute the definitive interpretation of the provisions of the Article V.")

(emphasis supplied). The Cash Balance Plan Administrative Committee was charged with the

powers and duties to "supervise the administration and enforcement of the Plan <u>according to the terms and provisions hereof</u>." *Id.*, § 17.7 (emphasis supplied). The offset amount was calculated by reference to the "Market Value" of Enron stock on the release date, which was defined as "the closing price for such share as reported on the New York Stock Exchange Composite Tape." *Id.*, § 5.2(g). Accordingly, any calculation of that amount constituted a "purely ministerial function" not requiring the exercise of discretion and therefore cannot form the basis of a cognizable ERISA fiduciary challenge. *See* 29 C.F.R. § 2509.75-8, D-2 Q&A; *Fitch v. Chase Manhattan Bank, N.A.*, 64 F. Supp.3d 212, 229 (W.D.N.Y. 1999) (holding that employer was not acting as a fiduciary when it prepared and issued benefit estimates under voluntary retirement program).

Indeed, had the Cash Balance Plan Administrative Committee sought to calculate the offset by any other means, the committee would have breached its fiduciary duties under ERISA. *See Donovan v. Daugherty*, 550 F. Supp. 390, 409-10 (S. D. Ala. 1982) (holding that trustees breached Section 404(a)(1)(D) of ERISA in allowing themselves and counsel to participate in and receive benefits from pension plans in violation of plan documents).

*   *   *

In sum, plaintiffs' challenge to the calculation of the offset in the Cash Balance Plan based upon the actual market price of Enron stock as quoted on the New York Stock Exchange for the years 1998 through 2000 is a challenge to plan design and therefore cannot be sustained as a breach of fiduciary duty claim as against Enron. There was no fiduciary obligation on the part of anyone to value Enron stock on any other basis for purposes of calculating the offset because the plan provisions specified the precise methodology to be used and left no aspect of the offset



calculation to fiduciary discretion.  Thus, Count IV cannot form the basis of a legally cognizable ERISA claim.

**B.      The Complaint's Express Allegations Negate Any Injury To Participants In The Cash Balance Plan.**

       **1.      The complaint demonstrates that when the ESOP offset calculation was made, the participants had the Enron shares in their ESOP accounts  and were free to sell them.**

It is undisputed that, at the time each one-fifth increment of the Enron stock held in a participant's ESOP account was released and the offset to the Cash Balance Plan was fixed, the participant had the right to (i) withdraw the shares of released Enron stock in the participant's ESOP account, (ii) leave them in the Enron ESOP, or (iii) roll them over either to an individual retirement account or to the Savings Plan.  TC ¶ 186; ESOP, § 13.2; Cash Balance Plan, § 5.2(c) (Joint Appendix, Tab A.2, at XIII-1; Tab A.3, at V-1).  Thus, by January 15, 2000, all Enron stock in a participant's Enron ESOP account was fully released to the investment control of the participant under the Enron ESOP.  ESOP, § 13.2.

In *Brengettsy v. LTV Steel (Republic) Hourly Pension Plan*, 241 F.3d 609 (7th Cir. 2001), a retiree filed a class action suit challenging the floor-offset arrangement of the pension plan of his former employer in circumstances quite analogous to the challenge posed here.  There, a participant's pension benefit was offset by the actuarial value of the participant's defined contribution account balance on the date of retirement.  The plaintiff had elected to defer the liquidation of his defined contribution account so that, at the time of liquidation, the actuarial value of that account was lower than at his retirement.  *Id.* at 610-12.

The Seventh Circuit Court of Appeals affirmed summary judgment in favor of defendants, reasoning as follows:



The plaintiff's complaint focuses on the possible discrepancy between the annuitized value of a defined contribution account on the date of his retirement and that value when he decides to liquidate the account, which as we noted he can defer doing. The price of an annuity is inverse to interest rates. . . . [T]he higher the interest rate the higher the annuity's yield to the annuitant and therefore for a given sum available to buy an annuity the monthly benefits generated by the purchase of the annuity will be greater the higher the interest rate when it's purchased. The plaintiff retired on the last day of 1995 but did not liquidate his defined contribution account until July of the following year. Apparently, interest rates fell during this interval, because the annuitized value of his account declined, and as a result the expected value of his retirement benefit (the sum of the defined benefit determined back in December and the benefit the plaintiff could have gotten by using the full assets in his defined contribution account in July to buy an annuity) fell. The floor turned out to be a ceiling.

It is difficult, however, to understand what injustice resulted. By waiting to liquidate his defined contribution account, the plaintiff was speculating on interest rates. If he wanted certainty, he should have liquidated the account when he retired.

Id. at 611-12 (emphasis supplied).

Just like the plaintiff in *LTV Steel (Republic) Hourly Pension Plan*, if plaintiffs here wanted certainty with respect to the benefit to be received by them through the Enron ESOP that was used to fix the offset to the Cash Balance Plan benefit, they could have converted to cash the shares released to them from the Enron ESOP immediately following the release dates. But plaintiffs here chose to maintain this component of their pension benefits at risk by not converting the Enron stock released by the Enron ESOP.

### 2. Count IV is merely an effort to recast plaintiffs' claims with respect to the Enron ESOP.

In reality, Count IV is simply a repetition of plaintiffs' claim under the ESOP. *See* TC, Counts I and II. As plaintiffs themselves acknowledge, the shares of Enron stock in the ESOP Retirement Account "are at issue in this lawsuit" (TC ¶ 169) – the very same account used to

offset benefits under the Cash Balance Plan. *See* ESOP, § 13.2; Cash Balance Plan, § 5.2(c) (Joint Appendix, Tab A.2, at XIII-2; Tab A.3, at V-1). It is the drop in the value of those shares about which plaintiffs actually are complaining. Count IV impermissibly seeks double recovery for the same alleged improper act, and should therefore be dismissed outright. *See Montgomery v. Aetna Plywood, Inc.*, 39 F. Supp.2d 915, 939 (N.D.Ill. 1998) (holding that ESOP participants, who established liability of nonsettling ESOP fiduciaries for having sold ESOP's stock back to the company for inadequate consideration, were required to offset amount recovered in settlement with settling fiduciaries against damages awarded against nonsettling fiduciaries in order to avoid a double recovery windfall); *Harms v. Cavenham Forest Indus., Inc.*, 984 F.2d 686, 693 (5th Cir.) ("What the beneficiaries seek, as they forthrightly conceded at oral argument, is merely a double-recovery windfall – a result abhorred by ERISA."), *cert. denied*, 510 U.S. 944 (1993).[14] Moreover, if the plaintiffs have any claim relating to the decline in value of their Enron stock held in the ESOP, it is a securities law claim, as described at pages 12-16, *supra*, not a claim under ERISA arising from the calculation of the fixed offset in the Cash Balance Plan.

### C.    Count IV Is An Impermissible Claim For Benefits Under The Cash Balance Plan, Not A Claim For Breach Of Fiduciary Duty.

Unlike the other ERISA claims for relief asserted in the complaint on behalf of the plans, Count IV is brought by "Certain Retirement Plan Participants and Beneficiaries" in the Cash Balance Plan. TC at 258 (heading of Count IV). Plaintiffs seek an injunction ordering defendants to compute the value of each component of the offset during the period 1998 through 2000 in accordance with the "true value" of the Enron stock on the respective release dates and to

---

[14] *See also* Memorandum of Law in Support of Motion to Dismiss on Behalf of Certain Administrative Committee Defendants and Mikie Rath, at 44 n.47.

redress all damages flowing from prior Cash Balance Plan payments made pursuant to the Offset Arrangement. TC ¶ 775, § XV.C. Plaintiffs do not contend that the Cash Balance Plan itself suffered any losses as a result of the alleged fiduciary breach.

Plaintiffs are not seeking to recover plan losses but only the decrease in plan benefits allegedly due them. Thus, Count IV fails to state a claim for which relief can be granted on a number of grounds. First, Count IV is a disguised claim for benefits under ERISA Section 502(a)(1)(b) because it seeks benefits under the Cash Balance Plan based upon what plaintiffs contend is the appropriate interpretation of the offset provisions. Accordingly, Count IV cannot be maintained under Section 502(a)(3) of ERISA. Second, plaintiffs have failed to allege in their complaint that they have exhausted plan remedies under the Cash Balance Plan for a claim for benefits. Without having satisfied such requirement, plaintiffs cannot bring a claim for plan benefits in federal court. Finally, the relief sought under Count IV does not constitute "appropriate equitable relief" and therefore is not available against Enron under Section 502(a)(3). To avoid unnecessary duplication and burden upon the Court, Enron hereby incorporates by reference the fuller explanation of these points set forth in Sections IV.B and IV.C of the Admin. Comm. Defendants Memorandum.

## VII. COUNT V FAILS TO STATE A CLAIM.

In Count V, plaintiffs claim that Enron, as well as the Compensation Committee Defendants, breached their fiduciary duties under ERISA by (i) appointing and failing to remove fiduciaries who were "not qualified" to loyally and prudently manage the plans' assets, (ii) failing to monitor adequately the fiduciaries' investment of plan assets and implementation of plan terms, and (iii) failing to disclose to the investing fiduciaries certain "material facts concerning

492662v1/005859                                    39



the financial condition of Enron." TC ¶ 780. However, none of these claims is supported by allegations sufficient to state a cognizable claim under ERISA.

### A. The Complaint Fails To Allege Facts Sufficient To State A Claim That Enron Breached Its Fiduciary Duties Under ERISA In Its Appointment And Monitoring Of The ESOP Administrative Committee, Cash Balance Plan Administrative Committee And Northern Trust And In Failing To Make Disclosure To Them Of Non-Public Information.

Plaintiffs make no factual allegations to support their conclusory allegation that any member of the ESOP Administrative Committee or the Cash Balance Plan Administrative Committee or Northern Trust was "not qualified." See TC ¶¶ 672-73 (relating only to Savings Plan Administrative Committee). Similarly, plaintiffs make no factual allegations to support their conclusory allegation that Enron failed to monitor any of them. *See id.* ¶¶ 672-75 (relating only to Savings Plan Administrative Committee). Finally, plaintiffs make no factual allegations to support their conclusory allegation that Enron failed to disclose to them certain material facts concerning the financial condition of Enron. *See id.* ¶ 675 (relating only to Savings Plan Administrative Committee). "[T]o avoid dismissal for failure to state a claim, a plaintiff must plead specific facts, not mere conclusory allegations," and "'[c]onclusory allegations and unwarranted deductions of facts are not admitted as true' by a motion to dismiss." *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992) (internal quotation marks omitted). *See also Jeanmarie v. United States*, 242 F.3d 600, 602 (5th Cir. 2001) ("[W]e may not rely on conclusional allegations or legal conclusions that are disguised as factual allegations."); *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993) ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."). Accordingly, plaintiffs' allegations regarding Enron's appointment and



monitoring of, and disclosure to the ESOP Administrative Committee, the Cash Balance Plan

Administrative, and Northern Trust fail to state valid claims that Enron breached ERISA's

fiduciary provisions (TC ¶¶ 777, 780).[15]

### B. The Complaint Fails To Allege Facts Sufficient To State A Claim That Enron Appointed Members Of The Savings Plan Administrative Committee Who Were Not Qualified.

While it is undisputed that Enron had the power to appoint and remove the members of

the Savings Plan Administrative Committee (*see* Savings Plan, § 15.2), plaintiffs make no factual

allegations to support their conclusory allegations that those fiduciaries were "not qualified."

Plaintiffs simply allege that the members of the Administrative Committee were "plainly

unqualified to serve as fiduciaries" as "senior Enron officials" and as "evidenced by the their

blatant breaches of their duties and utter lack of understanding of their roles as fiduciaries as

detailed in part below." TC ¶ 673. These allegations are insufficient as a matter of law to state a

valid claim for breach of fiduciary duty under ERISA.

First, plaintiffs insinuate that, by virtue of their position as alleged "senior Enron

officials," members of the Administrative Committee were unqualified. However, there is no

prohibition on senior corporate officials assuming a fiduciary role under ERISA. In fact, ERISA

specifically allows a person who is an officer of an employer to serve as a fiduciary. ERISA §

408(c)(3), 29 U.S.C. § 1108(c)(3). Moreover, it is well-established that officers of an employer

---

[15] In addition, the inclusion of the Cash Balance Plan on behalf of which Count V is brought
is misplaced. TC at 260 (heading of Count V). The gravamen of Count V is the continued
investment in Enron stock under the Savings Plan and ESOP. *See* TC ¶¶ 778, 780-81. As
discussed in Section IV, the Cash Balance Plan itself was not invested in any Enron stock.
Therefore, there can be no breach of a fiduciary duty by Enron relating to its appointment,
failure to remove, failure to monitor adequately or failure to disclose based on the continued
investment of plan assets in Enron stock with respect to the Cash Balance Plan.

may wear "two hats" – a fiduciary hat and a corporate hat – so long as "the fiduciary with two hats wear[s] only one at a time, and wear[s] the fiduciary hat when making fiduciary decisions." *Pegram v. Herdrich*, 530 U.S. 211, 225, 120 S. Ct. 2143, 2152 (2000). *See also Izzarelli v. Rexene Prods.Co.*, 24 F.3d 1506, 1524-25 (5th Cir. 1994) (noting that employer "can wear two hats"); cf. 29 C.F.R. § 2509.75-8, D-5 Q&A (providing that an officer or employee of an employer which sponsors an employee benefit plan is not a fiduciary with respect to the plan solely by holding such office or employment if he or she performs none of the functions described in Section 3(21)(A) of ERISA). Thus, plaintiffs' allegations that Enron appointed, and failed to remove individuals who were "senior Enron officials" as members of the Administrative Committee fails to state a valid claim that Enron breached ERISA's fiduciary provisions.[16]

Second, the "evidence" of alleged breaches by these fiduciaries (TC ¶ 673) cited by plaintiffs consist of a mishmash of argumentative allegations which do not bear at all on any particular member's qualifications as a fiduciary. This "evidence" consists of the following allegations:

- Cindy Olson, a member of the Administrative Committee, read a March 5, 2001 Fortune magazine article entitled "Is Enron Overpriced?" at some unspecified time and "did nothing" with respect to the information contained in the article and did not discuss the article with other members of the Committee. TC ¶¶ 679-80

---

[16] Indeed, individuals who were "senior Enron officials" in a company of Enron's size would presumptively be qualified because they would be expected to possess the experience, training, education, skills and ability to serve as fiduciaries with respect to the Savings Plan. Moreover, the Committee members here were not only presumptively qualified, but they also had access to experts they deemed necessary or advisable for the proper administration of the Savings Plan. *See* Savings Plan, § 13.7(d). *Cf. Martin v. Harline*, 15 Empl. Ben. Cas. (BNA) 1138, 1992 U.S. Dist. LEXIS 8778, at *29-30 (D. Utah Mar. 30, 1992).

- Olson sold approximately $350,000 of Enron stock on March 8, 2001. TC ¶¶ 681.

- James Prentice, a member of the Administrative Committee, sold approximately $900,000 of Enron stock in June 2001. TC ¶ 683.

- The Administrative Committee had no process for actively monitoring the prudence of Enron stock as an investment option or protocol for discontinuing the use of Enron stock upon it becoming no longer prudent as an investment of plan assets. TC ¶ 684.

- Olson met with Sherron Watkins on or about August 16, 2001, during which Watkins disclosed she had written a one-page letter expressing concerns about accounting issues. Olson did not inform the other members of the Administrative Committee, Plan counsel or the investment consultant about Watkins' allegations. TC ¶¶ 701, 704.

- Olson did not "correct Lay's misstatements, although she knew or should have known that they could reasonably be expected to influence participants to continue to hold and purchase more Enron stock," made during or in connection with an all-employee meeting on or about August 27, 2001 and an online chatroom meeting on September 26, 2001. TC ¶¶ 705-09.

- The Administrative Committee did not postpone the "lockdowns" of the Enron ESOP and Savings Plan. TC ¶¶ 710-25.

Whether examined individually or in the aggregate, these allegations simply do not state a claim that any members of the Administrative Committee were "not qualified" to serve on the



Committee, and thus a valid claim for relief against Enron regarding their appointment (or removal) has not been stated.

### C.   The Complaint Fails To Allege Facts Sufficient To State A Claim That Enron Failed To Monitor Adequately The Fiduciaries' Investment Of Plan Assets And Implementation Of Plan Terms.

Plaintiffs allege that Enron breached its duty to monitor by (i) "failing to adequately monitor the investing fiduciaries' investment of Plan assets" and (ii) failing to adequately monitor the Plan's other fiduciaries' implementation of the terms of the plans, including but not limited to the investment of Plan assets." TC ¶ 780.  Plaintiffs' only factual allegation in support of these claims against Enron is that Enron "failed to ensure the [Administrative] Committee was monitoring the prudence of Enron stock as a Plan investment." TC ¶ 675.

The members of the Administrative Committee have moved separately to dismiss the fiduciary breach claims asserted against them.  If the Court determines that the Complaint fails adequately to state a claim that the Administrative Committee members breached their fiduciary duty under ERISA in connection with the investments in Enron stock under the Savings Plan, then, as a matter of law, it also must dismiss the claim asserted against Enron that it breached its fiduciary duty under ERISA in failing to monitor adequately the Administrative Committee.  *See Landgraff v. Columbia/HCA Healthcare Corp. of America*, 2000 WL 33726564, at *19 (M.D. Tenn. May 24, 2000) (holding that, since the members of the retirement committee who administered a stock bonus plan did not breach their fiduciary duties, the employer could not be liable for breach of its fiduciary duty based on its alleged failure to monitor and remove retirement committee members).  *See also Atwood v. Burlington Indus. Equity, Inc*, 1994 WL 698314, at *6 (M.D.N.C. Aug. 3, 1994).

As established in at pages 7-10 *supra*, the Savings Plan was designed to invest in Enron stock.    As established in the memoranda of law filed by the former members of the Administrative Committee, plaintiffs fail to state a claim upon which relief can be granted that members of the Committee breached their fiduciary duties to the Savings Plan regarding the continued investment of Enron stock because:

- plaintiffs do not allege that the Administrative Committee induced and mandated the acquisition and retention of Enron stock;

- the Administrative Committee's failure to depart from plan design is not actionable; and

- plaintiffs do not allege that the Administrative Committee knew or should have known that Enron stock had become an imprudent investment option or that a reasonable investigation would have revealed that Enron stock was an objectively imprudent investment.

To avoid unnecessary duplication and burden upon the Court, Enron hereby incorporates by reference the arguments stated in (i) Sections I and III of the Admin. Comm. Memorandum and (ii) Section II of Defendant Cindy K. Olson's Motion to Dismiss.    Therefore, to the extent it is determined that plaintiffs have failed to state a claim for relief that members of the Administrative Committee breached their fiduciary duties with respect to the Savings Plan's investment in Enron stock, Enron cannot have breached its duties to monitor the Committee members.

**D.    Enron Had No Duty Under ERISA To Disclose Business Or Financial Condition Information To The Administrative Committee.**

Plaintiffs' contention that Enron had "an affirmative duty to disclose" certain material facts about the financial condition of Enron to the Administrative Committee (TC ¶ 778) simply has no legal merit under ERISA fiduciary law.  As established at pages 12-16, *supra*, ERISA itself does not require such disclosure, and this claim, purportedly brought under ERISA fiduciary law, is simply a repackaged federal securities laws claim.  Whatever duty to disclose adverse information concerning its financial condition that Enron may have had, that duty was not one imposed by ERISA.  *See Sweeney v. Kroger Co.*, 773 F. Supp. 1266, 1269 (E.D. Mo. 1991); *Hull v. Policy Mgmt. Sys. Corp.*, No. CIV.A.3:00-788-17, 2001 WL 1836286, at *9 (D.S.C. Feb. 9, 2001).  Accordingly, plaintiffs have failed to state a valid claim for breach of fiduciary duty under ERISA against Enron based on its failure to disclose to other ERISA fiduciaries non-public financial information about itself.

**VIII.    PLAINTIFFS FAIL TO MAKE ANY FACTUAL ALLEGATIONS IN SUPPORT OF THEIR ASSERTION THAT THE SAVINGS PLAN DOES NOT QUALIFY AS A SECTION 404(C) PLAN.**

Plaintiffs fail to make any factual allegations that the Savings Plan does not qualify as a plan subject to Section 404(c) of ERISA.  If it does so qualify, any fiduciary with respect to the Savings Plan is protected against any alleged breach of fiduciary duty under ERISA, including the duty to diversify, to the extent investment control of plan assets was left to the participants themselves.[17]    Section 404(c) of ERISA provides as follows:

---

[17]  Savings Plan participants under the age of 50 did not have such control with regard to Enron's matching contribution.  As noted above, by plan design the match was made in Enron stock and had to remain so invested until a plan participant reached the age of 50, at which time she could move that investment out of Enron stock if she so chose.  Savings Plan V.16.  Thus Enron s argument as to the applicability of Section 404(c) runs to all invested assets of the plan with the exception of

(1) In the case of a pension plan which provides for individual accounts and permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)

. . .

(B) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant s or beneficiary s exercise of control.

ERISA  404(c)(1)(B), 29 U.S.C.  1104(c)(1)(B).  *See, e.g., Schwartz v. Gordon*, 1983 U.S. Dist. LEXIS 20130, *3-4 (S.D.N.Y. Jan. 11, 1983).

The legislative history of Section 404(c)  explains that its purpose was to relieve any fiduciary of liability resulting from any loss or breach when the participant exercised control over his or her account:

A special rule is provided for individual account plans where the participant is permitted to, and in fact does, exercise independent control over the assets in his individual account.  In this case, the individual is not to be regarded as a fiduciary and other persons who are fiduciaries with respect to the plan are not to be liable for any loss that results from the exercise and control by the participant or beneficiary.  Therefore, <u>if the participant instructs the plan trustee to invest the full balance of his account in, e.g., a single stock, the trustee is not liable for any loss because of a failure to diversify or because the investment does not meet the prudent man standards.</u>

House Conference Report No. 93-1280, Joint Explanatory Statement of the Committee of Conference, 1974 U.S. Code Congressional and Administrative News, pp. 5085-86 (emphasis added), *quoted in id.*

Plaintiffs recognize that Section 404(c) acts as a complete bar against their claims of breach of fiduciary duty with respect to the Savings Plan relating to employee contributions and certain matching contributions.  In fact, they commence Section XII of the complaint, which

---

company-match assets in the accounts of plan participants under 50 years of age at the applicable date.

summarizes the alleged breaches of fiduciary duties, with the argument that the Savings Plan is not and has never been a 404(c) plan. (TC 670) What plaintiffs fail to do, however, is make any non-conclusory, factual allegations as to how or why the Savings Plan does not qualify as a Section 404(c) plan.

On its face, the Savings Plan clearly provides for self-directed investment. The plan provides for participants to invest their assets in the various investment vehicles provided by the Administrative Committee of the plan. Savings Plan ¶¶ V.17, V.18 (Joint Appendix, Tab A.1, at V-1-2) The Savings Plan contemplates a multitude of investment funds to chose from. *Id.* Plaintiffs note that the regulations set forth by the Department of Labor under Section 404(c) require a plan to provide participants with a broad range of diversified investment options, liberal opportunities to transfer assets among allocations, and sufficient information to make sound investment decisions. (TC 670)[18] They then make the sum total of the factual allegations concerning Enron s satisfaction of these requirements: For all or most of the Class Period, the Enron Savings Plan did not satisfy those requirements. *Id.*

Such conclusory, fact-deprived allegations cannot be the basis of a well-pleaded complaint. While the Court must accept the complaint s well-pleaded factual allegations as true, conclusory allegations and unwarranted deductions of fact are not admitted as true. *Guidry v.*

---

[18]  Plaintiffs get two out of three correct. The last one, sufficient information to make sound investment choices, is not quite right. The regulations state that the participant must be provided with or have the opportunity to obtain sufficient information to make informed decisions with regard to investment alternatives available under the plan, and includes the name and contact information for fund managers and the like. 29 CFR 2550.404c-1(b)(2)(B). That information is not defined as information regarding actual investment advice, which DOL regulations make clear is not to be provided. See Department of Labor Interpretive Bulletin Relating to Participant Investment Education, 29 C.F.R. 2509.96-1. Thus allegations concerning information specifically related to Enron stock are irrelevant to the application of Section 404(c) s protections to this Plan's fiduciaries.



*Bank of LaPlace*, 954 F.2d 278, 281 (5ᵗʰ Cir. 1992). A plaintiff must plead specific facts, and not mere conclusory allegations. *Id.* In order to escape the ramifications of the Savings Plan s status as a 404(c) plan, plaintiffs have to do more than simply state that the Savings Plan did not meet the requirements set forth by the Department of Labor. Plaintiffs, in order to avoid dismissal, must specify the ways in which the plan participants lacked control over the investment of their assets, or the ways in which the participants were not offered a broad range of diversified investment options.

The complaint does not contain such specific allegations because it cannot. Plaintiffs certainly have the means to plead facts regarding the control (or lack thereof) that they had over their accounts, and the options (or lack there of) that they had with regard to investing their assets. Plaintiffs make no factual allegations because they cannot, in good faith, make allegations that would bring the Savings Plan outside the ambit of Section 404(c).

Plaintiffs do make one factual allegation -- that the Savings Plan fails to put participants specifically on notice that the plan intends to qualify as a 404(c) plan. (TC 670) In fact, the DOL regulations state that plan participants need to have an explanation that the plan is intended to constitute a plan as described in Section 404(c). 29 CFR 2550.404c-1(b)(2)(i)(B)(1)(i). The DOL regulations do not require the Savings Plan itself must have the explanation written into it. Plaintiffs make no allegation regarding whether participants were informed by means other than the plan document that the Savings Plan intended to qualify under Section 404(c).

Because plaintiffs fail to make adequate factual allegations, the complaint does not state a claim for breach of fiduciary duty, including the duty of diversification, with respect to the Savings Plan relating to employee contributions and certain matching contributions.

492662v1/005859

49



## IX.   THE COMPLAINT FAILS TO ALLEGE SUFFICIENT FACTS TO STATE A CLAIM FOR CO-FIDUCIARY LIABILITY AGAINST ENRON

Plaintiffs assert co-fiduciary liability against Enron in each of Counts I, II, III & V.  TC ¶¶ 739, 757, 762, 779.  Plaintiffs correctly cite to ERISA § 405(a), which provides that a fiduciary is liable for the breach of duty by another fiduciary if he: (1) knowingly participates in or conceals an act or omission of another fiduciary; (2) enables another fiduciary to commit a breach of his duties; or (3) fails to remedy a breach of which he has knowledge.  *Id.* ¶ 739, ERISA § 405(a), 29 U.S.C. 1105(a).

Plaintiffs wholly fail to cite to any factual allegations that would support their claim. Instead, plaintiffs merely re-state, if they state anything at all with regard to co-fiduciary liability, that "defendants" knowingly participated in breaches of their co-fiduciaries, enabled their co-fiduciaries to commit breaches, and had knowledge of such breaches and failed to make reasonable efforts to remedy the breaches.  TC ¶¶ 741, 757, 780.  These bare assertions, wholly unsupported by any factual allegations, are insufficient to withstand a motion to dismiss.

Conclusory allegations that merely re-state the requisite legal elements without any factual allegations are facially inadequate to state a claim.  *See Vulcan Material Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001) (dismissing claim that merely "faithfully recites" the relevant statue but "does no more than that"); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992); *Haber v. Brown*, 774 F. Supp. 877, 879 (S.D.N.Y. 1991) (dismissing ERISA claim that "simply . . . incorporat[ed] terms directly from the statute").  "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993).

Moreover, plaintiffs failure to plead any facts regarding their co-fiduciary claim is clearly

a failure to comply with the particularity requirements of Rule 9(b) with regard to claims sounding in fraud. *See Williams v. WMX Techs, Inc.*, 112 F.3d 175, 178 (5th Cir. 1997). This is even more surprising given ERISA's requirement of knowing participation, a high standard that plaintiffs simply ignore. *See, e.g., Richman v. Aetna Life Ins. Co.*, 1992 U.S. App. LEXIS 20949, *9-11 (4th Cir. Aug. 31, 1992) (noting failure of plaintiffs to present sufficient evidence of direct knowledge of a co-fiduciary's breach fatal to co-fiduciary claim: here, plaintiffs fail to even make factual allegations of direct knowledge). For example, what is Enron supposed to have known, and with whom's breach did it participate? Whose breach did Enron allow? Plaintiffs failure to even address these issues renders its general allegations meaningless, and they should be dismissed.

## X.    CONCLUSION

For the foregoing reasons, Enron Corp. requests that the First Consolidated and Amended Complaint be dismissed.

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: _____
    Stephen D. Susman
    State Bar No. 19521000
    S.D. Admissions No. 03257
    1000 Louisiana Street, Suite 5100
    Houston, Texas 77002-5096
    Telephone: (713) 651-9366
    Fax:  (713) 654-6666

Attorney in Charge for Enron Corp.

OF COUNSEL:

Kenneth S. Marks
State Bar No. 12995500
S.D. Admissions No. 02767
Jonathan J. Ross
State Bar No. 00791575
S.D. Admissions No. 18293
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Facsimile: (713) 653-7897

## CERTIFICATE OF SERVICE

I, Kenneth S. Marks, hereby certify that on the 11th day of July, 2002, the foregoing was

served by electronic mail in accordance with the Order Regarding Service of Papers and Notice

of Hearings entered in this case on April 4, 2002, on the attached service list.

Kenneth S. Marks

## SERVICE LIST

| | |
|---|---|
| Lynn Lincoln Sarko<br>KELLER ROHRBACK,LLP<br>1201 Third Avenue, Suite 3200<br>Seattle, WA 98101-3052<br>206/623-1900<br>206/623-3384 (fax)<br>e-mail: lsarko@kellerrohrback.com<br><br>**Co-Lead Counsel for *Tittle* Plaintiffs** | Roger B. Greenberg<br>SCHWARTZ, JUNELL, CAMPBELL &<br> OATHOUT, LLP<br>Two Houston Center<br>909 Fannin, Suite 2000<br>Houston, TX 77010<br>713/752-0017<br>713/752-0327 (fax)<br>e-mail: rgreenberg@schwartz-junell.com<br><br>**Local Counsel for Securities Plaintiffs in *Newby*** |
| William S. Lerach<br>Helen J. Hodges<br>Byron S. Georgiou<br>MILBERG WEISS BERSHAD HYNES<br> & LERACH, LLP<br>401 B Street, Suite 1700<br>San Diego, CA 92101-5050<br>619/231-1058<br>619/231-7423 (fax)<br> - and -<br>Melvyn I. Weiss<br>Steven G. Schulman<br>Samuel H. Rudman<br>MILBERG WEISS BERSHAD HYNES<br> & LERACH, LLP<br>One Pennsylvania Plaza<br>New York, NY 10119-0165<br>212/594-5300<br>212/868-1229 (fax)<br>e-mail: enron@milberg.com<br><br>**Lead Counsel for Securities Plaintiffs in<br>*Newby*** | Steve W. Berman<br>Clyde A. Platt, Jr.<br>HAGENS BERMAN, LLP<br>1301 Fifth Avenue, Suite 2900<br>Seattle, WA 98101<br>206/623-7292<br>206/623-0594 (fax)<br>e-mail: steve@hagens-berman.com<br><br><br><br><br><br><br><br><br><br><br><br><br>**Co-Lead Counsel for *Tittle* Plaintiffs** |

| | |
|---|---|
| Robin Harrison<br>Justin M. Campbell, III<br>CAMPBELL HARRISON & DAGLEY, LLP<br>4000 Two Houston Center<br>909 Fannin Street<br>Houston, TX 77010<br>713/752-2332<br>713/752-2330 (fax)<br>e-mail: rharrison@chd-law.com<br><br>**Liason Counsel for *Tittle* Plaintiffs** | James F. Marshall<br>JUDICIAL WATCH INC.<br>2540 Huntington Drive, Suite 201<br>San Marino, CA 91108-2601<br>626/287-4540<br>626/237-2003 (fax)<br>e-mail: marshall@attglobal.net<br><br><br>**Attorneys for Plaintiff Ralph A. Wilt, Jr.** |
| George M. Fleming<br>Gregory Sean Jez<br>FLEMING & ASSOCIATES<br>1330 Post Oak Blvd., Suite 3030<br>Houston, TX 77056-3019<br>713/621-7944<br>713/621-9638 (fax)<br>e-mail: terri_rayburn@fleming-law.com<br><br>**Attorneys for Plaintiffs Jane Bullock, John Barnhill, Don Reiland, Scott Borchart, Michael Mies, Virginia Acosta, Jim Hevely, Mike Bauby, Robert Moran, Jack Turner, Marily Turner, Hal Moorman, Milton Tate, The Jose Plaintiffs and/or F&A, Fleming & Associates LLP, John Odam, Marian Rosen, Fred A. Rosen, Houston Federation of Teachers, on behalf of its members, Annie M. Banks, Larry D. Barnett, Robert Chazen, Clifford D. Gookin, Carl Herrin, Todd L. Johnson, David H.Lowe, Robin Saex, John Siemer, Elizabeth Siemer, Anthony G. Tobin, John E. Williams, Ruben Delgado, Irene Delgado, Preston Clayton, Harold Ahlich, Frances Ahlich, Irving Babson, Mary Bain Pearson** | Robert M. Stern<br>O'MELVENY & MYERS, LLP<br>555 13th Street, N.W., Suite 500W<br>Washington, DC 20004-1109<br>202/383-5300<br>202/383-5414 (fax)<br>e-mail: rstern@omm.com<br><br><br><br>**Attorneys for Defendant Jeffrey Skilling** |



| | |
|---|---|
| Paul J. Ondrasik, Jr.<br>F. Michael Kail<br>Anthony C. Epstein<br>STEPTOE & JOHNSON, LLP<br>1330 Connecticut Ave., N.W.<br>Washington, DC 20036<br>202/429-3000<br>202/429-3902 (fax)<br>e-mail: aepstein@steptoe.com<br><br>**Attorney for Philip J. Bazelides, Mary K. Joyce, James S. Prentice, James G. Barnhart, Keith Crane, William Gulyassy, Roderick Hayslett, Sheila Knudsen, Tod A. Linholm, Mikie Rath and David Shields** | Abigail K. Sullivan<br>BRACEWELL & PATTERSON, L.L.P.<br>South Tower Pennzoil Place<br>711 Louisiana Street, Suite 2900<br>Houston, TX 77002-2781<br>713/223-2900<br>713/221-1212 (fax)<br>e-mail: asullivan@bracepatt.com<br><br>**Attorneys for Defendant James V. Derrick, Jr.** |
| Eric Nichols<br>BECK, REDDEN & SECREST, L.L.P.<br>One Houston Center<br>1221 McKinney Street, Suite 4500<br>Houston, TX 77010<br>713/951-3700<br>713-951-3720<br>e-mail: enichols@brsfirm.com<br><br>**Attorneys for Defendants Michael J. Kopper, Chewco Investments, LJM Cayman, L.P.** | John J. McKetta III<br>GRAVES, DOUGHERTY, HEARON & MOODY, P.C.<br>515 Congress Avenue, Suite 2300<br>Austin, TX 78701<br>512/480-5600<br>512/478-1976 (fax)<br>e-mail: mmcketta@gdhm.com<br><br>**Attorneys for Defendant Rebecca Mark-Jusbasche** |

| | |
|---|---|
| Linda L. Addison<br>FULBRIGHT & JAWORSKI, LLP<br>1301 McKinney, Suite 5100<br>Houston, TX 77010<br>713/651-5628<br>713/651-5246 (fax)<br>e-mail: laddison@fulbright.com<br><br><br>**Attorney for Defendants The Northern Trust Company, Northern Trust Retirement Consulting LLC** | Jack C. Nickens<br>NICKENS, LAWLESS & FLACK, LLP<br>1000 Louisiana, Suite 5360<br>Houston, TX 77002<br>713/571-9191<br>713/571-9652 (fax)<br>e-mail: trichardson@mlf-law.com<br><br>**Attorneys for Defendants Estate of J. Clifford Baxter, Deceased, Joseph M. Hirko, Lou L. Pai, Paula Ricker, Kenneth D. Rice, Richard B. Buy, Richard A. Causey, Mark A. Frevert, Stanely C. Horton, Michael S. McConnell, Jeffrey McMahon, Cindy K. Olson, J. Mark Metts, Joseph W. Sutton, Steven J. Kean, Mark E. Koenig** |
| Dr. Bonnee Linden<br>PRO SE<br>1226 West Broadway, P.O. Box 114<br>Hewlett, NY 11557<br>516/295-7906<br><br><br>**DO NOT FAX OR E-MAIL** | James E. Coleman, Jr.<br>CARRINGTON, COLEMAN, SLOMAN & BLUMENTHAL, LLP<br>200 Crescent Court, Suite 1500<br>Dallas, TX 75201<br>214/855-3000<br>214/855-1333 (fax)<br>e-mail: deakin@ccsb.com<br><br>**Attorneys for Defendant Kenneth Lay** |

| | |
|---|---|
| William F. Marston, Jr.<br>TONKON TORP, LLP<br>888 S.W. Fifth Avenue, Suite 1600<br>Portland, OR 97204-2099<br>503/221-1440<br>503/972-3705 (fax)<br>e-mail: rick@tonkon.com<br><br><br><br><br>**Attorneys for Defendant Ken L. Harrison** | Jeremy L. Doyle<br>GIBBS & BRUNS, L.L.P.<br>1100 Louisiana, Suite 5300<br>Houston, TX 77002<br>713/650-8805<br>713/750-0903 (fax)<br>e-mail: jdoyle@gibbs-bruns.com<br><br>**Attorneys for Defendants Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Joe H. Foy, Charles A. LeMaistre, Wendy L. Gramm, Robert K. Jaedicke, Charles E. Walker, John Wakeham, John Mendelsohn, Paulo V. Ferraz Pereira, Frank Savage, Herbert S. Winokur, Jr., Jerome J. Meyer, Bruce G. Willison** |
| Charles G. King<br>KING & PENNINGTON, L.L.P.<br>711 Louisiana Street, Suite 3100<br>Houston, TX 77002-2734<br>713/225-8400<br>713/225-8488 (fax)<br>e-mail: cking@kandplaw.com<br><br>**Attorneys for Defendants Banc of America Securities LLC, Salomon Smith Barney Inc.** | Carolyn S. Schwartz<br>United States Trustee, Region 2<br>33 Whitehall St., 21st Floor<br>New York, NY 10004<br>212/510-0500<br>212/668-2255 (fax) |
| Craig Smyser<br>SMYSER KAPLAN & VESELKA, L.L.P.<br>700 Louisiana Street, Suite 2300<br>Houston, TX 77002<br>713/221-2300<br>713/221-2320 (fax)<br>e-mail: esmyser@skv.com<br><br>**Attorneys for Defendant Andrew Fastow** | Rusty Hardin<br>RUSTY HARDIN & ASSOCIATES, P.C.<br>1201 Louisiana, Suite 3300<br>Houston, TX 77002<br>713/652-9000<br>713/652-9800 (fax)<br>e-mail: rhardin@rustyhardin.com<br><br>**Attorneys for Defendant Arthur Andersen LLP** |

| | |
|---|---|
| Paul Vizcarrondo, Jr.<br>WACHTELL, LIPTON, ROSEN & KATZ<br>51 West 52nd Street<br>New York, NY 10019<br>212/403-1000<br>212/403-2000 (fax)<br>e-mail: pvizcarrondo@wlrk.com<br><br>**Attorneys for Defendant Banc of America Securities LLC, Salomon Smith Barney Inc.** | Sharon Katz<br>DAVIS POLK & WARDWELL<br>450 Lexington Avenue<br>New York, NY 10017<br>212/450-4000<br>212/450-3633 (fax)<br>e-mail: andersen.courtpapers@dpw.com<br><br>**Attorneys for Defendant Arthur Andersen LLP** |
| Henry F. Schuelke, III<br>JANIS, SCHUELKE & WECHSLER<br>1728 Massachusetts Ave., N.W.<br>Washington, DC 20036<br>202/861-0600<br>202/223-7230 (fax)<br>e-mail: hsschuelke@janisschuelke.com<br><br>**Attorneys for Defendant Ben Glisan** | Mark A. Glasser<br>KING & SPALDING<br>1100 Louisiana Street, Suite 4000<br>Houston, TX 77002-5213<br>713/751-3200<br>713/751-3290 (fax)<br>e-mail: mkglasser@kslaw.com<br><br>**Attorneys for Defendant LJM2 Co-Investments** |
| Robert Hayden Burns<br>BURNS WOOLEY & MARSEGLIA<br>1415 Louisiana, Suite 3300<br>Houston, TX 77002<br>713/651-0422<br>713/651-0817 (fax)<br>e-mail: hburns@bwmzlaw.com<br><br><br><br>**Attorneys for Defendant Kristina Mordaunt** | Andrew J. Mytelka<br>David LeBlanc<br>GREER, HERZ & ADAMS, L.L.P.<br>One Moody Plaza, 18th Fl.<br>Galveston, TX 77550<br>409/797-3200<br>409/766-6424 (fax)<br>e-mail: amytelka@greerherz.com<br>        dleblanc@greerherz.com<br>        bnew@greerherz.com<br>        swindsor@greerherz.com<br><br>**Attorneys for Plaintiffs American National Insurance Co., National Western Life Insurance Co., American National Investment Accounts Inc., SM&R Investments Inc., American National Property and Casualty Inc., Standard Life and Accident Insurance Co., Farm Family Life Insurance Co., Farm Family Casualty Insurance Co.** |

| | |
|---|---|
| John L. Murchison, Jr.<br>VINSON & ELKINS<br>2300 First City Tower<br>1001 Fannin<br>Houston, TX 77002<br>713/758-2222<br>713/758-2346 (fax)<br>e-mail: jmurchison@velaw.com | Barry G. Flynn<br>Law Office of Barry G. Flynn, P.C.<br>Wells Fargo Bank Tower,<br>1300 Post Oak Boulevard, Suite 750<br>Houston, Texas 77056 (Harris Co.)<br>Telephone: 713-840-7474<br>FAX: 713-840-0311<br><br>**Attorneys for David Duncan** |
| H. Bruce Golden<br>Golden & Owens, LLP<br>1221 McKinney Street<br>Suite 3600<br>Houston, Texas 77010 (Harris Co.)<br>Telephone: 713-223-2600<br>Fax: 713-223-5002<br>URL: http://www.goldenowens.com<br><br>**Attorneys for John A. Urquhart** | Mark C. Hansen<br>Kellogg, Huber, Hansen, Todd & Evans, P.L.L.C.<br>Sumner Square, 1615 M Street, N.W.<br>Suite 400<br>Washington, District of Columbia 20036-3209<br>Telephone: 202-326-7900<br>Fax: 202-326-7999<br><br>**Attorney for Defendant Nancy Temple** |
| Jeffrey C. King<br>Hughes & Luce, L.L.P.<br>1717 Main Street, Suite 2800<br>Dallas, Texas 75201 (Dallas Co.)<br>Telephone: 214-939-5500<br><br><br>**Attorney for Bruce Willison** | Benard V. Preziosi, Jr.<br>Curtis, Mallet-Prevost, Colt & Mosle LLP<br>101 Park Avenue<br>New York, New York 10178-0061<br>(New York Co.)<br>Telephone: 212-696-6000<br>Telecopier: 212-697-1559<br><br>**Attorney for Defendant Michael C. Odom** |
| Gary A. Orseck<br>Robbins, Russell, Englert, Orseck &<br>Untereiner LLP<br>1801 K Street, N.W., Suite 411<br>Washington, District of Columbia 20006<br>Telephone: 202-775-4500<br>Fax: 202-775-4510<br><br><br>**Attorney for Defendant Michael Lowther** | Scott B. Schreiber<br>Arnold & Porter<br>Thurman Arnold Building,<br>555 Twelfth Street, N.W.<br>Washington, District of Columbia 20004-1206<br>Telephone: 202-942-5000<br>Cable Address: "Arfopo"<br>Telecopy: 202-942-5999<br><br>**Attorney for Defendant Thomas Bauer** |

| | |
|---|---|
| George W. (Billy) Shepherd, III<br>Cruse, Scott, Henderson & Allen, L.L.P.<br>Chase Tower, 600 Travis, Suite 3900<br>Houston, Texas 77002-2910 (Harris Co.)<br>Telephone: 713-650-6600<br>Fax: 713-650-1720<br><br><br>**Attorney for D. Stephen Goddard, Jr.**<br>**Debra Cash and Michael Lowther** | John K. Villa<br>Williams & Connolly LLP<br>725 Twelfth Street, N.W.<br>Washington, District of Columbia 20005-5901<br>Telephone: 202-434-5000<br>Fax: 202-434-5029<br><br>**Attorneys for Vinson & Elkins, L.L.P.,**<br>**Ronald T. Astin, Joseph Dilg, Michael P.**<br>**Finch and Max Hendrick, III** |
| John Keker<br>Keker & Van Nest, LLP<br>710 Sansome Street<br>San Francisco, CS 94111<br>(415) 391-5400<br>(415) 397-7188 (fax)<br><br><br>**Attorneys for Andrew S. Fastow** | Taylor M. Hicks<br>Hicks Thomas & Lilienstern, L.L.P.<br>700 Louisiana, Suite 1700<br>Houston, Texas 77002<br>Telephone: 713-547-9100<br>**Facsimile: 713-547-9150**<br>**e-mail: thicks@hicks-thomas.com**<br><br>**Attorneys for Merrill Lynch & Co. Inc** |
| Ronald E. Cook<br>Cook & Roach, LLP<br>1111 Bagby Street, Suite 2650<br>Houston, Texas 77002<br>Phone: 713-652-2800<br>**Fax: 713-652-2029**<br><br><br>*Attorneys for Defendant*<br>*Alliance Capital Management* | Mark A. Kirsch<br>James N. Benedict<br>James F. Moyle<br>Clifford Chance Rogers & Wells<br>200 Park Avenue, Suite 5200<br>New York, New York 10166<br>Phone: 212-581-1600<br>**Fax:  212-586-7878**<br><br>*Attorneys for Defendant*<br>*Alliance Capital Management* |
| Brad S. Karp<br>Mark F. Pomerantz<br>Richard A. Rosen<br>Paul, Weiss, Rifkind, Wharton & Garrison<br>1285 Avenue of the Americas<br>New York, NY 10019<br>Phone: 212-373-3000<br>**Fax:  212-757-3990**<br><br>**Attorneys for Defendant Citigroup, Inc.** | William Edward Matthews<br>Gardere Wynne Sewell LLP<br>1000 Louisiana Suite 3400<br>Houston, TX 77002<br>Phone: . . . . . . . . . . . . . . . . .  713-276-5500<br>**Fax . . . . . . . . . . . . . . . . . . . . .  713-276-5555**<br><br>*Attorneys for Defendant Andersen*<br>*Worldwide, S.C.* |

| | |
|---|---|
| Kevin S. Allred<br>Kelly M. Klaus<br>Munger, Tolles & Olson<br>355 South Grand Avenue<br>35th Floor<br>Los Angeles, CA 90071<br>Phone: 213-683-9100<br>**Fax: 213-687-3702**<br>**e-mail: allredks@mto.com**<br><br>***Attorneys for Defendant Kirkland & Ellis*** | Gregory A. Markel<br>Brobeck, Phleger & Harrison LLP<br>1633 Broadway, 47th Floor<br>New York, NY 10019<br>Phone: 212-581-1600<br>**Fax: 212-586-7878**<br><br><br>***Attorneys for Defendant***<br>***Bank of America Corp.*** |
| Lawrence Byrne<br>Owen C. Pell<br>Lance Croffoot-Suede<br>White & Case LLP<br>1155 Avenue of the Americas<br>New York, New York 10036<br>Phone: 212-819-8200<br>**Fax: 212-354-8113**<br><br>***Attorneys for Defendant Deutsche Bank AG*** | Ronald E. Cook<br>Cook & Roach, LLP<br>1111 Bagby Street, Suite 2650<br>Houston, Texas 77002<br>Phone: 713-652-2800<br>**Fax: 713-652-2029**<br><br><br>***Attorneys for Defendant Alliance Capital***<br>***Management*** |
| Richard Mithoff<br>Mithoff & Jacks<br>One Allen Center, Penthouse<br>500 Dallas<br>Houston, Texas 77002<br>Phone: 713-654-1122<br>**Fax: 713-739-8085**<br>**e-mail dmorris@mithoff-jacks.com**<br><br>***Attorneys for Defendant J.P. Morgan Chase*** | Taylor M. Hicks<br>Hicks Thomas & Lilienstern, L.L.P.<br>700 Louisiana, Suite 1700<br>Houston, Texas 77002<br>Telephone: . . . . . . . . . . . . . . .  713-547-9100<br>**Facsimile: 713-547-9150**<br>**e-mail: thicks@hicks-thomas.com**<br><br>***Attorneys for Merrill Lynch & Co.*** |
| David Braff<br>Sullivan & Cromwell<br>125 Broad Street<br>New York, NY 10004-2498<br>Phone: 212-558-4000<br>**Fax: 212-558-3588**<br><br><br>***Attorneys for Defendant Barclays Bank PLC*** | Richard W. Clary<br>Julie A. North<br>Cravath, Swaine & Moore<br>825 Eighth Ave.<br>New York, NY 10019<br>Phone: 212-474-1000<br>**Fax: 212-474-3700**<br><br>***Attorneys for Defendant Credit Suisse First***<br>***Boston Corp.*** |

| | |
|---|---|
| Alan N. Salpeter<br>Michele Odorizzi<br>T. Mark McLaughlin<br>Mayer, Brown, Row & Maw<br>190 South LaSalle St.<br>Chicago, Il 60603<br>Phone: 312-782-0600<br>**Fax: 312-706-8680**<br><br>*Attorneys for Defendant Canadian Imperial Bank of Commerce* | Stephen J. Crimmins<br>Pepper Hamilton LLP<br>600 Fourteenth Street, NW<br>Washington, DC. 20005-2004<br>Phone: 202-220-1208<br><br><br><br>*Attorneys for Defendant Kevin P. Hannon* |
| Kenneth F. McCallion<br>McCallion & Associates LLP<br>16 West 46th Street, 7th Floor<br>New York, New York 10036<br>Phone . . . . . . . . . . . . . . . . . . 646-366-0880<br>**Facsimile . . . . . . . . . . . . . . . 646-366-1384**<br>**e-mail . . . . . . . . kfm@mccallion-law.com**<br><br>*Attorneys for defendant Peter M. Norris* | |

EXHIBITS MAY BE VIEWED IN THE OFFICE OF THE CLERK