IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION, | } } } | MDL 1446 |
| PAMELA M. TITTLE, on behalf of herself and a class of persons similarly situated, ET AL., | } } } } | |
| Plaintiffs | } } | |
| VS. | } } } | CIVIL ACTION NO. H-01-3913 CONSOLIDATED CASES |
| ENRON CORP., an Oregon Corporation, ET AL., | } } } | |
| Defendants. | } | |
| ASSOCIATED ELECTRIC & GAS INSURANCE SERVICES LIMITED, and FEDERAL INSURANCE COMPANY, | } } } } | |
| Interpleader Plaintiffs, | } } | |
| VS. | } } | |
| ENRON CORPORATION, et al., | } } } | |
| Interpleader Defendants. | } } | |

**OPINION AND ORDER**

The above referenced class action, grounded in the Employee Retirement Income

Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and alleging under section

409(a), 29 U.S.C. § 1109(a), breach of fiduciary duty against fiduciaries of three Enron Corporation

ERISA plans,[1] is before the Court on objections to final approval of the amended and restated

---

[1] The governing pleading is the Second Amended Consolidated Complaint (#667), filed on January 2, 2004.

The three plans are the Enron Corporation Savings Plan, the Enron Corporation Employee Stock Ownership Plan, and the Enron Cash Balance Plan. *Tittle* Plaintiffs summarize their four claims in their memorandum (#738 at 3) in support of their motion for preliminary approval of the proposed partial settlement as breaches of Settling Defendants' duties to

partial class action settlement agreement (Ex. A to #756), seeking certification pursuant to Federal

Rules of Civil Procedure 23(a)[2] and 23(b)(1)(A) and (B)[3] and preliminarily approved by the Court

1. provide participants in the Plans with accurate information regarding Enron stock and [instead wrongfully] induced participants to direct their retirement savings into Enron stock;
2. monitor Enron stock and ensure it was a prudent investment for the Plans, as well as to monitor other fiduciaries and to disclose to them material facts concerning Enron's financial condition;
3. postpone the transition of the Savings and ESOP Plans (the "Lockdown") when it was clear from Enron's precarious financial condition that it would have been prudent to do so, and to provide timely and informative notice of the Lockdown to participants so that they could safeguard their retirement assets; and
4. diversify the investments of the Plans so as to minimize the risk of large losses under both the Savings Plan and the ESOP.

[2]   Rule 23(a), setting forth part of the "Prerequisites to a Class Action," provides,

One or more members of a class may sue or be sued as class representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

[3]   Rule 23(b)(1)(B) authorizes certification of a class action

if the prerequisites of subdivision (a) are satisfied, and in addition

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests . . . .

The Advisory Committee Note states that certification under Rule 23(b)(1)(B) is appropriate in "an action which charges breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust." *See, e.g., Godschall v. The Franklin Mint*, No. 01-CV-6539, 2004 WL 2745890, *3 (E.D. Pa. Dec. 1, 2004)("When a breach of fiduciary duty is at issue, any individual adjudication regarding the breach would necessarily affect the interests of others" and "[t]herefore it is appropriate to certify the class

on May 31, 2004 in an order entered on June 3, 2004 (#765).  The objectors, who or which include

three non-settling Defendants Jeffrey K. Skilling, Kenneth L. Lay, and Northern Trust Company,[4]

maintain that the proposed partial settlement does not meet the standard of being fair, adequate and

reasonable and/or was not entered into without fraud or collusion among the parties.[5]  The Pension

Benefit Guaranty Corporation ("PBGC"),[6] State Street Bank and Trust Company ("State Street"),[7]

and Secretary of the Department of Labor Elaine Chao,[8] and individual class members have also

---

pursuant to Rule 23(b)(1)(B).").  This Court previously approved a settlement class in *Tittle* under
Rule 23(b)(1)(B) for a settlement with the foreign Arthur Andersen entities because prosecution
of separate actions by individual class members would pose a risk of inconsistent or disparate
adjudications and because adjudication of the *Tittle* Plaintiffs' claims would, as a practical matter,
be dispositive of the interests of other class members not parties to *Tittle* or would substantially
impede their ability to protect their interests.

       "Because individuals may bring class action to remedy breaches of fiduciary duty
only on behalf of the plan, rather than themselves, the Court cannot allow participants or
beneficiaries to opt out of this class." *Specialty Cabinets & Fixtures, Inc. v. American Equitable
Life Ins. Co.*, 140 F.R.D. 474, 479 (S.D. Ga. 1991).  *See also In re WorldCom, Inc. ERISA Litig.*,
No. 02 Civ. 4816 (DLC), 2004 WL 2338151, *8 (S.D.N.Y. Oct. 18, 2004)("There is no opportunity
under any Rule 23(b)(1)(B) class action to opt out . . . ."), *clarified*, 2004 WL 2922083 (S.D.N.Y.
Dec. 17, 2004).  Nevertheless, absent class members must be given notice of the proposed
settlement and may move to intervene and file objections to it.

    [4] Enron Corporation did not object to the settlement.

    [5] Although only class members and settling defendants have standing to object to
the fairness or adequacy of a settlement, and nonsettling defendants do not, nevertheless nonsettling
defendants may object to any terms of the settlement that preclude them from seeking contribution
and indemnification from the settling defendants. *In re Beef Industry Antitrust Litig.*, 607 F.2d
167, 172 (5th Cir. 1979)(and cases cited therein)(*citing and quoting* 3 Newberg on Class Actions
§ 5660b at 564-65 (1977)), *cert. denied*, 452 U.S. 905 (1981).

    [6] PBGC, an agency of the federal government, was created to administer the
defined benefit pension plan termination insurance program under Title IV of ERISA, as amended,
29 U.S.C. §§ 1301-1461.  Generally it is appointed statutory trustee of terminated, underfunded
pension plans and assumes responsibility for paying the terminated plan's benefits, subject to
statutory limitations.  It also is authorized to pursue all claims related to the plan, including
collecting any amounts owed to the plan for the plan, often through litigation on behalf of the plan
against fiduciaries or parties in interest who violated the terms of the plan or Titles I and IV of
ERISA.

    [7] State Street was appointed by Enron pursuant to an agreement with the United
States Department of Labor, which was then approved by the Bankruptcy Court, to serve as the
independent fiduciary for the Enron Plans on or about April 19, 2002.

    [8] The Secretary of the United States Department of Labor, who is not a party to the
*Tittle* class action or partial settlement and is not bound by the partial settlement's terms, has

filed comments and objections.[9]  Many of these have been compromised by the parties since their

submission.  Also pending in relation to the settlement are Plaintiffs' motion to set aside a portion

of funds recovered in partial settlement to establish attorneys' fee and litigation expense reserve

accounts (#809) and amended [supplemented] motion (#830),[10] to neither of which has any response

been filed.  A fairness hearing on the proposed settlement was held on August 19, 2004.[11]

---

entered into consent decrees with the Former Outside Directors of Enron in *Chao v. Enron Corp.*, H-03-2257, for $1,500,000.  Amended Consent Decree (#20 in H-03-2257, #748 in *Tittle*, entered 5/21/04).  It has also entered into consent decrees with Ken Harrison for $100,000 (#749 in *Tittle*) and with certain administrative committee defendants and other for $250,000 (#747 in *Tittle*).

[9]   Although during the hearings on the partial settlement counsel have referred to objections by Arthur Andersen LLP, this Court has been unable to locate any filed pleading in *Tittle* that asserts objections to the proposed settlement.

[10]   Federal Rule of Civil Procedure 23(e) provides that "a class action shall not be dismissed without the approval of the court."  To "protect absent class members and to police class action proceedings," the court's duty under Rule 23(e) to approve a compromise of a class action "'includes the obligation to explore the manner in which fees of class counsel are to be paid and the dollar amount for such services.' . . . To fully discharge its duty to review and approve class action settlement agreements a district court must assess the reasonableness of the attorneys' fees. . . . Moreover, the court's examination of attorneys' fees guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class."  *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998).  "The court's review of the attorney's fee component of a settlement agreement is thus an essential part of its role as guardian of the interests of class members."  *Id.* at 850.

Here the partial settlement agreement creates a reserve fund for reimbursement of attorney's fees and expenses to be placed in an escrow account; counsel are then to apply to the Court for reimbursement from that fund.  The Court will carefully review all fee requests.  Whatever is left after the Court has resolved those applications will be distributed to the plans.

[11]   *The Manual for Complex Litigation, Fourth* § 13.13 at 171 (2004) states,

> To facilitate partial settlements in multiparty cases, the court may (unless prohibited by the underlying statute) approve as a term of the settlement an order barring claims for contribution or indemnification by nonsettling defendants.  To ensure binding effect, the affected parties or their representatives should be before the court and their rights should be protected.  Such orders typically contain a formula for calculating a setoff for nonsettling defendants based on the settlement amount or the settlors' adjudged proportion of fault.

ERISA has no express prohibition against contribution bar orders.

When a proposed partial settlement agreement in a class action includes a bar order that extinguishes potential legal claims of non-settling defendants against settling defendants, the

The amended and restated partial settlement agreement[12] (Ex. A to #756) is conditioned upon (1) entry of the proposed bar order which (a) bars all claims against the Settling Defendants[13] (releasees) for indemnity and contribution or other claims arising out of or concerning

---

court is required to conduct an evidentiary fairness hearing to determine if the settling defendants are paying their fair share of any liability. *McDannold v. Star Bank, N.A.*, 261 F.3d 478, 484 (6th Cir. 2001); *Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litig.)*, 957 F.2d 1020, 1031 (2d Cir. 1992)("[T]hird party participation in an evidentiary fairness hearing and court approval of the settlement bar are necessary to protect the due process rights of third parties."); *Kovacs v. Ernst & Young (In re Jiffy Lube Sec. Litig.)*, 927 F.2d 155, 158 (4th Cir. 1991)("If the proposed settlement is intended to preclude further litigation by absent persons, due process requires that their interest be adequately represented.")(quoting Manual for Complex Litigation 2d, § 23.14 at 166 (1985)).

[12]  The partial settlement of the *Tittle* Class ERISA- claims only is for $85 million, representing the policy limits of two Enron fiduciary liability policies, the Fiduciary and Employee Benefit Liability Insurance Policy, Policy No. F0079A1A99 (the "Primary Policy"), issued by Associated Electric & Gas Insurance Services Limited ("AEGIS"), and the Excess Fiduciary Policy, Policy No. 8146-41-84A BHM (the "Excess Policy"), issued by the Federal Insurance Company ("Federal"), exclusive of defense costs otherwise payable under the separate sub-limit of the AEGIS policy, plus interest that the now interpleaded funds accumulate in the interpleader or, once established, in the Settlement Trust. In addition *Tittle* Plaintiffs will receive a note for $100,000 from Defendant Cindy Olson. Defendants have also agreed to a cooperation clause requiring them to provide documentation and other information relating to the *Tittle* Plaintiffs' claims and any transcripts of depositions taken of them by any federal agency relating to compliance with ERISA or breach of fiduciary duty under the statute. Defendants have further agreed that the settlement agreement will not bar any ability of *Tittle* Plaintiffs to obtain discovery from the Settling Defendants in this suit.

If the Court determines there is a right to contribution among co-fiduciary tortfeasors under ERISA, the settlement is also conditioned upon entry of a bar order that precludes claims against the Defendant Releasees for indemnity and contribution and other claims arising out of the settlement agreement. Any judgments on ERISA claims entered against persons covered by the bar order will be reduced by an amount equal to the class settlement amount, except that non-settling Defendants who are insureds under the two policies whose proceeds are funding the interpleader will receive an additional judgment reduction credit in the amount of $10,000,000.

The settlement does not release claims against Enron Corporation, Northern Trust Company, Arthur Andersen L.L.P., Kenneth Lay, and Jeffrey Skilling.

[13]  There are two groups of Settling Defendants named in the Amended and Restated Class Action Settlement Agreement. First are Officer and Director Settling Defendants (§ 1, 1.44): the Estate of Clifford Baxter, Richard B. Buy, Richard A. Causey, Mark A. Frevert, Kevin P. Hannon, Ken L. Harrison, Joseph M. Hirko, Steven J. Kean, Mark E. Koenig, Michael S. McConnell, Jeffrey McMahon, J. Mark Metts, Kenneth D. Rice, Lawrence Greg Whalley, Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Paulo Ferraz Periera, Joe H. Foy, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, John Mendelsohn, Jerome J. Meyer, Frank Savage, John Wakeham, Charles E. Walker, and Herbert Winokur, Jr. The other group (§ 1, 1.3) are the Administrative Committee Settling Defendants: the Estate of James

any of the ERISA claims released under the settlement agreement against the Defendant Releasees and (b) provides for a judgment reduction credit equal to at least $85 million for the non-settling Defendants to prevent double recovery, plus an additional $10 million judgment reduction credit for those non-settling Defendants who are insured under the two fiduciary liability policies; and (2) resolution of the interpleader by approval of the use of the policy limits in accordance with the agreement or by a supervening agreement of the parties to adjust the class settlement amount in a manner consistent with the findings of the Court.

Rather than identify each objection by each objector, the Court addresses the objections generally in the course of its discussion below.

## I. Interpleader

Since the May 31, 2004 at a hearing on preliminary approval of the settlement, Judge Gonzalez lifted the stay and this Court granted leave to the carriers to intervene and to file their complaint in the nature of interpleader (#758). At a hearing on August 19, 2004, Ms Patrick, counsel for the Outside Directors, advised this court that the carriers had filed pleadings in the Enron Bankruptcy Court that they found that the settlement amount was reasonable and thus they have fulfilled their *Stowers* duty. TR (#856) at 16. In its recent memorandum and order denying Defendants Jeffrey Skilling's and Kenneth Lay's motion to compel arbitration and to stay the interpleader action (#944), the Court set out the substantive law in Texas that permits exhaustion of the proceeds of the policies, following demands within policy limits, for a reasonable settlement of claims of some insureds, indeed makes it mandatory, and makes the use of interpleader action for distribution of those proceeds an appropriate procedural device that also relieves the carriers of liability. *White v. FDIC*, 19 F.3d 249, 251 (5th Cir. 1994)("Interpleader is a procedural device which entitles a person holding money or property, concededly belonging at least in part to another, to join in a single suit two or more persons asserting mutually exclusive claims to the fund").

---

G. Barnhart, Shiela Armsworth (f/k/a Shiela Knudsen), Philip J. Bazelides, Keith Crane, William J. Gulyassy, Rod Hayslett, Mary K. Joyce, Tod A. Lindholm, Cindy K. Olson, James S. Prentice, Mikie Rath, Paula Rieker and the Estate of David Shields.

The settling Defendants at the hearing on August 19, 2004, stated they would file a motion for judgment on the pleadings to resolve the interpleader action, but they have not yet done so. Nevertheless there is agreement that the final approval of the partial settlement can precede resolution of the interpleader because, in Mr. Sarko's words, "The funding and the resolution of the interpleader is a condition subsequent to the finality of the settlement by its terms." TR of August 19, 2004 Fairness Hearing (#856) at 21.

## II. Right to Contribution or Indemnity under ERISA

The federal Circuit Courts of Appeals and the district courts that have addressed the issue are split as to the threshold question here, i.e., whether a fiduciary has a right to contribution against another fiduciary[14] under ERISA when ERISA plan participants and beneficiaries, on their own behalf or on behalf of the plan, have a cause of action for plan losses. There is no express right in the statute.[15]

---

[14]   Under section 3(21) of ERISA, 29 U.S.C. § 1002(21)(A)(iii), "a person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan." *See Milofsky v. American Airlines, Inc.*, 404 F.3d 338, 341 (5th Cir. 2005), *citing Reich v. Lancaster*, 55 F.3d 1034, 1049 (5th Cir. 1995)("To be fiduciaries, such persons must exercise discretionary authority and control that amounts to actual decision making power."). The term fiduciary is "liberally construed to implement the remedial purpose of ERISA." *Id., citing Bannistor v. Ullman*, 287 F.3d 394, 401 (5th Cir. 2002).

[15]   Compare the silence in ERISA with provisions in the federal securities statutes, the Securities Act of 1933 and the Securities Exchange Act of 1934. Section 11(f) of the 1933 Act provides that all defendants are jointly and severally liable for violations of the Act, but also expressly preserves a right of contribution. 15 U.S.C. § 77k(f). The Supreme Court found an implied cause of action for contribution in § 10(b)(itself, an implied cause of action) and Rule 10b-5, under the 1934 Act. *Musick, Peeler & Garrett v. Employers Ins.*, 508 U.S. 286 (1993). Moreover, the PSLRA, passed in 1995, provides that jointly and severally liable defendants have a right to seek contribution from each other and mandates a mutual bar order for all partial settlements and proportional fault offset:

> A covered person who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons. Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered person arising out of the action. The order shall bar all future claims for contribution arising out of the action–
> (i) by any person against the settling covered person; and
> (ii) by the settling covered person against any person, other than a person whose liability has been extinguished by the settlement of

The provisions of ERISA that relate to this issue are section 502(a), 29 U.S.C. §
1132; section 409(a), 29 U.S.C. 1109(a); and section 405, 29 U.S.C. § 1105(a).

Section 502(a) states in relevant part,

A civil action may be brought . . .

(2) by the Secretary, or by a participant, beneficiary or fiduciary **for
appropriate relief** under section 1109 of this title;
(3) by a participant, beneficiary or fiduciary (A) to enjoin any act or
practice which violates any provision of this subchapter or the terms
of the plan, or (B) to obtain other **appropriate equitable relief** (i)
to redress such violations of (ii) to enforce any provisions of this
subchapter or the terms of the plan . . . .

29 U.S.C. § 1132 (emphasis added by this Court).

Section 409(a), which specifies the relief available to an ERISA plan alleging breach
of a fiduciary duty, reads,

Any person who is a fiduciary with respect to a plan who breaches
any of the responsibilities, obligations, or duties imposed upon
fiduciaries by this subchapter shall be personally liable to make good
to such plan any losses to the plan resulting from each such breach,
and to restore to such plan any profits of such fiduciary which have
been made through the use of assets of the plan by the fiduciary, and

---

the settling covered person.

15 U.S.C. § 78u-4(f)(7)(A)(bar extinguishing a right of contribution expressly established in § 78u-
4(f)(8)).  A "covered person" is defined as a

(i) a defendant in any private action arising under this chapter [the
Securities Exchange Act of 1934]; or
(ii) a defendant in any private action arising under section 77k of
this title [section 11 of the Securities Act of 1933], who is an
outside director of the issuer of the securities that are the subject of
this action.

Moreover, the contribution bar allows the ultimate judgment to be reduced by either the percentage
of fault of the covered person or by the amount actually paid in settlement by the covered person.
15 U.S.C. § 78u-4(f)(7)(B)(i)(ii).

Despite this statutory right to contribution from fellow defendant joint tortfeasors,
courts have approved partial settlements in multiparty cases that have bar orders extinguishing
contribution rights in return for formulas specifying an amount to offset any judgment against
nonsettling defendants, provided that the court determines the settlement is fair and adequate and
the statute does not prohibit barring contribution claims. *Eichenholtz v. Brennan*, 52 F.3d 478,
486-87 (3d Cir. 1995); *Harden v. Raffensperger, Hughes & Co.*, 933 F. Supp. 763, 771 (S.D. Ind.
1996).

> shall be subject to such other **equitable or remedial relief as the court may deem appropriate**, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

29 U.S.C. § 1109(a) (emphasis added by this Court).

Finally, section 405, which many courts construe as establishing joint and several liability among co-fiduciaries in specified situations and from which some courts have inferred a right of contribution or indemnification by a fiduciary from a co-fiduciary, states,

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission is a breach;
> (2) if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibility which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

Although there was no right to contribution among joint tortfeasors under common law, a right to contribution under federal law can be created where either (1) Congress enacts a statute that expressly or by clear implication provides such a cause of action or (2) where federal courts use their power to fashion appropriate remedies where there are gaps in a federal statute. *Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 86-87 (1981), and *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 634 (1981).

The Second Circuit and, in dicta, the Seventh Circuit have concluded that a private right to contribution and indemnity among ERISA co-fiduciaries exists. The Second Circuit's analysis expressly refused to imply a right to contribution in ERISA from the test established in *Cort v. Ash*, 422 U.S. 66, 78 (1975): (1) is the plaintiff a member of the class for whose benefit the statute was enacted; (2) is there an explicit or implicit legislative intent to create or deny the remedy sought; (3) is the remedy consistent with the purposes of the statute; and (4) is the cause of action traditionally relegated to state law, thus making implication of a remedy inappropriate. *Chemung*

*Canal Trust Co. v. Sovran Bank/Maryland*, 939 F.2d 12, 15 (2d Cir. 1991)(*Cort* test inappropriate because party seeking the remedy is not a member of the class for whose benefit the statute was enacted because "ERISA was enacted to protect plan participants and beneficiaries, not . . . fiduciaries"), *cert. denied*, 505 U.S. 1212 (1992). Instead, relying on *Firestone Tire and Rubber Co. v.* Bruch, 489 U.S. 101, 110 (1989), the Second Circuit determined that the development and application of federal common law by the courts, incorporating the common law of trusts, were authorized by ERISA. *Id.* at 16 (concluding that because the statute "abounds with the language and terminology of trust law," to fill the interstices of ERISA's statutory scheme Congress intended courts, "guided by the principles of traditional trust law," to fashion a federal common law of ERISA, imbued with a system of proportional fault with integral rights to indemnity and contribution),[16] Furthermore, the Second Circuit concluded that "traditional trust law provides for a right of contribution among defaulting fiduciaries." *Id., citing Restatement (Second) of Trusts* §

---

[16] In *Chemung*, the Second Circuit opined that "even a breaching fiduciary should be entitled to the protection of contribution. . . . Full responsibility should not depend on the fortuity of which fiduciary a plaintiff elects to sue." 939 F.2d at 16, 18. Subsequently in *Master Mates*, 957 F.2d at 1031, the Second Circuit expanded on and refined its conclusion: "We hold that contribution does not exist after a court approves a fair settlement bar. Otherwise, settlements among fewer than all the parties would be difficult to reach. However, third party participation in an evidentiary fairness hearing and court approval of the settlement bar are necessary to protect the due process rights of third parties."

Moreover, the Second Circuit requires that a settlement that bars contribution claims must be narrowly tailored and there must be a judicial determination that the settlement has been entered into in good faith, with no party targeted for unfair treatment. *Id.* at 1031. Furthermore "a court should not approve a settlement bar that grants a nonsettling defendant a judgment reduction less than the amount paid by settling defendants toward damages for which the nonsettling defendant would be jointly and severally liable." *Id.* In addition to relative fault, the court should take other factors into consideration in weighing the fairness of a settlement, such as the likelihood that the plaintiffs will prevail at trial, the sufficiency of the resources of the most culpable party, and the strength of the defendant's defenses. *Id.*

As for indemnity for ERISA defendants, the Second Circuit concluded that a court-approved settlement bar should have the same effect on that right as the right to contribution with the test being one of fairness. *Id.* at 1032 ("[A] court approved settlement bar may eliminate the right to contribution. Accordingly, if a district court determines after an evidentiary hearing that a settlement is fair and approves a settlement bar, then a defendant whose claim is based on differences in relative fault does not retain a right to seek indemnity. Thus, if the parties again come to terms and the district court determines after an evidentiary hearing that an agreement containing a settlement bar that precludes indemnity claims based on relative fault is fair, reasonable and adequate, then it may approve that settlement."). *Id.*

258 (1959)[17]; Bogert, *The Law of Trusts and Trustees* § 701 (2d ed. rev. 1982)("The trustee who is obliged to pay more than his proportionate share of the damage may have a cause of action for contribution against his co-trustees who are equally or more guilty than he."). More recently in *Harris Trust & Savings Bank v. Salomon Smith Barney*, 530 U.S. 238 (2000), which did not address the right to contribution under ERISA, the Supreme Court did observe that the common law of trusts is the "'starting point for analysis of ERISA unless it is inconsistent with the language of the statute, its structure, or its purposes.'" 530 U.S. at 250, *quoting Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 447 (1999).

The Seventh Circuit also turned to the common law of trusts because the legislative history of ERISA indicates that "Congress intended to codify the principles of trust law with whatever alterations were needed to fit the needs of employee benefit plan." *Free v. Briody*, 732 F.2d 1331, 1337-1338 (7th Cir. 1984)(In *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77 (1981), and *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630

---

[17]   Section 258 provides,

> (1)Except as stated in Subsection (2), where two trustees are liable to the beneficiary for a breach of trust, each of them is entitled to contribution from the other, except that
> (a) if one of them is substantially more at fault than the other, he is not entitled to contribution from the other but the other is entitled to indemnity from him; or
> (b) if one of them receives a benefit from the breach of trust, the other is entitled to indemnity from him to the extent of the benefit; and for further liability, if neither is more at fault than the other, each is entitled to contribution.
> (2) A trustee who commits a breach of trust in bad faith is not entitled to contribution or indemnity from his co-trustee.

The Comment regarding Subsection (1) provides,

> *Trustees equally at fault.* Where two trustees participate in a breach of trust, ordinarily either trustee who makes good the breach of trust can compel the other to reimburse him as to one-half of what he has had to pay; and if there are more than two trustees any one of the trustees who has made good the breach of trust can compel the others to reimburse him proportionately.

Even though the right to contribution among co-fiduciaries was well established at common law by the time ERISA was enacted, Congress did not expressly include it in the statute.

(1981) the Supreme Court "made clear that a joint tortfeasor's right to contribution or indemnity must be found in the underlying statute or within the scope of the federal common law; although there is no express right to contribution among co-fiduciaries in ERISA, the panel inferred from the language and structure of the statute and principles of trust law that "Congress intended to protect trustees from being ruined by the actions of their cofiduciaries"). Specifically in *Briody* the Seventh Circuit determined,

> Section 1105 of the Act relieves a trustee of liability for a co-trustee's breach of fiduciary duty by limiting co-fiduciary duty to those circumstances set forth in 1105(a), and also by allowing trustees to allocate explicitly responsibilities for various functions and thereby avoid liability for breaches of duties allocated to another trustee. 29 U.S.C. § 1105(b)(1)(B).

732 F.2d at 1337.[18] It further found that indemnity is within the meaning of the phrase "appropriate equitable relief" in § 409(a) and "appropriate relief" in § 502(a) of ERISA, for a breach of fiduciary duty included contribution and indemnity among co-fiduciaries. *Id.* at 1336-137. *See also Alton Memorial Hosp. v. Metropolitan Life Ins. Co.*, 656 F.2d 245, 250 (7th Cir. 1981)("[W]here an ERISA plan suffers losses and where the plan participants and beneficiaries have established a cause of action on their own behalf or on behalf of the plan assets against one fiduciary, that fiduciary may seek indemnification or contribution from co-fiduciaries in accordance with 29 U.S.C. § 1105(a).") (dictum); *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 464 & n.10 (7th Cir. 1991)("Contrary to the plaintiffs' assertion, a non-settling defendant does possess a right of

---

[18] Moreover ERISA allows a trustee to limit his exposure by purchasing liability insurance or having his plan sponsor purchase such insurance for its officers and employees acting in a fiduciary role, but any insurance bought by the plan to cover its fiduciary must specify that the insurer has recourse against the fiduciary for any breach of his duty. Section 410(b)(1) of ERISA, 29 U.S.C. § 1110(b)(1). Of course the same arguments can be made in support of the view that there is no right to contribution among co-fiduciaries because the scheme of the statute permits the fiduciary to shield himself from or limit his personal liability. It is noteworthy that the statute declares as void against public policy any agreement or provision in an ERISA plan that tries to relieve a fiduciary from liability other than those allowing him to delegate responsibilities to others, who then become fiduciaries as to those duties and obligations. Section 410(a), 29 U.S.C. § 1110(a). *See generally* George Lee Flint, Jr. and Philip W. Moore, Jr., *ERISA: A Co-Fiduciary Has No Right to Contribution and Indemnity*, 48 South Dakota L. Rev. 7, 23-26 (2002-03)(discussing ERISA provisions regarding exculpation and insurance attempting to relieve fiduciaries of liability).

contribution under ERISA," but admitting the question is "still unsettled"), *cert. denied*, 502 U.S. 939 (1991). *In accord that there is a right to contribution among co-fiduciaries: In re WorldCom, Inc. ERISA Litigation*, 339 F. Supp.2d 561, 568, 569 (S.D.N.Y. 2004); *Cooper v. Kossan*, 993 F. Supp. 375, 376 (E.D. Va. 1998); *Duncan v. Santaniello*, 900 F. Supp. 547, 550-51 (D. Mass. 1995); *Cohen v. Baker*, 845 F. Supp. 289, 291 (E.D. Pa. 1994); *Maher v. Strachan Shipping Co.*, 817 F. Supp. 43, 45 (E.D. La. 1993); *Jones v. Trevor, Stewart, Burton and Jacobsen, Inc.*, No. Civ. A. 1:90CV0420JOF, 1992 WL 252137 (N.D. Ga. Aug. 21, 1992).

In contrast, the Ninth Circuit does not recognize a right to contribution under the statute. *Kim v. Fujikawa*, 871 F.2d 1427, 1432-33 (9th Cir. 1989)(because the Supreme Court has held that § 409 of ERISA, 29 U.S.C. § 1109, "only establishes remedies for the benefit of the *plan[,]* . . .[19] [it] cannot be read as providing for an equitable remedy of contribution in favor of a *breaching fiduciary* [emphasis in original]."); *Concha v. London*, 62 F.3d 1493, 1500 (9th Cir. 1995), *cert. dism'd*, 517 U.S. 1183 (1996); *Call v. Sumitomo Bank of California*, 881 F.2d 626, 630 (9th Cir. 1989). In *Fujikawa*, the Ninth Circuit further reasoned, given "ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a 'comprehensive and reticulated statute,' it seems clear that 'Congress did *not* intend to authorize other remedies [under

---

[19] *Massachusetts Mutual Life Ins. v. Russell*, 473 U.S. 134, 141-42 (1984). The Ninth Circuit also reasoned that under *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981), there is no right to contribution under the Sheraton Act or Clayton Act because a right to contribution would be inconsistent or conflict with the Acts' punitive remedy of treble damages for antitrust violations. *Fujikawa*, 871 F.2d at 1433. "[I]mplying a right of contribution is particularly inappropriate where, as in this case, the party seeking contribution if a member of the class [here ERISA fiduciaries] whose activities Congress intended to regulate for the protection and benefit of an entirely distinct class [ERISA plans] and where there is no indication in the legislative history that Congress was concerned with softening the blow on joint wrongdoers." *Id.*; *Daniels v. Bursey*, 329 F. Supp.2d 975, 978 (N.D. Ill. 2004).

The Second Circuit concluded otherwise in *Chemung*. It found that the Supreme Court in both *Texas Industries* and *Northwest* determined that Congress had not authorized common law rule-making power in the statutes in dispute (Title VII, the Equal Pay Act, the Sherman Act and the Clayton Act). It distinguished those statutes from ERISA, under which "both the legislative history and the statute itself clearly contemplate development of a federal common law" and "[t]hus *Texas Industries* and *Northwest* are not impediments to our holding that, under ERISA, a federal common law including the traditional trust concept of a right to contribution, is appropriate." 939 F.2d at 17.

ERISA] that it simply forgot to incorporate expressly." *Id.*, 871 F.2d at 1432, *quoting Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. at 146. This Court observes that more recently in *Mertens v. Hewitt Associates*, 508 U.S. 248, 254 (1993), the Supreme Court reconfirmed that *Russell* "emphasized our unwillingness to infer causes of action in the ERISA context, since that statute's carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Id., quoting Russell*, 473 U.S. at 146-47. Moreover, the development of such law is appropriate only when "necessary to fill in interstitially or otherwise effectuate the statutory pattern enacted in large by Congress." *In accord with the Ninth Circuit's rule are Openshaw v. Cohen, Klingenstein & Marks, Inc.*, 320 F. Supp. 2d 357, 363 (D. Md. 2004); *Williams v. Provident Investment Counsel, Inc.*, 279 F. Supp. 2d 894, 898, 900 (N.D. Ohio 2003)("[C]ontribution among co-fiduciaries cannot be found in or implied from the terms of ERISA. Therefore, because ERISA's remedial provisions are fully integrated and comprehensive, courts should not judicially create a contribution remedy."); *Daniels v. Nat'l Employee Benefit Services, Inc.*, 877 F. Supp. 1067, 1074 (N.D. Ohio 1995); *North Carolina Life and Acc. and Health Ins. Guar. Ass'n v. Alcatel*, 876 F. Supp. 748, 756 (E.D.N.C. 1995), *aff'd*, 72 F.3d 127 (4th Cir. 1995); *Int'l Broth. of Painters and Allied Trades Union and Industry Pension Fund v. Duval*, No. Civ. A. 92-1099(JHG), 1994 WL 903314 (D.D.C. Apr. 14, 1994); *NARDA, Inc. v. Rhode Island Hosp. Trust Nat'l Bank*, 744 F. Supp. 685, 695-99 (D. Md. 1990); *Mutual Life Ins. Co. v. Yampol*, 706 F. Supp. 596, 598 (N.D. Ill. 1989)("a fiduciary . . . does not appear to be a member of a class for whose especial benefit ERISA was enacted").[20] Two district courts in the Fifth Circuit have followed the Ninth Circuit rule. *Schloegel v. Boswell*, 766

---

[20]   Although within the Seventh Circuit, a district court rejected the Seventh Circuit's rule after the United States Supreme Court issued *Russell*, 473 U.S. at 140, construing "such other equitable or remedial relief" in the second clause in 29 U.S.C. § 1109(a) as limited to "the plan" in the first clause. *Mutual Life Ins. Co. v. Yampol*, 706 F. Supp. 596, 599-600(N.D. Ill. 1989).

F. Supp. 563, 568-69 (S.D. Miss. 1991); *Lawrence v. Jackson Mack Sales, Inc.*, 837 F. Supp. 771, 791 (S.D. Miss. 1992), *aff'd*, 42 F.3d 642 (5th Cir. 1994)(Table).[21]

The courts concluding that there is no right to contribution and indemnity under ERISA acknowledge that when a federal statute is silent, a right to contribution can arise by operation of federal common law, but emphasize that the Supreme Court has indicated that the "need and authority . . . to formulate what has come to be known as 'federal common law' . . . are 'few and restricted.'" *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. at 640. *See, e.g., Cooperative Benefit Administrators, Inc. v. Ogden*, 367 F.3d 323, 329-30 (5th Cir. 2004)("the power of the judiciary 'to develop federal common law pursuant to ERISA does not give carte blanche power to rewrite the legislation to satisfy our proclivities'"; instead "federal common law may be applied to fill 'minor gaps' in ERISA's text, as long as the federal common law rule created is 'compatible with ERISA's policies'"; it may not be applied where ERISA "'specifically and clearly addresses the issue'" and its application requires "the existence of a 'gap' in the text of that legislation that allows for the creation of the federal common law remedy sought by the plaintiff" [citations omitted]). They view ERISA as a comprehensive and intricate statute into which Congress could have injected provisions for indemnification or contribution among fiduciaries but chose not to; ERISA's silence about contribution indicates an intent not to recognize remedies not expressly incorporated.

Indeed, United States Supreme Court cases have continued to reiterate the same point. *See, e.g., Northwest Airlines, Inc. v. Transport Workers Union*, 451 U.S. 77, 90-91

---

[21] Although the discussion in *Jackson Mack* is cursory, in a more detailed analysis the *Schloegel* court relied extensively on Judge Leinenweber's opinion in *Mutual Life Ins. Co. v. Yampol*, 706 F. Supp. 596 (N.D. Ill. 1989). The court examined the language of the statute, in particular 29 U.S.C. §§ 1001(b), 1132, 1109(a), and 1105, and construed, as the aim of the statute and of the equitable relief it provided, the protection the ERISA plan and its participants or beneficiaries. *Schloegel*, 766 F. Supp. at 566-67. It found that the statute was silent about any right to contribution or indemnification and that it created only joint and several liability among co-fiduciaries. *Id.* at 565, 567. Similarly it found that the legislative history did not support a right to contribution. *Id.* at 567. In sum, it emphasized that ERISA is a comprehensive statute with an integrated system of procedures for enforcement, that Congress therefore did not intend to authorize other remedies than those provided, and that it should not "engraft upon ERISA the remedies of contribution and/or indemnification." *Id.* at 567-58.

(1981)(When Congress passes a statute with comprehensive enforcement procedures, "[t]he presumption that a remedy was deliberately omitted from a statute is strongest."); *Russell*, 473 U.S. at 146 ("The six carefully integrated civil enforcement provisions found in § 502(a) of the statute as finally enacted . . . provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly.  The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a 'comprehensive and reticulated statute.'"); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54, 42 (1987)(Supreme Court's review of the civil enforcement provisions "made us 'reluctant to tamper with an enforcement scheme crafted with such evident care as the one in ERISA.'"; "Congress had tried to careful[ly] balanc[e] . . . the need for prompt and fair claims settlement procedures against the public interest in encouraging the formation of employee benefit plans"); *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 144 (1990)("Congress intended § 502(a) to be the exclusive remedy for rights guaranteed under ERISA"); *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 209 (2002)("We have observed repeatedly that ERISA is a 'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefits system. . . .  We have therefore been especially 'reluctant to tamper with the enforcement scheme' embodied in the statute by extending remedies not specifically authorized by its text. . . . Indeed, we have noted that ERISA's 'carefully crafted and detailed enforcement scheme provides strong evidence' that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly. [citations omitted]").

   After reviewing the law, this Court is persuaded by the reasoning of courts agreeing with the Ninth Circuit's approach and by the Supreme Court's consistent reiteration of the exclusivity of the express remedies available under ERISA's civil enforcement section, and concludes that a remedy for indemnification or contribution among plan fiduciaries is not available under ERISA.  Indeed, it has applied the same rationale to a number of other issues in this litigation and concluded that ERISA does not permit other remedies.

## III.  Federal Rule of Civil Procedure 23(e)

Nevertheless,   this   conclusion   does   not   end   the   matter.

First, the Court notes that in the event that this Court is wrong and there is a right to contribution among co-fiduciaries implied under ERISA or arising from federal common law of trusts applied to fill gaps in the statute, the settling Defendants seek entry of the proposed bar order and judgment reduction credit as part of the settlement.  Indeed, the only proposed order for final approval submitted to the Court includes the bar order and judgment reduction credit.

More significant, however, is that because this litigation is a class action, any settlement, even after certification of a class, must be approved by the Court as fair, reasonable and adequate after notice and a hearing on the matter.  Fed. R. Civ. P. 23(e)(1)(A) and (C).  Under Rule 23(e), the district court must approve a proposed settlement before a class action may be dismissed or compromised.  Fed. R. Civ. Proc. 23(e); *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998).

Furthermore, in arguing for the fairness, adequacy and reasonableness of the settlement under *G. A. Stowers Furniture Co. v. American Indem. Co.*, 15 S.W.2d 544 (Tex. Comm. App. 1929, holding approved), *Texas Farmers Ins. Co. v. Soriano*, 881 S.W.2d 312 (Tex. 1994), *Travelers Indemnity Co. v. Citgo Petroleum Corp.*, 166 F.3d 761 (5th Cir. 1999), *American States Ins. Co. of Tex. v. Arnold*, 930 S.W.2d 196 (Tex. App. 1996, writ denied), and *Vitek, Inc. v. Floyd*, 51 F.3d 530 (5th Cir. 1995), Plaintiffs' counsel blurs a key distinction here.  There are **two** settlements involved in the proposed partial settlement.  The Texas cases they cite relate to a settlement between an insurance carrier and some of its insureds; these cases have established Texas' first-come, first-serve rule for liability insurance proceeds, allowing the exhaustion of funds for the benefit of only some co-insureds for partial settlements within policy limits that the carrier finds reasonable, to the disadvantage of other coinsureds left without any coverage, and without risk to the carrier.  Such a settlement has provided the insurance funds here.

After approving as a matter of law in Texas the fairness of exhausting the insurances funds in favor of only some of the insureds, now the Court is asked to step back and see a larger

picture of a class action settlement between different parties, i.e., Plaintiffs and Settling Defendants, and to determine if the interpleaded insurance proceeds provided by the *Stowers* settlement, are sufficient for a fair, reasonable and adequate class action settlement.  Merely because exhaustion of the policy proceeds for use by settling Defendants in settling their dispute with Plaintiffs is fair, reasonable, and adequate under Texas law does not automatically translate into the partial class action settlement, for which there are additional criteria, being fair, reasonable and adequate.

Rule 23 fails to provide the court with any standard by which to measure a proposed class action settlement, so the district court must turn to the case law for guidance.  *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 207 (5th Cir. 1981).

A district court's approval of a class settlement may only be overturned on appeal for abuse of discretion.  *Reed v. General Motors Corp.*, 703 F.2d 170, 172 (5th Cir. 1983).

"Counsel for the class and the other settling parties bear the burden of persuasion that the proposed settlement is fair, reasonable and adequate."  *Manual For Complex Litigation, Fourth* § 21.631 at 218 (2004).  The same is true at the fairness hearing.  *Id.,* § 21.634 at 322. "Even if there are no or few objections or adverse appearances before or at the fairness hearing, the judge must ensure that there is a sufficient record as to the basis and justification for the settlement."  *Id.*, § 21.635 at 322.

"'The settlement terms should be compared with the likely rewards the class would have received following a successful trial,'" and "'the strength of the case for the plaintiffs (must be) balanced against the amount covered in settlement'" [citations omitted].  *Corrugated*, 643 F.2d at 212.  The Fifth Circuit has endorsed a three-step analysis by the district court:  "First, the district court must evaluate the likelihood that plaintiffs would prevail at trial.  Second the district court must establish a range of possible recovery that plaintiffs would realize if they prevailed at trial. And third, guided by its findings on plaintiffs' likelihood of prevailing on the merits and such other factors as may be relevant, the district court must establish, in effect, the point on, or if appropriate, below, the range of possible recovery at which a settlement is fair and adequate."  *Id.*  It is

Plaintiffs' and settling Defendants' burden to submit sufficient evidence for the Court to be able to make such determinations.[22]

The district court must independently review the facts, the law, and the terms of the settlement to "ensure that the settlement is in the interest of the class, does not unfairly impinge on the rights and interests of dissenters, and does not merely mantle oppression." *Id.*, *quoting Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1214 (5th Cir. 1878); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)("A threshold requirement is that the trial judge undertake an analysis of the facts and the law relevant to the proposed compromise.  A 'mere boiler-plate approval phrased in appropriate language but unsupported by evaluation of the facts or analysis of the law' will not suffice. . . . [I]t is essential that the trial judge support his conclusions by memorandum, opinion or otherwise in the record.").

Nevertheless, the district court's "evaluation is not and cannot involve a trial on the merits" because the policy of encouraging settlements is effected by "the very uncertainty of the outcome of the litigation and the avoidance of wasteful litigation and expense." *In re Corrugated Container Antitrust Litigation*, 643 F.2d at 212.  The Court observes that many of Northern Trust's objections are merits-based and thus inappropriate here.

"[D]etermining the fairness of the settlement is left to the sound discretion of the trial court and we will not overturn the court's decision absent a clear showing of abuse of that discretion." *In re Chicken Antitrust Litigation American Poultry*, 669 F.2d 228, 238 (5th Cir. 1982). The "cardinal rule" for the court's exercising its discretion is that class action settlement should only be approved by the district court if it finds that the settlement is "fair, adequate and reasonable

---

[22]   Where objectors challenge a proposed class settlement,

> the proponents can be expected to present evidence and arguments suggesting that the settlements are within "a range of reasonableness" and the objectors will do the same for the contrary position. By weighing the competing evidence and evaluating the legal arguments, we think the court should be able to reach a just conclusion.

*Corrugated*, 643 F.2d at 213.

and is not the product of collusion between the parties." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *In re Corrugated Container Antitrust Litigation*, 643 F.2d at 207; *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982), *cert. denied*, 459 U.S. (1982).  The Fifth Circuit has identified six factors to help courts determine whether a proposed settlement is "fair, adequate, and reasonable":  (1) evidence that the settlement was obtained by fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the stage of the litigation and the amount of discovery completed; (4) the probability of plaintiffs' prevailing on the merits; (5) the range of possible recovery and the certainty of damages;  and (6) the opinions of class counsel, class representatives, and absent class members.  *Reed*, 703 F.2d at 172; *Parker*, 667 F.2d at 1209.  *See also In re Wireless Telephone Federal Cost Recovery Fees Litigation*, 396 F.3d 922, 932 (8th Cir. 2005)("A district court is required to consider four factors in determining whether a settlement is fair, reasonable, and adequate:  (1) the merits of the plaintiff's case weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement."; the first factor is the most important); *Wal-Mart Stores, Inc. v. VISA U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005)(Second Circuit's "*Grinnell*" factors for examining the fairness, adequacy and reasonableness of a class settlement, established in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), are "(1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of the attendant risks of litigation."), *cert. denied sub nom. Leonardo's Pizza by the Slice, Inc. v. Wal-Mart Stores, Inc.*, No. 04-1339, 2005 WL 816332 (May 16, 2005); Manual For Complex Litigation (Third) § 30.42 (1995).

Moreover, as recognized by the Second Circuit, not only the interests of the Plaintiffs and the Defendants are relevant: "Where a case is complex and expensive, and resolution of the case will benefit the public, the public has a strong interest in settlement.  The trial court must protect the public interest, as well as the interests of the parties, by encouraging the most fair and efficient resolution."  *United States v. Glen Falls Newspapers, Inc.*, 160 F.3d 853, 856-57 (2d Cir. 1998), *quoted for that proposition in In re WorldCom, Inc. ERISA Litigation*, 339 F. Supp.2d 561, 567 (S.D.N.Y. 2004).  Here there is a strong public interest in the settlement of this lengthy, expensive, complex litigation that has affected parties and potential class members across the country, indeed across the world.

## IV.  Certification of the Class Under Fed. R. Civ. P. 23(a) and (b)(1)

The settlement class is defined as all person who were participants or beneficiaries in the Enron Corp. Savings Plan (401(k)), the Enron Corp. Employee Stock Ownership Plan (ESOP) and/or the Enron Corp. Cash Balance Plan and any and all predecessors and successors to such plans during the period January 1, 1995 through June 7, 2002.  That definition has been expanded from that in the original complaint to encompass an earlier time period to correlate to an amendment made on January 1, 1995 to what is now known as the Cash Balance Plan and the claim relating to it was pleaded for the first time in the Second Amended Complaint.  Under Fed. R. Civ. P. 23(c)(1)(C) this Court retains the authority to modify the class definition even after certification of the class. *See, e.g., Buycks-Roberson v. Citibank Federal Savings Bank*, 162 F.R.D. 322, 328-29 (N.D. Ill. 1995)("This Court retains the power to modify the class definition at any time before a final judgment on the merits, if the evidence or the legal principles governing this case established that the class definition is too broad.").

Certification requirements "designed to protect absentees by blocking unwarranted or overbroad class definitions" mandate an "undiluted, even heightened attention in the settlement context." *Amchem Prod. v. Windsor*, 521 U.S. 591, 620 (1997).  The Court finds that the class definition is not overbroad and that  Plaintiffs have met the prerequisites of Rule 23(a) here. *Berger v. Compaq Computer Corp.*, 257 F.2d 475, 479-80 (2001)(party seeking class certification bears

the burden satisfying all requirements of Rule 23), *clarified*, 279 F.3d 313 (5th Cir. 2002).  The

merits of the case are not relevant in certifying a class; "'In determining the propriety of a class

action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will

prevail on the merits, but rather whether the requirements of Rule 23 are met.'"  *Eisen v. Carlisle*

*& Jacquelin*, 417 U.S. 156, 178 (1974), *quoting Miller v. Mackey Int'l*, 452 F.2d 424, 427 (5th Cir.

1971).

The party moving for class certification may demonstrate numerosity by some

evidence of a reasonable estimate of the number of members of the putative class, but need not

provide a precise number.  *James v. City of Dallas, Tex.*, 254 F.3d 555, 570 (5th Cir. 2001), *cert.*

*denied*, 534 U.S. 1113 (2002); *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 569 (S.D. Tex. 2000).

The classes based on the three plans, each of which consists of thousands of Enron plan participants

and their beneficiaries, are clearly so numerous that joinder of all member is impracticable.

Rule 23(a)'s commonality and typicality requirements "together serve as

'guideposts' for the court to determine 'whether the named plaintiff's claim and the class claims

are so inter-related that the interests of the class members will be fairly protected in their absence.'"

*Spann v. AOL Time Warner, Inc.*, 219 F.R.D. 307, 316 (S.D.N.Y. 2003), quoting *Caridad v. Metro-*

*North Commuter R.R.*, 193 F.3d 283, 292 (2d Cir. 1999).  Commonality and typicality are not

demanding tests.  For the former, the putative class members need not have identical interests or

claims, but only at least one issue, the resolution of which would affect all or a substantial number

of class members.  *James*, 254 F.3d at 570.  Here they share the claim that the plans' fiduciaries

made imprudent investments in Enron stock even though they knew of Enron's financial condition.

There is easily more than one question of law or fact common to the class here.  For example,

shared issues include whether the defendants were fiduciaries, whether they breached fiduciary

duties, and what is the measure of the plan's alleged losses.

Typicality refers to similarity, but not complete identity, between plaintiffs' legal and

remedial theories and those of the class members; it does not require identity of claims, but only that

the class representatives' claims share essentially the same characteristics as those of the class

members.  Where the claims arise from the same course of conduct and are brought under the same legal theory, factual differences are inconsequential.  *James*, 254 F.3d at 571.  Here a common course of conduct in violation of ERISA is alleged.  The claims of the class representatives and the injuries resulting from the same breaches of fiduciary duty are typical of the claims of the class and injuries suffered by all participants in the plan during the class period.

Kenneth Lay has objected that some putative class members' potential release defenses defeat typicality here. #782 at 32.  "Although 'the mere existence of individualized factual questions with respect to the class representative's claims will not bar class certification, class certification is inappropriate where a putative representative is subject to unique defenses which threaten to become the focus of the litigation.'"  *Spann*, 219 F.R.D. at 316, *quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir. 2000); *in accord Koos v. First National Bank of Peoria*, 496 F.2d 1162, 1164-65 (7th Cir. 1974).  Moreover, there is no per se rule that a release automatically precludes certifying a class.  Indeed the Seventh Circuit has concluded that typicality "should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."  *Wagner v. The Nutrasweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996), *citing* 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1764 (1986).  This Court has concluded that the typicality test is whether the proposed representative would be required to devote considerable time to rebut the claim, here the release defense.  *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 456 (S.D. Tex. 2002); *see also Lehocky v. Tidel Technologies, Inc.*, 220 F.R.D. 491, 501 (S.D. Tex. 2004)(Hittner, J.).  Here Lay' s vague challenge provides **no** specifics about any releases, no less that they are unique as to each alleged but unidentified releasee or that a defense of release threatens to become the focus of this litigation.

Adequacy is weighed by examining the zeal and competence of representative plaintiffs' counsel and the willingness and ability of the class representatives to take an active and controlling role in the litigation to protect the absent class members, who will be conclusively bound by a judgment in the class action.  *Berger*, 257 F.2d at 479.  Class representatives are

inadequate only if the differences between them and the putative class members create conflicts between the plaintiffs' interests and the class members' interests. *James*, 254 F.3d at 571. Plaintiffs' counsel are highly experienced and qualified in ERISA class action litigation. There are no conflicts of interest between class representatives and putative class members; both share the goal of maximizing recovery for the plans. The Court finds that the representative parties and their counsel will fairly and adequately protect the interests of the absent class members.

Moreover, the Court also finds that Rule 23(b)(1)(A) and (B) has been satisfied. Separate actions by individual class members would create the risk of inconsistent or varying adjudications that would likely prejudice the defendants and those adjudicated might be dispositive of the interests of class members not parties to the actions or impair their ability to protect their rights and interests.   A suit which alleges "'a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class' of beneficiaries requiring an accounting or similar procedure 'to restore the subject of the trust'" is a classic example of the Rule 23(b)(1)(B) action. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999), *quoting* the Advisory Committee's Notes on Fed. R. Civ. P. 23.

ERISA's § 502(a)(2), 29 U.S.C. § 1132(a)(2), confers standing on plan participants and beneficiaries to sue for breach of fiduciary duty under § 409, 29 U.S.C. § 1109(a).   The Supreme Court has held that § 502(a)(2) actions are limited to those seeking recovery that benefits the plan as a whole, as opposed to relief for the individual participant or beneficiary. *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 140, 142 n.9 (1985)(Any plan participant or beneficiary may sue for breach of fiduciary duties "in a representative capacity on behalf of the plan as a whole."). *See Matassarin v. Lynch*, 174 F.3d 549 (5th Cir. 1999)(holding that for standing under § 502(a)(2) and *Russell*, a plaintiff must assert a claim whose remedy would inure to the benefit of the plan as a whole), *cert. denied*, 528 U.S. 1116 (2000).

In March of this year, a panel of the Fifth Circuit issued *Milofsky v. American Airlines, Inc.*, 404 F.3d 338 (5th Cir. 2005).  In *Milofsky*, the plaintiffs were airline pilots who were participants in an individual account pension plan at the time their company, Business Express Inc.,

was acquired by another, AMR Eagle Holding Company ("Eagle").  The pilots were transferred to Eagle over a sixteen-month period, as slots became available,  and once they were employed by Eagle, their plan assets were transferred to a new plan, the Super Saver-A Capital Accumulation Plan for Employees of Participating AMR Corporation Subsidiaries (the "Super Saver Plan") of the new company.  Both the old and the new plans were individual account plans and 401(k) plans that permitted plan participants to choose among various investment options.  The pilots were sent notices that the transfers would be effected within a short time; once transferred, each pilot's account was placed in a credit union investment account and then the pilot could choose any option available for investment under the Super Saver Plan, including the credit union investment account. The transfers, however, instead of being rapid, took weeks or months.  During the extended transfer process there was a blackout period, during which the pilots did not have access to their accounts, which lost value in the delay, instead of being placed in the safer Super Saver Plan's credit union investment account.  The pilots sued various defendants related to the Super Saver Pension and American Airlines and alleged a breach of fiduciary duty in defendants' failure to effect a timely transfer of the pilots' account balances from the old plan to the Super Saver Plan, as the pilots had been promised in a number of misrepresentations, failure to provide correct information about the transfer process or to update previously inaccurate information, and failure to transfer within the time frames that had been stated in the notices to the pilots.

The majority of a divided panel of the Fifth Circuit held that although the plaintiffs conclusorily asserted their causes of action on behalf of their pension plan, in actuality the plaintiffs' specific allegations failed to allege facts demonstrating that the defendants were fiduciaries exercising control or discretion about the blackout periods and about investments of the assets in the plan participants' accounts.  More relevant to this action, relying on *Russell* and *Matassarin*, Judge Jerry Smith wrote, "Despite plaintiffs' contrary claims, this suit concerns individualized relief for the particularized harm suffered by a subset of plan participants and does not seek to vindicate the rights or interests of the plan as a whole," but instead "specifically requests that the damages be allocated among plaintiffs' *individual* accounts proportionate to *plaintiffs'*

losses." *Milofsky v. American Airlines, Inc.*, 404 F.3d at 343 ("Although proceeds would be paid to the plan as an entity, the fact that they are channeled exclusively into the accounts of the plaintiff class benefits only a subsection of the plan, which cannot be said to benefit the plan as a whole as required under § 502(a)(2)."). He concluded, "[G]iven that the alleged fiduciary breaches occurred only as to the members of the plaintiff class and were not directed to the whole plan membership, this claim does not benefit the entire plan."[23] *Id.* at 344.

The Secretary of the Department of Labor and the *Tittle* Plaintiffs contend that *Milofsky* does not support Northern Trust's insistence that the case should affect this Court's

---

[23] Judge Smith explained,

In an individual account plan, . . . a participant has rights to the plan based 'solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses and any forfeitures of accounts of other participants which may be allocated to that participant's account. Consequently, because plaintiffs demand that any relief be channeled only to the individual accounts of the plaintiff class members, non-class members would receive no benefit as a result of a successful suit because they would not receive additional funds in their accounts, apart from the attenuated possibility that class members might forfeit their balances at some future, unspecified time.

Legal title may be formally in the hands of the trustees, but individual account holders retain a beneficial interest only in their respective account balances. Although proceeds would be paid into the plan as an entity, the fact that they are channeled exclusively into the accounts of the plaintiff class benefits only a subsection of the plan . . . . Similarly, the fact that the total assets of the plan--defined as the sum of the values of the individual accounts–would increase as a result of a successful suit does not mean that recovery inures to the benefit of the entire plan. . . .

We cannot adopt an interpretations that would allow a plaintiff, merely by praying that relief pass through the plan into individual accounts, to eviscerate the standing requirement imposed by § 502(a)(2) by engaging in a legal fiction that the suit benefits the plan as a whole. The increase would be of no benefit to participants outside the plaintiff class, either by augmenting the value of their accounts or by vindicating their rights to fiduciary breaches directed toward them.

404 F.3d at 343-44.

decision on class certification. This Court agrees. The facts and the pronouncements in *Milofsky* are distinguishable from the circumstances here.

First, the *Tittle* Plaintiffs do bring suit on behalf of the plan as a whole, unlike the numerically small subset of transferred pilots seeking relief for their individual losses[24] and not for the benefit of the Super Saver Plan as a whole in *Milofsky*. Moreover the alleged breach of fiduciary duty in the Enron Corporation Savings Plan affected all the 401(k) participants because they all were recipients of matching contributions consisting of Enron stock. Moreover Enron stock made up more than half of the plan's assets and the Defendants allegedly retained Enron stock as an investment alternative even though they purportedly knew that Enron's financial status was not accurately reflected in its financial statements. Moreover, the alleged fiduciary breaches in the failure to satisfy the duty of diversification and in imposition of the lockdown applied to the plan as a whole. Furthermore in *Milofsky* the Fifth Circuit was careful to expressly state,

> We stop short, however, of saying that there is no standing [under ERISA's § 502(a)(2)] unless all plan participants would benefit from the litigation. The central question, in the context of an individual plan, is whether the suit inures to the benefit of the *plan*, which occurs whenever all plan participants would directly benefit (by all having increased balances in their individual accounts) or when the suit seeks to vindicate the rights of the plan as an entity when the alleged fiduciary breaches targeted the plan as a whole–whether the suit is filed by all plan participants or only a subset thereof.

404 F.3d at 344 n.16. *See also id.* at 345 ("We need not speculate on every possible situation in which a suit demands relief beneficial to a large proportion of beneficiaries can reasonably be said to 'protect the entire plan.' Instead it is enough to say, for present purposes, that the specific relief

---

[24] Similarly, emphasizing *Russell*'s distinguishing "what it called 'the entire plan,' on the one hand, from what it termed 'the rights of an individual beneficiary,' on the other hand and [requirement] that an individual claim benefit the former," the *Milofsky* majority noted that in *Matassarin*, where there were sixty-seven plan participants seeking recovery for their own accounts, the "specific nature of the claim [was] tailored to only a small portion of the account holders." *Milofsky*, 404 F.3d at 344, 345 n. 18, *citing Matassarin*, 174 F.3d at 566..

here requested, affecting only 218 individual accounts out of a much larger plan, is too narrow to qualify.")[25]

## V.  Bar Order and Judgment Reduction Proposal

Whether the bar order and the judgment reduction credit scheme are fair and equitable therefore must be weighed as part of the fairness of this settlement.

Furthermore, as noted, the *Manual for Complex Litigation, Fourth* § 13.13 at 171 (2004), approves the use of bar orders in partial settlements of class actions:

> To facilitate partial settlements in multiparty cases, the court may (unless prohibited by the underlying statute) approve as a term of the settlement an order barring claims for contribution or indemnification by nonsettling defendants.  To ensure binding effect, the affected parties or their representatives should be before the

---

[25]  Chief Judge Carolyn King dissented in part from the majority:

> I respectfully dissent from the majority's unprecedented holding that participants in an individual account lack standing under § 502(a)(2) of ERISA to recover losses to the plan under § 409 of ERISA for a fiduciary breach unless *all* plan participants would benefit from the litigation. . . . The majority's holding means that those participants in individual accounts plans [representing well over half of all pension plan assets in the United States] who are unfortunate enough to be forced to litigate in the Fifth Circuit will be unable to recover monetary losses  to the plans caused by fiduciary breaches when fewer than all plan participants would benefit from the litigation, thereby limiting recovery to the equitable relief available under § 502(a)(3) of ERISA.  To deprive plan participants in such circumstances of a § 409 remedy for breach of fiduciary duty effectively nullifies Congress's intent to provide a high level of protection to any and all plan participants from fiduciary abuse.  The majority's holding finds no support in the two cases it cites and it squarely conflicts with the one other circuit court to have directly addressed this issue.

404 F.3d at 347-48.  The "one other circuit court" is the Sixth Circuit that has ruled the opposite way.  *Kuper v. Iovenko*, 66 F.3d 1447 (6th Cir. 1995)(holding that recovery must inure to the plan but that a subclass of plan participants may sue for breach of fiduciary duty).

Judge King in essence echoes the stance of the Department of Labor, which is authorized by Congress to interpret, promulgate regulations regarding, and enforce the provisions of Title I of ERISA and whose interpretations are entitled to deference.  The Secretary of the Department of Labor has argued its interpretation of the statue here.  *See, e.g.,* Brief of Amicus Curiae Elaine L. Chao, Secretary of the United States Department of Labor, #246; Secretary of Labor's Response to Northern Trust Company's Notice of Supplemental Authority, #953 and Ex. A.

> court, and their rights protected.  Such orders typically contain a
> formula for calculating a setoff for the nonsettling defendants based
> on the settlement amount or the settlors' adjudged proportion of
> fault.  [citations omitted]

Given that settlements are favored and encouraged in federal court, bar orders as parts of settlements in complex class action litigation have been approved where they are fair not only to the settling parties, but to nonsettling third parties.  *See, e.g., Masters Mates*, 957 F.2d at 1031 (approving settlement bars of claims for contribution and indemnity where the non-settling defendant received a judgment credit of at least "the amount paid by settling defendants toward damages for which the nonsettling defendants would be jointly and severally liable"); *Eichenholtz v. Brennan*, 52 F.3d 478, 486 (3d Cir. 1995)("'The purpose of settlement contribution bar rule is to 'harmonize the equitable objectives of contribution with the encouragement of settlement.'"); *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 494, 496 (11th Cir. 1992)(the reason for the modern trend of incorporating bar orders in class action settlements "is that bar orders play an integral role in facilitating settlement.  Defendants buy little peace through settlement unless they are assured that they will be protected against codefendants' efforts to shift their losses through cross-claims for indemnity, contribution, and other causes related to the underlying litigation."; "The propriety of the settlement  bar order should turn upon the interrelatedness of the claims that it precludes, not upon the labels which parties attach to those claims.  If the cross-claims that the district court seeks to extinguish through the entry of a bar order arise out of the same facts as those underlying the litigation, then the district court may exercise its discretion to bar such claims in reaching a fair and equitable settlement.").[26]  The Court finds that all claims identified by objectors as independent here are based upon, relate to, or arise out of the settled claims, whether labeled tort, contract or statutory, some barred by ERISA preemption any way, and that the requested bar order against any claims "arising out of or concerning any of the Claims released under this Settlement Agreement" is narrowly tailored and permissible.

---

[26]  *But see TBG, Inc. v. Bendis*, 36 F.3d 916 (10th Cir. 1994)(holding that the district court lacked the authority in a partial settlement to deprive nonsettling defendants of their statutory right to contribution by imposing a bar order adopting a *pro tanto* apportionment approach).

Although early common law in England and the United States did not permit contribution to mitigate the doctrine of joint and several liability,[27] the Second Circuit has noted that these days it is widely accepted that "fundamental fairness demands a sharing of the liability" where there is joint and several liability. *Masters Mates*, 957 F.2d at 1027, 1028. In a class action settlement, the court must not only consider whether the settlement is fair, reasonable and adequate with respect to the plaintiff class, but also whether the compromise is fair as to the rights of third parties. *Id.* at 1035-26.[28] Developed as a procedural mechanism to apportion damages fairly based on relative fault among tortfeasors with joint and several liability, the right to contribution requires "each tortfeasor to pay that portion of damages attributable to his action" while indemnity allows "one tortfeasor to shift all of the loss on to another tortfeasor if it is determined that the latter should rightfully answer for all of the plaintiff's damages." *Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1130 (5th Cir. 1995).

To avoid the harshness of joint and several liability, some jurisdictions have used a judgment reduction after court approval of a settlement bar order: the three basic methods of apportionment are *pro rata*, proportionate fault, and *pro tanto*. *Master Mates*, 957 F.2d at 1028, *citing In re Jiffy Lube*, 927 F.3d at 160 & n. 3. As with the issue of a right to contribution under

---

[27] *Merryweather v. Nixan*, 101 Eng. Rep. 1337 (1799). Subsequently, as procedural rules evolved to allow joinder of joint tortfeasors, the rule against contribution was criticized as inequitable and as fostering collusion among plaintiffs and tortfeasors. *See, e.g., Franklin v. Kaypro Corp.,* 884 F.2d 1222, 1226-27 (9th Cir. 1989), *cert. denied sub nom. Franklin v. Peat Marwick Main & Co.*, 498 U.S. 890 (1990).

[28] At the hearing on August 19, 2004 Plaintiffs' counsel insisted,

> It is the plaintiffs' right to decide who to settle with. We make a informed decision both on ability to pay other judgments against people, and culpability. And culpability is more than just whether or not someone can be found liable. Culpability for the plaintiffs can be that we have the choice of deciding who we believe is maybe more wrong and more morally wrong."

TR (#856) at 11. Nevertheless, ultimately the Court has the responsibility to determine whether the settlement is fair, reasonable and adequate to all parties.

ERISA, the federal courts addressing the issue have adopted different setoff methods. Each method has advantages and drawbacks.

Under a *pro rata* rule of apportionment for reducing judgment against nonsettling defendants after a partial settlement the court divides the amount of the total judgment by the number of settling and non-settling defendants, regardless of that defendant's culpability. *Master Mates*, 957 F.2d at 1028-29 ("When, for example, a plaintiff settles with one defendant in a two defendant case, a judgment against the nonsettling defendant is reduced by one-half, regardless of whether the settling defendant was primarily or only minimally culpable."), *quoting In re Jiffy Lube*, 927 F.3d at 160 & n. 3. The *pro rata* rule tends to deter settlements with fewer than all the parties. *Id.*

With the proportionate fault rule, after a partial settlement, at trial the "'jury assesses the relative culpability of both settling and non-settling defendants and the non-settling defendant pays a commensurate percentage of the judgment.'" *Id.* at 1029*, quoting In re Jiffy Lube*, 927 F.3d at 160 & n. 3. "Because the credit determination is made after a determination of liability the proportionate method is always consistent with fault," but "a holdout defendant can make settlement difficult for the plaintiffs, who bear the risk of a bad settlement." *Id.* In addition, because the amount of the set-off is not known until after the trial, it makes adequate notice of the settlement to the class difficult. *Id.*[29]

---

[29] The Ninth Circuit has fully embraced the proportionate fault method over the pro tanto offset rule. *Franklin v. Kaypro*, 884 F.2d at 1231-32; *RTC v. Rice*, 51 F.3d 194, 197 (9th Cir. 1995), *cert. denied sub nom. Rice v. FDIC*, 516 U.S. 1071 (1996); *Renfrew v. Chao*, No. 02-17386, 2003 WL 1737925, *1 (9th Cir. Aug. 2, 2004). In *Kaypro*, it reasoned that because contribution "'is an equitable doctrine . . . [t]o apportion damages without regard to fault reduces, to an extent, the equity which the doctrine was intended to provide.'" 884 F.2d at 1230-31, *quoting Smith v. Mulvaney*, 827 F.2d 558, 559 (9th Cir. 1987). It explained,

> This approach satisfies the statutory goal [of the Securities Act of 1933 and the Securities Exchange Act of 1934] of punishing each wrongdoer. . . .The goal of equity is also satisfied. Settling defendants pay an amount to which they voluntarily agree. The bar on further contribution extinguishes further risk on their part. Nonsettling defendants never pay more than they would if all parties had gone to trial. This comports with the equitable purpose of contribution. . . . Furthermore, this approach leaves the burdens of

The *pro tanto* method reduces the non-settling defendant's liability for the judgment against him by the amount paid (dollar for dollar) by a settling defendant. *Id.* Thus it, like the *pro*

---

proof intact, alleviating Prudential-Bache's complaint that a good faith hearing . . . forces the burden of proof onto the nonsettling defendants. Obviously, there will be a certain amount of "fingerpointing" at the empty chair. . . . However, settling defendants will be protected by the bar order, and the financial motives of both plaintiffs and nonsettling defendants to vigorously press their arguments at trial will be unchanged.

Finally this approach satisfies the policy goal of encouraging settlements. Defendants that are inclined to settle may do so without penalty or risk.

The Second Circuit argues that the approach we adopt may violate the one satisfaction rule. . . . We do not agree.

The one satisfaction rule provides that a plaintiff is only entitled to one satisfaction for any given injury. The Second Circuit paints this scenario: plaintiffs settle with some defendants for a large sum, at trial the nonsettling defendants are found to be primarily responsible for the damage and are required to pay a large sum, and plaintiffs end up with more money than they would have received if all parties had gone to trial. . . .

In the first place we do not believe that the plaintiffs in the above referenced scenario have received more than one satisfaction for the same injury. All the defendants are required to contribute, none pay the entire damages. The plaintiffs are merely receiving more money than they *might* have in different circumstances. If all the defendants had settled for a sum larger than the trial verdict, the one satisfaction rule would not be violated. There is little conceptual difference between that and only some of the defendants settling for a larger amount.

In the second place, it is not entirely clear that the one satisfaction rule applies in these circumstances. The rule is based in common law; it is not statutorily mandated. . . . Contribution, on the other hand, is a statutory deviation from the common law. . . .

884 F.2d at 1231-32. *See also In re The Exxon Valdez*, 229 F.3d 790, 797 (9th Cir. 2000)("The main advantage of the proportionate share approach is that it is the only one of the three that combines fairness to all parties with an appropriate balance of individual incentives to settle. The effect of proportionate share apportionment, however, is that the actual amount of damages the plaintiff receives will deviate from the amount awarded by the jury, unless the amount of the settlement exactly matches the setting defendant's share of fault as subsequently determined by the jury. If the jury later determines that the settling defendant's share of fault is less than the amount paid in settlement, this will result in a windfall to the plaintiff. If the jury's allocation is higher, this will result in a shortfall.").

*rata* rule, may result in a judgment reduction that is unrelated to proportionate fault, and it can encourage a "'collusive arrangement between a plaintiff and a favored joint tort feasor." *Id.* For this reason some jurisdictions applying this method require a showing of good faith and a hearing on culpability and the fairness of the settlement prior to court approval of the bar order. *Id.; in accord In re Jiffy Lube*, 927 F.2d at 160. In the event that the Court concludes that a right to contribution exists under ERISA, the settling parties here seek a pro tanto bar order that would give the non-settling Defendants an offset for the settlement amount, i.e., the $85 million being paid from the policy proceeds, plus a $10,000,000 judgment reduction credit, which would reduce any judgment recovered against the non-settling Defendants for any of the ERISA claims against them.[30] Under this scheme there would be no double recovery for the Plaintiffs.[31]

---

[30] Once the credits had been applied, the non-settling Defendants would be jointly and severally liable for any remaining portion of the judgment against them.

[31] In *Kaypro*, the Ninth Circuit opined about this method,

> The strongest argument for adoption of this rule is that it adheres to the one satisfaction rule. "It is a fundamental legal principle that an injured party is ordinarily entitled to only one satisfaction for each injury." . . . . Because the settlement amount is merely offset from the total amount, the combined amounts paid by the settling defendants and by the nonsettling defendants can never be larger than the total amount of damages sustained by the plaintiffs. . . . [W]e think this advantage is illusory.

> There are several disadvantages to this scheme. Plaintiffs may be tempted to engage in collusion with certain defendants. By accepting a low partial settlement, plaintiffs would be able to fund further litigation with no diminution of the total amount eventually received. Similarly, plaintiffs could effect low settlements with defendants who had limited resources, and thereby *force* wealthier defendants to pay more than if all parties proceeded to trial.

> [A] good faith hearing [does not] prevent[] these evils. . . . In the first place, a good faith hearing "means bogging down the settlement process in a miniature trial before trial." . . . . In order to be truly efficacious, the good faith hearing would require a full evidentiary hearing on all of the parties' relative culpabilities. This would negate many of the benefits of settlement.

> Furthermore, the very dynamics of settlement guarantee that, even with a good faith hearing, the offset scheme forces nonsettling defendants to pay more than the amount for which they are culpable.

The United States Supreme Court has addressed the question whether, after "a plaintiff settles with one of several joint tortfeasors, the nonsettling defendants are entitled to a credit for that settlement." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 211 (1994). In *McDermott*, in the context of admiralty tort law, in which the high court emphasized traditionally the courts fashioned remedies, five joint tortfeasors were found proportionately negligent for damage to the plaintiff's crane and to the deck of its oil and gas production platform. *Id.* at 206, 204. Before trial the plaintiff settled with three defendants for one million dollars. *Id.* at 204 At the trial, a jury determined that the plaintiff's total loss was $2.1 million and that of the two remaining defendants, AmClyde was 32% at fault while River Don Castings, Ltd. was 38% at fault. *Id.* The issue before the Supreme Court was "whether the liability of the nonsettling defendants should be calculated with reference to the jury's allocation of proportionate responsibility, or by giving the nonsettling defendants a credit for the dollar amount of the settlement." *Id.* The Supreme Court examined the three leading methods of apportioning damages, set out in the Restatement (Second) of Torts § 886A at 334-35 (1977):  (1) pro tanto without contribution; (2) pro tanto with contribution; and

Settlement is attractive to parties because it reduces litigation costs. Therefore, plaintiffs are willing to settle for less than they might receive if a claim were fully litigated. . . .

(3) proportionate share.[32]   The proposed settlement in *Tittle* would be closest to the second category.

In *McDermott* the Supreme Court held that "the proportionate share approach is the correct one" because it promotes the interest in fairness. *Id.* at 202, 208.  It noted that in choosing among the three methods, its paramount considerations were "consistency with the proportionate fault approach [established in] *United States v. Reliable Transfer*, 421 U.S. 397 . . . (1975),[33] promotion of settlement, and judicial economy." *Id.* at 211.  It opined that the first option was inferior because

> [i]t   settlement and leads to unnecessary ancillary litigation.  It discourages settlement because settlement can only disadvantage the settling defendant.  If a defendant makes a favorable settlement, in which it pays less than the amount a court later determines is its share of liability, the other defendant can sue the settling defendant for contribution.

*Id.* at 211-12.

---

[32]   The Supreme Court quoted the Restatement § 886A's description of the three methods of allocation, respectively:

> (1) The money paid extinguishes any claim that the injured party has against the party released and the amount of his remaining claim against the other tortfeasor is reached by crediting the amount received; but the transaction does not affect a claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation . . . .

> (2) The money paid extinguishes both any claims on part of the injured party and any claim for contribution by another tortfeasor who has paid more than his equitable share of the obligation and seek contribution. . . .

> (3) The money paid extinguishes any claim that the injured party has against the released tortfeasor and also diminishes the claim that the injured party has against the other tortfeasors by the amount of the equitable share of the obligation of the released tortfeasor.

*McDermott*, 511 U.S. at 208-09.

[33]   In *Reliable Transfer*, the Supreme Court overturned the traditional maritime rule in collision cases requiring equal division of property damage, regardless of the degree of fault, in favor of a more equitable rule of apportioning damages based on relative fault of the tortfeasors. *McDermott*, 511 U.S. at 207.

The distinction between the second and third approaches is "less clear," the Supreme Court noted. *Id.* at 212. It observed that the proportionate fault rule was more consistent with *Reliable Transfer* since the nonsettling defendant usually pays only its proportionate share of the judgment. *Id.* In contrast, under the second option frequently a settlement with one defendant is for less that its equitable share and results in a larger amount to be paid by the nonsettling defendant. *Id.* Even though the second option requires the court to hold a "good faith" hearing, which provides protection to the settling defendant against contribution actions if the settling defendant demonstrates that the settlement "is a fair forecast of its equitable share of the judgment," nevertheless the hearings cannot fully preclude "inequitable apportionments of liability," contrary to the rule of *Reliable Transfer*. *Id.* at 213-14. "[O]ne of the virtues of the proportionate share rule is that, unlike the *pro tanto* rule, it does not make a litigating defendant's liability dependent on the amount of a settlement negotiated by others without regard to its interests." *Id.* at 220. While the second option will better promote settlement, it does so at the cost of that inequity to the nonsettling defendant's likelihood of paying more than its fair share of the damages. *Id.* at 214-15. With respect to judicial economy, the potential for unfairness mandates a good-faith hearing and it cannot be said with certainty that adjudication of relative fault at a preliminary hearing is more or less economical that the same at trial. *Id.* at 216-17. Some of the Defendants here have objected that the proposed partial settlement with its pro tanto approach is contrary to *McDermott*.

While many of the considerations are the same in *McDermott* as here, *McDermott* expressly addressed admiralty tort actions and drew on maritime law tradition and case law of equitable apportionment in reaching its endorsement of proportionate responsibility to reduce an award against nonsettling defendants after the plaintiff had settled with one or more others. In contrast, as discussed, ERISA provides for joint and several liability among co-fiduciaries, but no express right to contribution or proportionate fault. Nevertheless *McDermott*'s approach has influenced the law to recommend proportionate responsibility in tort cases,[34] although it has not

---

[34]     *See, e.g., Masters Mates*, 97 F.2d at 1025 (applying proportionate fault from federal common law to ERISA suits, including the right to contribution and indemnification among

been universally followed. Indeed, this Court selected the proportionate fault method of offset as the most equitable for application to a settlement in *In re Granada Partnerships Securities Litigations*, 803 F. Supp. 1236 (S.D. Tex. 1992), because (1) it prevents the plaintiff from engaging in collusion with some defendants by accepting a low settlement offer with no diminution of the total amount the plaintiff will ultimately receive; (2) it is equitable because setting defendants pay the sum to which they voluntarily agreed and a bar order on additional contribution extinguishes any further risk to them; (3) it does not put the burden of proof on non-settling defendants; and (4) it supports the policy goal of encouraging settlements because the settling defendants are protected by the bar order while the non-settling defendants do not have to pay more they would had they gone to trial. *Id.* at 1240, *citing Franklin v. Kaypro*, 884 F.2d at 1230.

Nevertheless, as the Tenth Circuit points out in *TBG, Inc. v. Bendis*, 36 F.3d 916, 923 (3d Cir. 1994), following *McDermott* is not mandatory:

> Since *McDermott* only required proportional fault credits in admiralty cases, . . . we cannot say that approving a different credit in this case was reversible error. Furthermore, the court in *McDermott* had the freedom to weigh and choose from various possible credits because the settlement itself did not mandate a credit. . . . The court in this case, however, could only approve or disapprove a settlement with a pro tanto credit. *McDermott* explains why courts should choose a proportional fault credit when they are free to choose and orders them to do so in admiralty, but it does not explain why approving a different credit on which a settlement depends would be an error where the Supreme Court has not mandated a proportional fault credit. Agreeing with *McDermott* that a pro tanto credit does not fully compensate for lost contribution rights does not lead to the conclusion that approving a pro tanto credit itself is reversible error. It does suggest that barring contribution claims to recover any difference between the credit and the settling defendants' proportional fault would be inappropriate, but it does not explain why, since no bar order was at issue in *McDermott*.

*See also Harden v. Raffensperger*, 933 F. Supp. at 772 ("[T]he settlement agreement being considered is conditioned on this Court issuing a contribution bar order with a pro tanto method of

---

joint tort feasors); *Eichenholtz v. Brennan*, 52 F.3d 478, 486-87 (3d Cir. 1995)(approving application of proportionate fault offset in federal securities action).

setoff. Essentially, it is in a take it or leave posture. The Court is not free to modify the agreement to force the parties to agree to proportionate share liability.").

Because the settlement before the Court specifies a pro tanto plus contribution offset, the Court has no right to prefer the proportionate fault method, but accepts the parties' right to apply such an offset and instead examines the settlement as written to determine if it is fair, reasonable and adequate for Plaintiffs, settling Defendants, nonsettling Defendants, and the public.

## VI. Is the Proposed Partial Settlement, Incorporating the Pro Tanto Bar Order and Credit Reduction Scheme, Fair, Adequate and Reasonable?

A settlement that bars contribution claims must be narrowly tailored and there must be a judicial determination that "the settlement has been entered into in good faith and that no party has been set apart for unfair treatment." *Masters Mates*, 957 F.2d at 1031. Other factors for the Court's consideration are "relative fault, the likelihood of a plaintiff's success at trial, and the adequacy of the resources of the most culpable party to ensure that 'a settling defendant escapes neither the responsibility for his wrongdoing nor, therefore, the deterrent effect which underlies his right to contribution.'" *WorldCom*, 339 F. Supp. 2d at 569, *quoting Masters Mates*, 957 F.2d at 1032. The disadvantages of the pro tanto method raise other fairness concerns: plaintiffs may be lured to collusion with certain defendants and accept a low partial settlement to force other nonsettling defendants to pay more if the case proceeds to trial, all without any risk to the total amount the plaintiffs ultimately receive. "Consideration of all these factors, including relative fault, in determining what is a fair settlement 'guarantee[s] that a settling defendant escapes neither the responsibility for his wrongdoing nor, therefore, the deterrent effect which underlies the right to contribution.'" *Masters Mates*, 957 F.2d at 1032. If the Court finds that the settlement bar order is not fair, it cannot stand. *Id.*

The joint and several liability provision in ERISA and the federal policy favoring settlement may support a minimum pro tanto offset with a bar order because under the statute any defendant may be held responsible for the total amount sought by a plaintiff. Nevertheless, as recognized by the Second Circuit and other courts, the trend in tort law has been development of

comparative fault or apportionment of liability out of fairness concerns for the plaintiff, the settling defendants and third-parties or nonsettling defendants, as well as the public. *Masters Mates*, 957 F.2d at 1028 ("'It is now widely recognized that fundamental fairness demands a sharing of liability.'" "'[T]he common law's rejection of contribution among joint tortfeasors has itself been rejected by most states and most commentators.'"); *WorldCom*, 339 F. Supp. 2d at 568 (despite the joint and several liability provision under ERISA, "[a]s a matter of fairness . . . joint tortfeasors do not have to shoulder the entire burden of a judgment alone where there are other solvent tortfeasors" and "[t]he law generally recognizes the right of contribution among joint tortfeasors"); *Harden*, 933 F. Supp. at 772; *Fluck v. Blevins*, 969 F. Supp. 1231, 1239 (D. Or. 1997)("In a *pro tanto* system, that determination requires a 'fairness hearing' to ensure the settling parties are paying their fair share of any liability.  For the most part, that is not an issue in a proportionate liability system because the non-settling defendant will be liable only for his or her proportionate share of the judgment. [Because a bar order would extinguish the right to seek contribution of a defendant who paid more than his fair share, the scope of such a fairness hearing] will be narrow."  The threshold question will be whether the non-settling defendants are each capable of paying any judgment that may be rendered against them and would be subject to contribution to their fellow non-settling defendants.  An affirmative answer terminates the inquiry.  Otherwise, I must consider whether the settling defendants are paying their fair share of the total liability, as apportioned among those defendants who are both solvent and subject to claims for contribution."); *In re Granada Partnership Securities Litigations*, 803 F. Supp. at 1241 (the pro tanto "approach requires a separate fairness hearing at the time of partial settlement to determine that the settlement was made in good faith and is fair to the non-settling party").  A number of courts have required evidentiary hearings to consider the "merits of nonsettling defendants' individual contributions." *Master Mates*, 957 F.2d at 1032 & n. 4, *citing In re Jiffy Lube Sec. Litig.*, 927 F.2d at 160; *Patriot's Point*, 772 F. Supp. at 1565; *Dalton v. Alston & Bird.*, 741 F. Supp. 157, 160 (S.D. Ill. 1990).

In *In re Granada Partnership Litigations* this Court pointed out the following as factors that would support a finding of fairness under a pro tanto offset rule: "(1) whether a larger judgment against the settling defendants would have been collectible; (2) the strength of plaintiffs' liability case against the settling defendant; (3) the settling defendant's relative culpability; and (4) the participation of a magistrate or judge in settlement negotiations. 803 F. Supp. at 1241, *citing In re Atlantic Financial*, 718 F. Supp. 1012, 1017-23 (D. Mass. 1988). Here, the last factor is not relevant.

In view of the various requirements and tests set out above, the Court examines the factors individually.

The Court finds no evidence of intentional fraud or collusion behind the partial settlement, which was reached after years of discovery to uncover the facts of the litigation and intense negotiations with numerous parties and counsel, "looking over the shoulders" of the settling Plaintiffs and Defendants. There has also been an extraordinary amount of investigation regarding the collapse of Enron, including by Congress, the Department of Labor, the SEC, and State Street, that seems focused *inter alia* on claims of breach of fiduciary duty relating to the ERISA plans. In the bright light of such intense public and publicized scrutiny no fraud or collusion in the proposed settlement has been revealed.

While it is not relevant that other negotiators might have obtained a better settlement for the class, nevertheless this Court must find that the terms of the proposed agreement are fair, reasonable and adequate. *In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 212 (5th Cir. 1981).

The complexity, expense and likely duration of the litigation, which involve not only *Tittle,* but numerous Enron-related actions, are self evident and exceptional, and it appears likely that the litigation will continue for some time. Without question this settlement is driven by the need to preserve for the plaintiff class the insurance policy proceeds, which otherwise are likely to be consumed by litigation defense costs. This factor works to justify a settlement for less than what

Plaintiffs might obtain if they continued to prosecute their claims through trial, only to find that the actual recovery has gone up in smoke.

Moreover there are risks to the Plaintiffs in not settling. As they have pointed out, ERISA breach of fiduciary duty is a "developing and somewhat esoteric, area of law" and therefore there is some risk to their suit, which supports settlement. #738 at 2. Moreover, presenting the evidence of Enron's [and the other Defendants'] alleged, complicated misconduct at trial would be a "mammoth undertaking." *Id.* The settlement avoids the risks and additional great expense inherent in these challenges in a vigorously litigated action.

As for the stage of the litigation and the amount of formal and informal discovery completed, this case has been proceeding since it was filed on November 11, 2001 and the discovery has been substantial and is ongoing. Sufficient investigation has permitted counsel to make reasonable judgments about the merits of the case as well as the solvency of the parties and their relative fault. Plaintiffs have not provided the Court with any evidence regarding the specific roles of individual settling Defendants and nonsettling Defendants so that the Court can gauge for itself the relative fault of the Defendants. Without factual details, Mr. Sarko represented, "The nonsettling defendants are at least equally at fault [as the settling defendants], and the claims are at least equally as strong." TR (#856) at 38. Plaintiffs' counsel also said at the hearing, "The reason for settlement is not that we don't have enough potential liability in damages. The reasons are more that we don't want to see the policy vanish." TR (#856) at 12.

Nor has there been any evidence of the financial solvency of the individual Defendants that might enable them to contribute additional amounts in the settlement from their own resources. Mr. Sarko did conclusorily assert that "the potential judgments that the settling defendants face would bankrupt all of them." TR #856 at 36. He further remarked that "the settling defendants have an ability to pay issue because of all the lawsuits against them." *Id.* at 37. He also stated, "The settling defendants will not have an ability to pay a larger judgment . . . [W]hat's unique here is the huge staggering litigation against the settling defendants." *Id.* at 37-38.

Further, settling Defendants argue, "Against this backdrop--*the lack of any further insurance coverage*--it was critical for settling Defendants to have absolute certainty that if the Settlement Agreement were approved, they would have no further risk or loss." #820 at 17.

Plaintiffs' argument boils down to one of necessity. Although some of the settling Defendants may be able to pay more than the insurance proceeds, they will not **settle** for more than the insurance proceeds. Obtaining the additional amount is not worth the candle to the Plaintiffs because it would necessitate trying the case and depleting a part or all of the insurance funds, with no guarantee of recovery or collection of the same amount plus the additional amounts the settling defendants might be obliged to pay after a trial. The nonsettling objectors' argument is that if there is a right to contribution under ERISA they will be barred from seeking contribution from the settling Defendants and will have only a dollar for dollar credit for any amounts they may be obligated to pay. The Court must determine if, under the circumstances of this case, this settlement is fair, adequate, and reasonable.

From its review of the record of this and related cases and of the results of numerous investigations arising out of Enron's collapse, and as reflected in its memoranda and orders, although counsel for the settling parties have not provided specific evidence for the record, the Court believes Plaintiffs have colorable breach-of-fiduciary-duty claims against all the Defendants, although in varying degrees, and that there is a strong possibility that they will prevail on the merits against at least some of the Defendants. "[A]bsent fraud or collusion, the most important factor is the probability of the plaintiffs' success on the merits. . . . 'If the settlement offer was grossly inadequate . . . it can be inadequate only in light of the strength of the case presented by the plaintiffs.'" *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982), *cert. denied*, 459 U.S.828 (1982).

The range of possible recovery here is estimated by Plaintiff's counsel at one to one and one-half billion dollars in excess of the insurance policy proceeds. No evidence in support of that estimate was offered, and Northern Trust's counsel, noting the lack of evidentiary support, has questioned this amount. If this estimate is accurate, such an amount is undoubtedly well beyond

the ability of the settling and nonsettling Defendants to pay.  The settlement at this point would save great expense and would give the Plaintiffs hard cash, a bird in the hand.  An inquiry into the fairness of the settlement "should contrast settlement rewards with likely rewards if the case goes to trial." *In re Chicken*, 669 F.2d at 239; *see also In re Corrugated Container Antitrust Litigation*, 643 F.2d 195, 212 (5th Cir. 1981)("'The settlement terms should be compared with the likely rewards the class would have received following a successful trial.'"), *quoting Cotton v. Hinton*, 559 F.2d at 1330.

Here all but five defendants have joined in the partial settlement, but the settlement amount is a very small fraction of the damages amount projected by the Plaintiffs.  Nonsettling Defendants argue that the settlement is unfair to them because it is funded solely by exhausting insurance proceeds that otherwise would offer coverage to the nonsettling Defendants and by means of a broad bar order extinguishes all rights they might have to contribution.  Kenneth Lay's counsel argued at the fairness hearing that the nonsettling Defendants would "be left exposed potentially to 92 percent of the alleged 1.2 billion dollars in alleged damages . . . without insurance coverage and without any ability whatsoever to obtain contribution or indemnity from the 50 settling defendants who are being released in this settlement agreement." TR. #856 at 104.  Although actual recovery by Plaintiffs of over one billion dollars in damages is improbable, it is likely that Plaintiffs could recover from settling Defendants substantially more than the insurance policy proceeds.  This dilemma is, of course, faced in the settlement of every law suit, but the question in this lawsuit is, does the extinguishment of the nonsettling Defendants' right to contribution (if it exists under ERISA) make the settlement so unfair to them that the settlement cannot be approved because it cannot be found fair, reasonable, and adequate. The Court thinks not.  Extinguishing whatever contribution rights that may exist in favor of the nonsettling Defendants is not unfair, given the fact there is a *pro tanto* settlement credit; exhausting the policy limits in favor of the settling Defendants is not unfair, given the state of insurance law in Texas. *Cf. Travelers Indemnity Company v. Citgo Petroleum Corp.*, 166 F.3d at 767, relying on *Soriano*, 881 S.W.2d at 314-16, *Vitek*, 51 F.3d at 536-

38, and *Arnold*, 930 S.W.2d at 202-03.  Moreover, the Court finds that the $10 million additional judgment credit for the nonsettling insureds is proper and equitable.

The Court gives weight to the fact that Plaintiffs mailed out 41,454 notices to class members and no member has voiced an objection to the settlement, supporting approval of it as fair.[35]  Receipt of few or no objections "can be viewed as indicative of the adequacy of the settlement."  4 Herbert B. Newberg, *Newberg on Class Actions* Sec. 1141 at 108 (4th Ed. 2002).  Also not objecting to the proposed settlement are Enron, the Department of Labor, and The Regents.

Finally, the Court agrees with Plaintiffs' counsel that the objections made by the Pension Benefit Guarantee Corporation in its effort to be excluded from the bar order lack merit.  Because the Cash Balance Plan has not been terminated, any interest it might have or right to act on the Plan's behalf is speculative and  contingent; moreover the parties have provided evidence that Enron's confirmed Plan of Reorganization has created a $321.8 million fully funded reserve to cover any claims PBGC might have in the future.  The Court also finds the scope of the bar order (precluding claims against the Officer and Director Releasees "for indemnity, for contribution, and any other claims arising out of or concerning any of the Claims released" in the settlement agreement) is not too broad and that the non-parties covered by it were substantial participants in, or contributors to, the settlement and are properly within its reach.

The dearth of objections to the settlement adequacy, coupled with the fact that there is no question that this was an arm's length negotiation and with the Court's determination that the settlement is not inherently unfair to the nonsettling Defendants, compels the Court to find that this settlement, although imperfect, is fair, reasonable, and adequate under the unusual circumstances of this case.

Accordingly, the Court

---

[35]  Five plan participants (Harriet D. Dickson, Richard L. Senst, Chris P. Christenson, Alan L. Myers, and Ray D. Barnes) initially stated objections because they erroneously believed that this settlement resolved all claims against all parties in the litigation, but they subsequently withdrew them after discussions with counsel.  Another objection lodged by Douglas Kelly regarding whether he was vested in the cash balance plan was not properly asserted within the scope of this litigation and not related to the fairness of the settlement.

**ORDERS** that (1) all objections to the partial settlement that have not previously been resolved are OVERRULED for reasons stated above; (2) The partial settlement is **APPROVED**; and (3) Plaintiffs' unopposed amended motion to set aside a portion of funds recovered in partial settlement, to establish an attorneys' fees and litigation reserve account, and amended plan of allocation is **GRANTED**.

**SIGNED** at Houston, Texas, this 24th day of May, 2005.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE