IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ENRON CORP. SAVINGS PLAN, f/k/a ENRON CORP., an Oregon Corporation, | § § § § | |
| Plaintiff, | § § | |
| V. | § § | |
| HEWITT ASSOCIATES, L.L.C., | § § | |
| Defendant. | § § | |
| V. | § § | |
| ENRON CREDITORS RECOVERY CORP., f/k/a ENRON CORP., an Oregon Corporation, | § § § § | CONSOLIDATED WITH |
| Third-Party Defendant. | § | |
| PAMELA M. TITTLE, et al., | § § | |
| Plaintiffs, | § § | |
| V. | § § | CIVIL ACTION NO. H-01-3913 |
| ENRON CORP., et al., | § § | |
| Defendants. | § § | |

### OPINION AND ORDER

Pending before the Court in H-01-3913 are the following motions: (1) Enron Creditors Recovery Corp.'s[1] ("Enron's") Rule 12(b)(6) motion to dismiss Hewitt Associates, L.L.C.'s ("Hewitt's") Complaint for Declaratory Judgment (#1411 in H-01-3913, #40 in H-08-2699); (2) Enron's Rule 12(b)(6) motion to dismiss [Hewitt's]

_____

[1] Formerly known as Enron Corp.

-1-

Third Party Complaint (#1412 in H-01-3913)[2]; and (3) Third-Party
Defendant Enron's Rule 12(b)(6) motion to dismiss Counterclaim[3] of
Hewitt (#1441 in H-01-3913).

Three cases, arising out of the dispute between Enron and
Hewitt over Hewitt's role in the miscalculations that resulted in
an incorrect distribution of settlement funds to the *Tittle*
beneficiaries, have been consolidated into *Tittle*, H-01-3913, in
which original proceedings relating to the miscalculation first
occurred: (1) H-07-4081 (Enron Corp. Savings Plan and its

---

[2] Hewitt's Third Party Complaint, also seeking indemnification
from Enron under the ASA, is instrument #1406 in H-01-3913.  Enron
explains in its motion to dismiss Hewitt's Declaratory Judgment
Complaint (#1411 at 2, n.2):

> Hewitt filed a Third Party Complaint against Enron in the
> Plan Lawsuit which includes allegations which are
> virtually identical to the allegations contained in the
> present [Declaratory Judgment] Complaint and seeks
> declarations essentially identical to those sought by
> Hewitt in this Complaint.  Enron has moved concurrently
> to dismiss the Third Party Complaint on the same grounds
> set forth in this motion.  Enron apologizes to the Court
> for filing simultaneously two separate motions raising
> identical arguments, but the existence of two Hewitt-
> filed complaints asserting duplicative causes of action
> against Enron has left it no choice but to submit two
> motions to dismiss.

Hewitt agrees that all the claims in Hewitt's Complaint for
Declaratory Judgment and Third Party Complaint and Enron's
Complaint for Declaratory Judgment raise the same issues and
"concern Enron's indemnification obligations under the Enron-Hewitt
Administrative Services Agreement ("ASA").  #1416 at 1 n.1.

[3] Hewitt's Amended Counterclaim, filed in Enron's Declaratory
Judgment action, is found in its First Amended Answer, #1436 at 25-
25, ¶¶ 186-194, incorporates its Third-Party Complaint against
Enron (#1406) in H-01-3913.

Administrative Committee's action for damages against Hewitt for negligent misrepresentation, grossly negligent misrepresentation, negligence, gross negligence, professional negligence, and breach of contract); (2) H-08-1894 (Enron's Declaratory Judgment Action seeking a declaration that it has no duty to indemnify Hewitt for damages caused by Hewitt's own conduct under an Administrative Services Agreement (the "ASA")); and (3) H-08-2699, transferred to this district from Illinois (Hewitt's Declaratory Judgment action for a declaration that Enron is obligated under the ASA to indemnify Hewitt for all losses under the terms of the ASA including defense expenses).[4]  As pointed out by counsel for Enron, these cases are interrelated, indeed overlap,[5] because Hewitt has filed three separate complaints essentially seeking the same relief:  a declaratory judgment that Hewitt is entitled to indemnification from Enron under the ASA,[6] entered into on June 1,

---

[4] Also involved is Elaine Chao, Secretary of the United States Department of Labor, who filed suit (H-03-2257) against Enron's Board of Directors for breach of fiduciary duty, also consolidated in H-01-3913, and therefore has an interest in the outcome of the dispute with Hewitt.

[5] *See, e.g.*, #1441 at 2.

[6] A copy of the ASA is attached as Ex. A. to the Complaint for Declaratory Judgment, in turn attached to Defendant's Notice of Removal (#1411 in H-01-3913, #40 in H-08-2699).  The Exhibits to the Complaint are considered part of the complaint "for all purposes" of a Rule 12(b)(6).  *United States ex rel. Riley v. St. Luke's Hosp.*, 355 F.3d 370, 375 (5th Cir. 2004), *citing* Fed. R. Civ. P. 10(c).  Moreover, in the Declaratory Judgment Complaint Hewitt has expressly stated that the exhibits are incorporated into and part of the Complaint.

2001 by Enron and Hewitt, for losses and expenses resulting from Hewitt's mistaken calculations for distribution of the first tranche of the *Tittle* settlement funds, as well as for defense of claims brought against Hewitt by Enron Corp. Savings Plan and the Administrative Committee of the Enron Savings Plan.[7]   Enron has filed its motions to dismiss Hewitt's Declaratory Judgment Complaint and the Third-Party Complaint for failure to state a claim,[8] while Third-Party Enron's motion to dismiss the Counterclaim incorporates much of and is also related to the first two motions.   Thus the Court analyzes on the arguments of Enron's motion to dismiss Hewitt's Complaint for Declaratory Judgment, the first motion, because its decision about that applies to and controls the resolution of the others.

The Court has diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as well as ancillary jurisdiction and jurisdiction under the All Writs Act, 28 U.S.C. § 1651, over this matter, because the undersigned judge retained jurisdiction over "any and all disputes" arising out of the *Tittle* settlement agreements and allocation

---

[7] See the Declaratory Judgment Complaint (#1, Ex. 1 in H-08-2699, now consolidated into *Tittle*) and Hewitt's Third Party Complaint (#1406 in H-01-3913).

[8] Enron's motion to dismiss the Third Party Complaint states that it "is virtually identical to the Complaint for Declaratory Judgment . . . .  In both actions, Hewitt seeks a declaration that it is entitled to 'indemnification' from Enron for the Plan Lawsuit and certain other amounts pursuant to [the ASA].""  #1412 at 1-2.

plan.[9]

## I.  Hewitt's Complaint for Declaratory Judgment

Hewitt's Complaint for Declaratory Judgment under 735 ILCS 5/2-701, *et seq.*,[10] is Hewitt's first-filed claim for indemnification under the ASA from Enron, arising out of its provision of services to Enron, including allocation of the *Tittle* settlement funds.  It asks the Court to determine and adjudicate the rights and liabilities of the parties under the June 1, 2001 ASA, a contract obligating Hewitt to provide certain benefit plan administration services to various Enron employee benefit plans

---

[9] #987 at ¶ 30; #1075 at ¶ 31.

[10] Hewitt is a Delaware corporation, headquartered in Lincolnshire, Illinois.  It originally filed the Declaratory Judgment action under Illinois state law in the Circuit Court of Lake County, Illinois, from which it was removed by Enron to the Eastern Division of the United States District Court for the Northern District of Illinois, and subsequently transferred to this Court pursuant to a motion filed by Enron.  In this Court it was designated H-08-2699.  H-08-2699 was subsequently consolidated into *Tittle*, H-01-3913.
As pointed out by this Court in its Opinion and Order of August 29, 2008 (#1389 at 8 n.10 in H-01-3913), Hewitt filed this Illinois suit six months after the Enron Corp. Savings Plan filed its suit here in the Southern District of Texas (H-07-4081) and one week after Enron filed a motion in *Tittle* (#1309 in H-01-3913) alerting this Court to, and explaining in detail its view of Hewitt's role in the erroneous distribution of settlement funds and failed attempts by Enron to work out a solution with Hewitt.
The Complaint for Declaratory Judgment at issue can be found attached to the Notice of Removal, #1 in H-08-2699.  For some procedural background on the various actions arising out of the dispute with Hewitt that were combined in *Tittle*, see #1392 in H-01-3913, also filed as #31 in H-07-4081.

(the "Plans") and their participants.[11]  Hewitt argues that the ASA

contained detailed provisions[12] for the sharing and limitation of

---

[11] In the ASA, "Client" is Enron.

[12] Specifically the following ASA Sections are relevant to the dispute:

§ 1.25 "**Losses**" means unrecoverable losses, costs, damages or expenses resulting from Hewitt's performance of the Services.

§ 1.35 "**Services**" means the benefit plan administrative services to be performed by or on behalf of Hewitt as described generally in the Fee Schedule and in more detail in the Delivery Model and the Requirements Document.

§ 2.5(a) **Hewitt Errors.**  If Hewitt's performance of the Services does not comply in any material respect with the terms of this Agreement . . ., Client may require Hewitt, at Hewitt's expense, to correct or re-perform any defective or non-conforming Services when such performance is reasonably necessary and practical under the circumstances.  In addition, if Hewitt's non-compliance causes Losses to Client or the Plan(s), Hewitt will be liable to Client in accordance with Section 10.

Section 10, composed of six subsections, is entitled in bold type, "**Liability and Indemnification**":

§ 10.1 **Limitation of Liability.**  Hewitt will furnish services at no charge to identify, correct or re-perform any defective or non-conforming service as described in Section 2.5.  In addition to its obligations under Section 2.5, if Client or the Plan(s) suffers Losses as a result of Hewitt's negligence, Hewitt will be liable for up to $1,000,000 of such Losses incurred by Client or the Plan(s) during any Agreement Year after the first $100,000 of such Losses.

§ 10.2 **Exclusions from Limitation on Liability.** Notwithstanding anything to the contrary contained here, the limitations on Hewitt's liability contained in Section 10.1 shall not apply to Losses arising from (a) Hewitt's gross negligence, willful, fraudulent or

-6-

criminal misconduct . . . .

## § 10.4   Indemnification.

(a) **By Hewitt.**   Subject to Sections 10.1, 10.2, and 10.3. and 10.4(c), Hewitt shall indemnify, defend and hold Client and Plans harmless from and against any Claims and shall pay all Losses (including reasonable attorneys' fees and expenses):   (i) arising out of any breach by Hewitt of any of its material obligations, representations or warranties contained in this Agreement; (ii) arising out of Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct . . . .

(b) **By Client.**   Client shall indemnify, defend, and hold Hewitt harmless from and against any claims, and pay all losses and related expenses (including reasonable attorneys' fees and expenses) suffered by Hewitt:   (i) arising out of any breach by Client of any of its material obligations, representations, or warranties contained in this Agreement; (ii) arising from Client's negligence, gross negligence or willful, fraudulent, or criminal misconduct . . . [or] (v) arising from Losses for which Hewitt is not liable under this Section 10 . . . .

### § 10.4(c)   Defense of Third Party Claims.   Hewitt will defend all Claims brought against Client or Hewitt by any third party relating to this Agreement or the Services to the extent such Claims relate to or arise out of Losses described in Section 10.2(b)-(d).   Client will defend all other Claims brought against Client or Hewitt by any third party relating to the Agreement or the Services. . . . Included among third parties are the Plans, any trustees, the Participants and affiliates of Client. . . .

Hewitt maintains that Enron's duty to defend Hewitt from the Plan's claims includes Claims for Losses described in Section 10.2(1) "arising from Hewitt's gross negligence or willful fraudulent or criminal misconduct."

**§ 10.2(b)-(d),** according to Hewitt, provides that the Plans are neither a party nor a third party beneficiary to the ASA, and that ASA does not "create any legal relationship, interest or right

responsibility for errors and omissions in connection with the work performed by Hewitt, which includes errors in its services for Enron and defense of the suit against it by the Plans.

Hewitt concedes that on January 1, 2005, Enron terminated Hewitt's record keeping services for the Plans,[13] but insists that the contractual relationship continued because on that same date Enron and Hewitt executed an Amendment to the ASA limiting and changing the scope of services to permit access to Plan data still

---

whatsoever between Hewitt and any individual, beneficiary or applicant or assignee under any Plan."

**§ 17.1 No Third Party Beneficiaries.**  This Agreement has been entered into for the sole benefit of the parties and their respective permitted successors and assigns. Except as specifically set forth in this Agreement, the parties do not intend the benefits of this Agreement to inure to any third party, and nothing contained herein shall be construed as creating any right, claim or cause of action in favor of any such third party against any party hereto.  Furthermore this Agreement shall not create any legal relationship, interest or right whatsoever between Hewitt and any individual, beneficiary, Participant, applicant or assignee under any Plan.

**§ 13.2 Fiduciary Status.**  Client and Hewitt understand and intend that Hewitt shall not be a fiduciary within the meaning of ERISA or any state law with respect to any Plan. . . . All discretion and control with respect to the terms, administration, or assets of any Plan shall remain with Client or with named fiduciaries under such Plan.

[13] The Declaratory Judgment Complaint asserts that the ASA was "originally executed in contemplation of Hewitt's taking over record keeping responsibilities for the Plans, including the Enron Corp. Savings Plan.  By January 1, 2005 the record keeping had been transferred away from Hewitt, largely as a result of the Plans' being integrated into successor plans of other employers."

-8-

in Hewitt's possession and for services to be performed occasionally by Hewitt at Enron's request pursuant to work orders. Amendment ("Amendment I"), Ex. B to Complaint for Declaratory Judgment, attached to #1 in H-08-2699.  According to Hewitt's Complaints, Hewitt and Enron agreed that under Amendment I Hewitt would provide "Services" "primarily consisting of providing information to [Enron] related to Participant data which Hewitt has maintained on its proprietary systems, to the extent Hewitt maintains such information."

In late 2005 Enron requested Hewitt to develop a settlement allocation protocol for the first tranche of the *Tittle* settlement fund.[14] When the litigants in *Tittle* filed a Second Supplemental Amended Plan of Allocation on or about July 25, 2006, Hewitt and Enron concurrently executed a July 25, 2006 Amendment to the ASA in the form of a letter ("Amendment II")(Ex. C, incorporated into the Declaratory Judgment Complaint, effective July 1, 2006), extending the term of the ASA for another year, through September 30, 2007, to cover the services Hewitt would be performing for Enron in connection with the *Tittle* allocation protocol. Both Amendments stated, "The provisions of the Agreement not amended, revised or supplemented by this amendment will remain in full force and effect." Enron authorized Hewitt to proceed on the allocation work

---

[14] The Plan of Allocation was negotiated by the parties to *Tittle*; Hewitt was not a party to the action.

in a July 31, 2006 work order ("Requirements Document"), Ex. D to Declaratory Judgment.  Hewitt was paid approximately $900,000 out of the settlement fund for its services relating to the allocation.

Only after the first tranche of the settlement funds had been distributed was a challenge raised in late January 2007 by a dissatisfied class member as to the accuracy of the distribution. Upon investigating, Hewitt represents that it discovered that an archived computer system used to calculate ESOP class member allocations contained an incorrect share value for January 1, 1998, resulting in overly large losses to participants holding ESOP shares at the start of the class period.  As a result, excessive amounts of the settlement proceeds were distributed to them at the expense of other class members who received underpayments. Approximately $22 million was misallocated among the participant class members.  An interest obligation has been accruing on those who received underpayments.  Moreover Enron estimated that of the $22 million overpayment, approximately $11.2 million may not be recoverable through reversals of payments to new plan trusts and IRAS, or through offsets from forthcoming distributions.

Hewitt observes that ASA Section 10.5 ("**Mitigation Efforts**") provides, "Both Hewitt and Client agree to use reasonable efforts to mitigate liability, damages and other losses suffered in connection with this Agreement, including where any damages can be mitigated lawfully pursuing recovery from Participants or other

-10-

third parties, each of Hewitt and Client will conduct or permit diligent efforts to so recover." Hewitt charges that Enron failed reasonably to mitigate losses, causing Hewitt damages. As a fiduciary of the Plans, Enron has the right and ability to seek recovery of the *Tittle* allocation overpayments from participant class members, while Hewitt does not. Both Enron and Hewitt, reserving their rights under the ASA, executed loans to the Plan so the participants who were underpaid or unpaid would be paid without awaiting recovery of overpayments. Hewitt's loan was more than $1,000,000. Hewitt argues that from whatever funds the Plan is able to recoup from overpaid participants, it must repay the loans in equal shares to Hewitt and Enron. Hewitt represents that it also provided Enron with prompt written notice that it was seeking indemnification under the ASA for past and future expenses in defending against the Plan's suit against Hewitt, but that Enron refuses to honor its obligation to indemnify Hewitt under the ASA.

## II. Standard of Review under Rule 12(b)(6)

When a district court reviews a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), it must construe the complaint in favor the plaintiff and take all well-pleaded facts as true. *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007); *Kane Enterprises v. MacGregor (US), Inc.*, 322 F.3d 371, 374 (5th Cir. 2003), *citing Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).

"While a complaint attacked by a Rule 12(b)(6) motion to

-11-

dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)(citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965, *citing* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1216, pp. 235-236 (3d ed. 2004)("[T]he pleading must contain something more . . . than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"). "*Twombly* jettisoned the minimum notice pleading requirement of *Conley v. Gibson*, 355 U.S. 41 . . . (1957)["a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"], and instead required that a complaint allege enough facts to state a claim that is plausible on its face." *St. Germain v. Howard*, ____ F.3d ____, No. 08-30364, 2009 WL 117944, *2 (5th Cir. Jan. 20, 2009), *citing In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)("To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to state a claim to relief that is plausible on its face.'"), *citing Twombly*, 127 S. Ct. at 1974).   The plaintiff must plead specific facts, not merely

conclusory allegations to avoid dismissal.  *Id.*, *citing Collins v.*
*Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)("We
will thus not accept as true conclusory allegations or unwarranted
deductions of fact."). "Dismissal is proper if the complaint lacks
an allegation regarding a required element necessary to obtain
relief . . . ." *Rios v. City of Del Rio, Texas*, 444 F.3d 417, 421
(5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006).

In addition to the complaint, the court may review documents
attached to the complaint and documents attached to the motion to
dismiss to which the complaint refers and which are central to the
plaintiff's claim(s).  *Collins*, 224 F.3d at 498-99.  If an exhibit
attached to the complaint contradicts an allegation in the
complaint, the exhibit controls.  *United States ex rel. Riley v.*
*St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004).

**III.  Enron's Rule 12(b)(6) Motion (#1411)**

Enron insists that Hewitt fails to state a claim.  Enron, in
this case, and Enron Corp. Savings Plan and its Administrative
Committee in the Plan's lawsuit (previously H-07-4081, before
consolidation into H-01-3913), dispute that Hewitt's allocation
work was performed pursuant to the ASA attached to the Declaratory
Judgment Complaint.  However, **assuming for purposes only of the**
**motion to dismiss that the ASA applies** [emphasis added by the

Court],[15]      Enron      argues      that      Section

---

[15] For all other purposes, Enron's First Amended Complaint
(duplicatively filed as #1428 and 1433 in H-01-3913) asserts that
Hewitt drafted and Enron signed the ASA effective June 1, 2001 for
Hewitt to provide benefits administrative services to Enron for
some of its defined contribution plans.   ¶¶ 12-13.   In that
contract, "Services" was defined as "benefit plan administrative
services to be performed by . . . Hewitt as described generally in
the Fee Schedule and in more detail in the Delivery Model and
Requirements Document."   ¶ 13, § 1.35.   Section 2.1 of the ASA also
provided,   "**Services.**   Hewitt shall provide the Services in
accordance with the terms of this Agreement and the Requirements
Document."   ¶ 14, citing § 2.1.   Section 17.7 of the ASA requires
any amendment to be a written instrument executed by the parties or
their successors or assigns.   ¶ 25.

The Amended Complaint states that by November 2004 the
responsibility for record keeping for the majority of Plan assets
being administered under the ASA was transferred to Portland
General Electric and Diversified Investment Advisors, so that Enron
had no need of these benefit administration services from Hewitt.
¶¶ 26-28.   Therefore Hewitt drafted the January 1, 2005 document
amending the ASA and "drastically circumscrib[ing] the scope of
Services Hewitt would provide under the ASA going forward."   ¶ 29.
The Amendment provided,

> **Whereas**, Client and Hewitt have previously entered into
> an Administrative Services Agreement effective as of June
> 1, 2001 (as amended, the "ASA") pursuant to which Hewitt
> provided certain benefits administration services to
> Client as described therein (the "Administrative
> Services");
>
> **Whereas**, effective as of December 31, 2004, Client
> terminated the Administrative Services . . . .

¶ 30, citing Ex. 3 at 1.   Thus Enron completely terminated all
benefits administration services by Hewitt and never rehired Hewitt
to perform them again.   Hewitt shut down the call center it had
maintained in connection with the Plan and no longer served as
record keeper for Enron with the Plan nor performed any day-to-day
work with respect to the Plan for Enron.   ¶ 31.

The post-Amendment work performed by Hewitt for Enron was
defined as "provid[ing] ongoing maintenance and assistance to the
Client with respect to Client data maintained by Hewitt on its
internal systems . . . . "   ¶ 32, citing Ex. 3 at 1.

Enron insists that the Amendment completely amended the

10 of that agreement does not provide a contractual basis for Enron to indemnify Hewitt for Hewitt's own conduct and/or negligence. Moreover, even if it somehow did, Enron argues that it is unenforceable under Texas' strict Fair Notice doctrine.

Enron points out that Hewitt admitted its mistake in calculating the allocations in open court on the record multiple times, including at a July 27, 2007 hearing.[16]   Enron states that

---

"Service" section of the ASA (§ 1.35 and 2.1), including any notion of a "Requirements Document," and it severely modified and limited Hewitt's work for Enron, i.e., "Services shall be limited as follows," listing six items.   None of the six included any calculations or computations, no less allocation of any fund of any kind.   ¶ 33, Ex. 3, § 1 & 2.   The Amendment defined "Services" as "providing information to Client related to Participant data," for which Hewitt was to be paid $10,000 per month, and this definition of Services was never amended or expanded thereafter.   ¶ 35.   The Amendment stated the ASA was to terminate on September 30, 2006. *Id.*   Before it did, Hewitt drafted a Second Amendment, dated July 25, 2006, the purpose of which was to extend its term by one year, until September 30, 2007.   ¶¶ 36-37, citing Ex. 4.   The Second Amendment did not amend or expand the definition of Services nor mention any computations, allocation work, the *Tittle* Acton or any Settlement Allocation Plan, and did not revive its earlier benefits administration services terminated in 2005.

Thus Enron contends that the calculations and allocation work were not done pursuant to the ASA.

[16] #1335, Ex. A, Transcript of Proceedings, July 27, 2007, at pp. 18-20, Mr. Boies on behalf of Hewitt stated, [W]e're all here this afternoon because of a mistake my client [Hewitt] made."   He explained,

What happened was that Hewitt's computer system--there was a flaw in old software; and rather than using the actual market price on January 1, 1998, the defect in the system took that price to what computer people call a default price, Your Honor.   It's not the actual price. It goes to--in this case I think it was $100 price, which is a plug figure.   Defect in the system.   Our mistake. We accept the responsibility for that.

-15-

it was because Hewitt subsequently "repudiated its promises and sought to dodge responsibility" for the misallocation that the Savings Plan and Administrative Committee filed their lawsuit (H-07-4081) against Hewitt, alleging negligence, professional negligence, and gross negligence in its "bungled allocation" of the *Tittle* distribution.   After the United States Secretary of Labor asked this Court to find Hewitt in civil contempt (#1348), Hewitt provided some funds to help the Savings Plan cover the shortfall (#1392).

Enron contends that Section 10.4(a) of the ASA (emphasis added by Enron and the Court) states the circumstances under which Hewitt is obligated to indemnify Enron ("Client"), while § 10.4(b) addresses Enron's ("Client's") duty to indemnify Hewitt. Significantly § 10.4(b) does not require Enron to indemnify Hewitt for Hewitt's own conduct:

> **(a) By Hewitt.** Subject to Sections 10.1, 10.2, and 10.3, and 10.4(c), Hewitt shall indemnify, defend and hold Client and the Plans harmless from and against any Claims and shall pay all Losses (including reasonable attorneys' fees and expenses): (i) arising out of any breach by Hewitt of any of its material obligations, representations or warranties contained in this Agreement; ***(ii) arising out of Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct***; (iii) arising from bodily injury, including death, or damage to tangible personal or real property arising from physical acts or omissions that constitute Hewitt's negligence, gross negligence or willful, fraudulent, or criminal misconduct; or (iv) arising out of the infringement of the Proprietary Rights of a third party or the use of the Hewitt Information contemplated hereunder and/or Hewitt's provision of the Services.

-16-

       **(b) By Client.**  Client shall indemnify, defend and hold Hewitt harmless from and against any Claims and shall pay all losses and all related expenses (including reasonable attorneys' fees and expenses) suffered by Hewitt:  (i) arising out of any breach by Client of any material obligations, representations or warranties contained in this Agreement; (ii) arising from Client's negligence, gross negligence or willful, fraudulent, or criminal misconduct; (iii) arising from bodily injury, including death or damage to tangible personal or real property arising from physical acts or omissions that constitute Client's negligence, gross negligence or willful, fraudulent or criminal misconduct; (iv) arising out of the infringement of the Proprietary Rights of a third party by use of the Client Information provided to Hewitt hereunder; (v) arising from Losses for which Hewitt is not liable under this Section 10; or (vi) arising from the acts or omissions of any third party provider of services to Client, the Plans and Participants.

Declaratory Judgment Complaint, Ex. A § 10.4 (a) and (b).  Thus Section 10.4(a) expressly requires Hewitt to indemnify Enron for Hewitt's conduct, while § 10.4(b) is silent about Enron's indemnifying Hewitt for Hewitt's own conduct.

       In sum, under the express terms of the ASA, Hewitt is the only party required to provide indemnification against damages arising out of Hewitt's own conduct.  Moreover, Enron observes that "[i]t would be incongruous indeed for Hewitt to be both obligated to provide indemnification ***to Enron*** for Hewitt's own conduct and entitled to indemnification ***from Enron*** for damages resulting from Hewitt's own conduct.  #1411 at 8-9.  Therefore Hewitt's complaint should be dismissed as a matter of law for failure to state a claim because on its face the ASA does not provide for the relief that Hewitt seeks.

-17-

Furthermore, argues Enron, even if Hewitt did state a claim under the ASA for contractual indemnity by Enron for Hewitt's own conduct, it is unenforceable under Texas' fair notice doctrine. Under Texas law, a contractual provision to indemnify a party for its own negligence must afford fair notice of its existence. *Dresser Indus. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1987)("Because indemnification of a party of its own negligence is an extraordinary shifting of risk," Texas' fair notice doctrine requires that an indemnification clause meet two criteria: the express negligence doctrine and the conspicuousness requirement[17]). *See also Enserch Corp. v. Parker*, 794 S.W.2d 2, 8-9 (Tex. 1990). Whether the requirements of conspicuousness and express negligence are satisfied is a question of law for the court to decide. *Am. Home Shield Corp. v. Lahorgue*, 201 S.W.3d 181, 184-85 (Tex. App.-- Dallas 2006), *citing Dresser*, 853 S.W.2d at 509 (holding that

---

[17] Under the express negligence doctrine, the "party seeking indemnity from the consequences of that party's own negligence must express that intent in specific terms within the four corners of the contract." *Dresser*, 853 S.W.2d at 508. *See Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987)(adopting the express negligence test requiring parties seeking to indemnify the indemnitee from the consequences of its own negligence to express that intent in specific terms within the four corners of the contract).

"The conspicuousness requirement mandates 'that something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it.'" *Id., quoting Ling & Co. v. Trinity Sav. & Loan Ass'n*, 482 S.W.2d 841, 843 (Tex. 1972).

These fair notice requirements do not apply if the indemnitee demonstrates that the indemnitor had actual notice or knowledge of the indemnity agreement. *Dresser*, 853 S.W. 2d at 508, *citing Cate v. Dover Corp.*, 790 S.W.2d 559, 561 (Tex. 1990).

-18-

"compliance with both of the fair notice requirements is a question of law for the court"). To be enforceable, an indemnity agreement must satisfy both. *U.S. Rentals, Inc. v. Mundy Serv. Corp.*, 901 S.W.2d 789, 791-92 (Tex. App.--Houston [14th Dist.] 1995, writ denied).

"In the express negligence context, an enforceable indemnity clause must contain three elements: (1) the intent of the parties must be clear; (2) it must be set forth within the four corners of the agreement; and (3) the specific intent of the parties must be expressed." *Delta Air Lines, Inc. v. ARC Security, Inc.*, 164 S.W.3d 666, 671 (Tex. App.--Fort Worth 2005, pet. denied). Texas courts adhere strictly to the express negligence rule to "require a party who attempts to indemnify itself from its own negligence to express that intent in specific terms." *Glendale Const. Servs., Inc. v. Accurate Air Sys., Inc.,* 902 S.W.2d 536, 537 (Tex. App.--Houston [1st Dist.] 1995, writ denied). "The [express negligence] doctrine is intended to remove the ambiguity from indemnity provisions and ultimately reduce the need for satellite litigation regarding interpretation of indemnity clauses." *English v. BGP International, Inc.*, 174 S.W.3d 366, 374 (Tex. App.--Houston [14th Dist.] 2005, no pet.).

The following rulings in Texas cases with significantly more specific provisions than any in the ASA make clear that a party cannot be indemnified for its own negligence absent an

-19-

unmistakable, unambiguous and explicit statement within the four corners of the contract that such is the intent of the parties; Enron insists that the indemnification clause in the ASA clearly does not satisfy the strictures of the express negligence test under Texas law. *See, e.g., Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 460 (5th Cir. 2002)(an indemnity provision promising to indemnify the plaintiff for "any pending or threatened medical malpractice or other tort claims asserted against [the indemnitee]" held not sufficiently specific to satisfy the express negligence test because it did not state that the indemnitee would be responsible for losses caused by its own negligence); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 705 (Tex. 1987)(rejecting indemnity provision that "did not clearly and unequivocally require the subcontractor to indemnify the company for its own negligence"); *Delta Airlines*, 164 S.W.3d at 675 (no indemnity under provision "ARC will indemnify Delta regardless of whether the injury or damage . . . arises out of . . . the negligence . . . of . . . Delta" because "nowhere is there language that directly or indirectly says that ARC will indemnify Delta if Delta is solely at fault."); *Glendale*, 902 S.W.2d at 538 (rejecting as insufficient to indemnify the contractor for his own negligence a provision requiring subcontractor to indemnify contractor for "any negligent act or omission . . . arising out of or resulting from the performance of the Subcontractor's Work . .

-20-

. regardless of whether it is caused in part by a party indemnified hereunder"); *Jobs Bldg. Servs., Inc. v. Rom, Inc.*, 846 S.W.2d 867, 870 (Tex. App.--Houston [1st Dist.] 1992, writ denied)(indemnity provision insufficiently specific to require the contractor to be indemnified for damage caused by the contractor's own negligence where the clause stated that the subcontractor would indemnify for "*damage . . . caused by the subcontractor's negligent act* or omission or by the negligent act or omission of anyone employed by the subcontractor *or for whose acts [or omissions] the contractor* or subcontractor *may be liable* . . . . [emphasis in original]").[18]

Even if the ASA had an adequate express negligence provision, argues Enron, the ASA would have to satisfy the conspicuousness requirement.   Whether an agreement meets the conspicuous requirement is also a question of law for the court.   *Am. Home Shield*, 201 S.W.3d at 184, *citing Dresser*, 853 S.W.2d at 509. Enron points out that each of the seventeen sections of the ASA, spanning twenty-two, single-spaced pages, is made up of multiple paragraphs defining the parties' rights and obligations, with twenty-nine pages of single-spaced schedules attached.   The key Section 10, on which Hewitt relies, is composed of seventeen paragraphs, all of which are in the same font, typeface, and color

---

[18] Hewitt argues that these cases merely stand for the proposition that the express negligence rule cannot be met where it is necessary to infer exculpation for the consequences of one's own negligence.

as the rest of the fifty-one-page ASA; nothing stands out or seems designed to attract the attention of a reasonable person against whom the provision was to operate.  *See Douglas Cablevision IV, L.P. v. Southwestern Electric Power Co.*, 992 S.W.2d 503, 509 (Tex. App.--Texarkana 1999); *Dresser,* 853 S.W.2d at 511.

In sum, Enron maintains that § 10.4 of the ASA fails to meet the fair notice requirements of conspicuousness and express negligence, and therefore Hewitt cannot state a claim for indemnification or defense expenses.  The indemnity provision, § 10.4(b), drafted by Hewitt, says nothing about indemnifying Hewitt for Hewitt's own negligence.  Nor does the Complaint elsewhere point to any provision that expressly states that Enron must indemnify Hewitt for Hewitt's own negligence, despite Hewitt's fruitless effort to cobble together snippets of nine different contractual subsections to create one.  Complaint at ¶¶ 10-16.  The Fifth Circuit has also proclaimed, "General, broad statements of indemnity are not effective to shift the consequences of the indemnitee's own negligence to the indemnitor."  *Quorum Health Resources, L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 461 (5th Cir. 2002)(applying Texas law).  Nor is Section 10 sufficiently conspicuous to meet the fair notice doctrine's requirements.

Thus, Enron concludes, Hewitt cannot state a claim for relief.

**D.  Hewitt's Opposition (#1416)**

Incorporating by reference and adopting its Opposition to

-22-

Enron's Motion to dismiss Hewitt's Third Party Complaint (#1412 & Ex. A to #1416) into #1416, Hewitt insists that the ASA's § 10 requires Enron to indemnify and defend Hewitt against claims by the Enron Savings Plan for losses in excess of $1 million, suffered as a result of Hewitt's negligence in performing services under the ASA. Hewitt contends that Enron's arguments (that ASA does not provide for such indemnification and that even if it did, the indemnification is unenforceable under the Texas fair notice requirements of express negligence and conspicuousness) ignore the ASA's clear statements demonstrating that Enron did agree to indemnify and defend Hewitt from losses, liabilities and claims arising from Hewitt's own conduct:

> * Section 10.4(b)(v) requires Enron to indemnify and defend Hewitt from Claims "arising from Losses for which Hewitt is not liable under this Section 10." "Losses" means losses "resulting from Hewitt's performance of Services."

> *Sections 10.1 and 10.2 of the ASA specify that Hewitt is not liable in excess of $1 million for Losses suffered by Enron or the Plan "*as a result of Hewitt's negligence*" unless it rises to the level of gross negligence or worse. Section 10.4(c) expressly requires Enron to defend Hewitt from all third-party negligence claims, including specifically those asserted by the Plan.

Hewitt argues that this indemnification obligation, which applies even in cases of Hewitt's negligence, satisfies the fair notice doctrine.

Furthermore, fair notice requirements cannot serve as a basis for a Rule 12(b)(6) motion because they become irrelevant if facts

at trial demonstrate that Enron had actual notice of the provisions in dispute. *Cleere Drilling Co. v. Dominions Exploration & Production, Inc.*, 351 F.3d 642, 647 (5th Cir. 2003)("we are convinced that the requirement of fair notice[,] both elements, i.e., express negligence and conspicuousness[,] is irrelevant in the face of Dominion's actual knowledge of the subject provisions of the Contract"), *citing Dresser*, 853 S.W.2d at 508 ("the fair notice requirements are not applicable when the indemnitee establishes that the indemnitor possessed actual notice or knowledge of the indemnity agreement"). Hewitt argues that the ASA not only meets the fair notice requirements, but even if it did not, Hewitt is entitled to demonstrate that Enron had actual notice and knowledge of its obligations to indemnify Hewitt for losses in excess of $1 million arising from Hewitt's own negligence. Therefore Hewitt's Declaratory Judgment and Third Party Complaints state a claim and cannot be dismissed.

Hewitt also charges that in a fruitless attempt "to avoid the limits on Hewitt's liability under the governing ASA," Enron, which "employs and therefore controls the Administrative Committee that administers the Plan," "manipulated that control to have the Plan bring tort and contract claims for losses that the Plan itself has not even incurred."

Hewitt calls "erroneous" Enron's arguments that § 10.4(b) says nothing about Enron indemnifying Hewitt for Hewitt's own conduct

and that it would be "incongruous" to read that provision to
indemnify Hewitt for its own conduct because Hewitt agrees in
Section 10.4 to indemnify Enron for Hewitt's conduct.  Section 1.25
defines "Losses" as "unrecoverable losses, costs, damages or
expenses resulting from Hewitt's performance of the Services."
Section 10.4(b)(v) obligates Enron to indemnify Hewitt from claims
and losses "arising from Losses for which Hewitt is not liable
under this Section 10."  Thus concludes Hewitt, § 10.4(b)(v) does
provide for Enron to indemnify Hewitt for its own conduct (Hewitt's
performance of the Services") in some cases ("Losses for which
Hewitt is not liable under Section 10").  Hewitt asserts that
Enron's argument depends on ignoring the definition of the word
"Losses."

Furthermore, claims Hewitt, its obligation to indemnify Enron
for Hewitt's own conduct under § 10.4(a) is in harmony with Enron's
indemnification obligation.  The first clause of § 10.4(a) states
that all of Hewitt's indemnification obligations are made "subject
to Sections 10.1 [and] 10.2."  Reading all of the provisions of §
10 together,[19] one must find that the parties' rights and
obligations are clear:  Hewitt must indemnify Enron for losses

---

[19] *Millennium Petrochem. Inc. v. Brown & Root Holdings, Inc.*,
390 F.3d 336, 342 (5th Cir. 2004)(under Texas law, "when
ascertaining the intent of the parties from written expressions, a
court should read all parts of a contract together, ensuring that
each provision of such contract are [*sic*] given effect and none are
rendered meaningless").

arising from Hewitt's own conduct, but only within the expressed limits of its liability (e.g., up to $1 million for ordinary negligence), while Enron must indemnify Hewitt for losses arising from Hewitt's own conduct which are beyond the expressed limits of Hewitt's liability (e.g., after the first $1 million in losses for ordinary negligence).

Hewitt thus contends that the ASA satisfies the "fair notice" requirements under Texas law.  Section 10 (see footnote 17) meets the express negligence requirement (clear statement of the parties' intent within the four corners of the contract) by explicitly stating that a "Loss for which Hewitt is not liable under this Section 10" includes, in accordance with §§ 10.1 and 10.2, Losses arising from Hewitt's own negligence in excess of $1 million. There is no requirement that the indemnity clause be a single sentence or paragraph, nor does it alleviate the other party of its obligation to read a contract.  *DuPont v. TXO Production Corp.*, 663 F. Supp. 56, 58 (E.D. Tex. 1987)(indemnity clause enforceable even though it spanned multiple paragraphs with cross references)[20]; *Enserch Corp.*, 794 S.W.2d at 8 ("[a]n indemnity agreement need not

---

[20] Enron points out that in *Dupont*, 663 F. Supp. at 57, the court concluded that "the contract at issue satisfied the express negligence requirement because the indemnity provisions contained two separate clauses, *each* of which independently and expressly stated that the party would be indemnified for its own negligence in two separate paragraphs."

be confined to one sentence).[21]  No inference is required to identify Enron's indemnity obligations, i.e., that Enron is to indemnify Hewitt for Hewitt's own conduct for which Hewitt is not liable under Section 10; and that Hewitt is not liable for losses arising from its ordinary negligence beyond $1 million.

Hewitt also insists that the indemnification provision is conspicuous.  Relying on Section 10 of the ASA, which Hewitt argues is not hidden in boilerplate, fine print or on the back of a purchase order, Hewitt maintains that it is an essential term set forth in an ongoing commercial services contract.  Moreover § 10 is highlighted in § 2.5 and § 17.3, in which Enron and Hewitt agreed that Section 10 would survive termination of the ASA.  The 2005 written Amendment did not alter § 10, but stated, "The provisions will remain in full force and effect."  Third Party Complaint, Ex B to 1416 at 3.  The same is true of the July 25, 2006 written extension.  *Id.,* Ex. D at 1.  Hewitt claims that a reasonable person procuring long-term services of this nature ought to have read the ASA before signing it.

**E.  Enron's Reply (#1422)**

Incorporating its reply (#1423 and Ex. A to #1422)) in support of its Rule 12(b)(6) motion to dismiss Hewitt's Third-Party

---

[21] Enron charges that Hewitt misrepresents the holding in *Ensearch* also.  In that case, the indemnity agreement, while not in a single sentence, was in a single, two-sentence paragraph.  794 S.W.2d at 6-7.

Complaint, Enron points out that Hewitt's "strained and circuitous reading of the ASA" by "narrowly parsing bits and pieces of numerous disparate ASA provisions (some more that a dozen single-spaced pages apart") clearly fails to "demonstrate how this purported indemnification is 'expressly' set forth." Ex. A at 1.

In particular, Hewitt relies on Section 10.1 (no indemnification for Claim of breach of contract, gross negligence or ordinary negligence up to $1 million), which is captioned "Limitation of Liability," and which mentions nothing about indemnification. Instead of exculpating Hewitt, the language, drafted by Hewitt, inculpates Hewitt and offers a "plum" to Enron: "*In addition to its obligations under Section 2.5*, if the Client or the Plan(s) suffers Losses as a result of Hewitt's negligence, Hewitt *will be liable for up to* $1,000,000 of such Losses incurred by Client or the Plan(s) . . . .[emphasis added]" It does not say anything such as "Hewitt shall not be liable" or "for any Losses in excess of," no less is it a plain statement of extraordinary risk-shifting. Enron contends that "Hewitt's use of passive language phrased as a positive benefit to the Client (rather than an onerous shift of risk) defeats Hewitt's position." Ex. A at 2.

Moreover, maintains Enron, the "Limitation" is very narrow: it does not apply to any claim for breach of contract, but only reaches negligence claims, and even then, not gross negligence. Section 10.2. As for "Hewitt's negligence," Hewitt concedes that

the indemnification is only partial for defined "Losses" over $1,000,000. In sum Hewitt concedes that the ASA does not provide for indemnification for claims against it of breach of contract, gross negligence, and ordinary negligence of up to $1,000,000. Thus Hewitt's Complaint, to the extent it seeks such indemnification, must be dismissed with prejudice.

Hewitt does not cite, nor has Enron found, any case holding that a contractual clause purporting to indemnify one party against its own negligence, but only partially, could satisfy Texas' strict express negligence doctrine.

Enron further insists the ASA does not indemnify Hewitt for its own negligence. As noted, there is no express mention that Hewitt is indemnified by Enron for Hewitt's own conduct in the 789-word section (10.4), captioned **Indemnification.**" Instead Hewitt focuses on the definition of "Losses" and on section 10.1, **"Limitation of Liability**," which Enron argues does not address Losses incurred by Hewitt. Nowhere in the Hewitt-drafted Section 10.4(b), which does set out Enron's duty to indemnify, did Hewitt cross-reference section 10.1.[22] Furthermore, out of the whole 789-word **Indemnification** section 10.4, the only mention of Losses "arising out of Hewitt's negligence" is in Section 10.4(a); and section 10.4(a) sets out the circumstances under which only *Hewitt*

---

[22] In contrast, Section 10.4(a) does cross-reference Section 10.1 and states that Enron is to be indemnified when Hewitt acts with negligence.

does the indemnifying and does not mention Enron indemnifying Hewitt for Hewitt's negligence.

The definition of "Losses" ("unrecoverable losses, costs, damages or expenses **resulting from Hewitt's performance of the Services** [emphasis added]," stated thirteen pages earlier than section 10.4, despite Hewitt's efforts, does not alter this standard indemnity structure nor provide that Losses are damages resulting only from Hewitt's negligence; instead, insists Enron, the definition is tied to the subject matter of the 2001 ASA. Enron argues that Hewitt, in its opposition in response, clarifies that the "Losses" for which it seeks indemnifications are amounts "resulting from Hewitt's performance of the Services" under § 1.25 of the 2001 ASA and that "[i]n 2001, Enron entered into the ASA, contracting for Hewitt to provide administrative services to the Enron-administered plans."[23]   #1416, Ex. A at 3 and 8.   Enron emphasizes that Hewitt agreed that all such "administrative services" were terminated in January 2005 and thus cannot support claims of indemnified Losses arising out of work Hewitt did subsequently in 2006 and thereafter.[24]   The Complaints do not allege

---

[23] Section 1.35 of the ASA defines "Services" as "**the benefit plan administrative services** to be performed by on behalf of Hewitt as described generally in the Fee Schedule and in more detail in the Delivery Model and Requirements Document [emphasis added by the Court]."

[24] Exhibit C at 1 to Hewitt's Third Party Complaint (also found as Ex. B to Hewitt's Complaint for Declaratory Judgment) plainly states that in June 1, 2001 Hewitt and Enron entered into the ASA

that after January 1, 2005 the ASA was again amended to encompass any benefits administration services or the Settlement Fund allocation calculations.  Therefore, concludes Enron, Hewitt has no indemnifiable Losses under either Section 10.4(b) and 10.1 for the Settlement Fund allocation calculations that Hewitt performed in 2006, 2007, and 2008.

Enron reiterates that Hewitt's claim of partial indemnification for its own ordinary negligence under the ASA does not satisfy Texas' fair notice requirements.  First of all, the language of § 10.1 addresses Hewitt's liability to Enron for losses incurred by Enron or the Plan as a result of Hewitt's negligence, not for losses incurred by Hewitt.  Yet Hewitt asks the Court to accept that it governs losses incurred by Hewitt for its own negligence and then also to infer that Section 10.4(b)(v) imposes an affirmative obligation upon Enron to indemnify Hewitt for Losses Hewitt suffered as a result of its own negligence.  The express negligence doctrine precludes precisely this type of supposition and inference.  *Quorum*, 308 F.3d at 463 ("Statements that require inference or extension to impose an indemnification obligation for

---

"pursuant to which Hewitt provided certain benefits administrative services to Client . . . (the 'Administrative Services')" and that the "Administrative Services" were terminated by Enron as of Dec. 31, 2004.  Regarding the "Terminated Services," the Third Party Complaint states, "Each party agrees that the other party's obligations with respect to the Administrative Services described in the ASA have been fulfilled, except for those that survive termination as described therein."  *Id.* at ¶7, p.2.

the indemnitee's own negligence do not satisfy the express negligence doctrine."). While Section 10.4(b)(v) refers to "Losses for which Hewitt is not liable under this Section 10," Section 10 is composed of twelve separate, bold-captioned sections composed of 1,364 words over three single-spaced pages, while the definition of "Losses" in Section 1.25 is approximately thirteen, single-spaced pages away. Enron argues that if Hewitt intended to have Enron indemnify Hewitt for Hewitt's own negligence, it should have stated that in Section 10.4(b); Hewitt did not. Instead the provision broadly purports to cover any Losses for which Hewitt is not liable; Texas law does not permit such catch-all language to satisfy the express negligent requirement. *Seal Offshore, Inc. v. Am. Standard, Inc.*, 736 F.2d 1078, 1081 (5th Cir. 1984)("An indemnification of 'any and all claims' will not include the negligence of the indemnitee. Indemnity 'is an area in which to cover *all* does not include one of its parts.'")(emphasis in original); *Quorum*, 308 F.3d at 461 ("General, broad statements of indemnity are not effective to shift the consequences of the indemnitee's own negligence to the indemnitor."); *Jobs Bldg.*, 846 S.W.2d at 870 (indemnity provision insufficiently specific to require indemnity for contractor's own negligence where it provided that the subcontractor would indemnify for damage "*caused by the Subcontractor's negligent* act or omission or by the negligent act or omission of anyone employed by the Subcontractor or *for whose*

-32-

*acts the Contractor* or the Subcontractor *may be liable* [emphasis in original].";  *Glendale*, 902 S.W.2d at 537 ("The purpose of the express negligence test is to require a party who attempts to indemnify itself from its own negligence to express that intent in specific terms.").

Nor, insists Enron, are the indemnification provisions upon which Hewitt relies conspicuous.  The purpose of this requirement is to highlight by some kind of differentiation a particularly "extraordinary shifting of risk."  *Douglas Cablevision*, 992 S.W.2d at 509.

As for Hewitt's contention that it is entitled to demonstrate that actual knowledge makes the fair notice requirements irrelevant here, Enron argues that it only makes conspicuousness irrelevant; Hewitt must still satisfy the express negligence requirement. *Sydlik v. REEIII, Inc.*, 195 S.W. 3d 329, 332-33 (Tex. App.--Houston [14[th] Dist.] 2006, no pet.)("While actual notice may serve as a substitute for conspicuousness, it may not serve as a substitute for express negligence"; allowing a party to avoid the express negligence test by proving actual notice would "fly in the fact of our contract interpretation jurisprudence"); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.*, 94 S.W.3d 163, 169 (Tex. App.-- Houston [14[th] Dist.] 2002, no pet.)("The second requirement-- conspicuity--is immaterial if [the plaintiff] has actual knowledge of the indemnity clauses").

**F.  Hewitt's Surreply (#1426)(incorporating Hewitt's Surreply in opposition to Enron's Motion to Dismiss Hewitt's Third Party Complaint**)

Hewitt reiterates that sections 10.1 and 10.4(b) on a single page of the ASA clearly and conspicuously provide that Hewitt's liability for "Losses" suffered by Enron or the Plan as the result of Hewitt's negligence is limited to $1 million, absent gross negligence, and that Enron must indemnify Hewitt from claims for losses for which Hewitt is not liable under Section 10.

To Enron's new arguments Hewitt responds that the $1 million limitation on indemnification under the ASA provides no basis for dismissal of anything.  Hewitt only sued Enron for Losses that are subject to indemnification under the ASA.

The scope of Enron's indemnification obligations for matters alleged by the Plan against Hewitt may only become evident after the adjudicated outcome of the first-party claims.  Moreover, argues Hewitt, the Plan alleges breach of contract based on Hewitt's negligence; the ASA does not make such claims mutually exclusive and therefore provides for indemnification.  The only distinction between the two causes of action in the ASA is in Section 10.1 between Hewitt's obligation to re-perform any defective work and Hewitt's financial obligation in the event that it results in "Loss" to Enron or the Plan.  Furthermore, Section 10.4(d) obligates Enron to defend Hewitt even in cases alleging

-34-

gross negligence, and more generally is subject to the obligation of good faith and fair dealing inherent in any  contractual undertaking.

Hewitt calls senseless Enron's argument that the ASA cannot satisfy Texas' strict express negligence doctrine because it only works a partial shift (after the first $1 million) rather than a complete shift in Hewitt's liability for its own negligence.

Hewitt charges that Enron improperly introduces factual matters to avoid its burden in moving to dismiss.  Initially Enron agreed for purposes of this motion that the ASA governed Hewitt's allocation services and argued that the ASA does not indemnify Hewitt for its own negligence.  Hewitt then argued that under ASA Enron must indemnify Hewitt for "Losses" for which Hewitt is not liable, including those in excess of $1 million arising from its own negligence) and that "Losses" is defined to include damages arising from Hewitt's services.  Now, after originally agreeing that ASA controlled Hewitt's allocation services, Enron argues that "Services" do not include services Hewitt rendered for the allocation because the "Services" originally performed by Hewitt were terminated through an amendment to the ASA in January 2005 and Hewitt never alleged afterward that the ASA was amended again to encompass any benefits administrative services or the Settlement Fund Allocation calculations.  Enron admitted that the ASA was amended, not terminated, in 2005 (Reply at 4).  Moreover Enron is

incorrect in asserting that Hewitt has not alleged that ASA governed Hewitt's allocation services.  See ¶¶ 17-20 of the Third-Party Complaint (#1406).  Hewitt attaches three letters Exs. 1-3) from Enron/Administrative Committee Representatives written to Hewitt after the allocation error was discovered, from which paragraphs 24-27 of the Third Party Complaint are drawn; the letters specifically assert Enron's rights under the ASA.  Because Hewitt's allegations are contrary to Enron's argument that the Plan and Hewitt purportedly entered into a separate contract through a July 28, 2006 "written agreement" pursuant to which Hewitt provided services separate and apart from the ASA, dismissal is not appropriate.

## G.  Court's Determination

Because Enron expressly stated that for purposes of the motions to dismiss it would assume that the ASA applies to Hewitt's work on calculating and allocating the first tranche of the *Tittle* settlement distribution, the Court will hold it to its word and not address the issue of whether the ASA governs here.

## 1.  The ASA and Indemnification of Hewitt for Hewitt's Conduct

This Court fully concurs with Enron's logical reading, construction of its express language, and examination of the structure of the ASA, especially in regard to Section 10 and in particular Section 10.4, and concludes there is no basis for Hewitt's claim for contractual indemnification for damages Hewitt

suffered as a result of its own conduct.  Hewitt's forced pastiche of provisions in the ASA, unconnected by proximity, reference, format, or logic, does not create a clear statement sufficient to indemnify Hewitt for damages arising from its own conduct.

Because the Court finds there is no contractual basis for Hewitt's claim for indemnification of its alleged negligence, the Court need not reach the question whether the alleged indemnification agreement satisfies the Texas Fair Notice Doctrine. Nevertheless, the Court chooses to indicate its conclusions, should there be an appeal and reversal of this order.

**2.  Texas' Fair Notice Requirement**

As noted, to satisfy the fair notice requirement under Texas law where an indemnification agreement constitutes "extraordinary risk shifting," Hewitt must show that the indemnity agreement satisfies the express negligence doctrine and the conspicuousness requirement, discussed previously. *Storage and Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004).  Both are questions of law for the court and thus can be resolved on a motion to dismiss.  *The Daneshjou Co., Inc. v. Goergen & CNA Construction, Inc.*, No. 03-04-00730, et al., 2008 WL 3171256, *9 (Tex. App.--Austin Aug. 8, 2008)("Compliance with the express negligence requirement is a rule of contract interpretation and, thus a question of law for the court."), *citing Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 814 (Tex. 1994); *id.* ("Whether an agreement meets

-37-

the conspicuousness requirement is a question of law for the court."), *citing Dresser*, 853 S.W.2d at 509.  If an agreement does not satisfy either the express negligence doctrine or the conspicuous requirement, it is unenforceable as a matter of law; it must satisfy both.  *Id.*, *citing Reyes*, 134 S.W.3d at 192.

The Court incorporates the law on the express negligence doctrine stated previously.

"Ambiguous indemnity provisions are unenforceable."  *Cabo Const., Inc. v. R.S. Clark Const., Inc.*, 227 S.W.3d 314, 318 (Tex. App. --Houston [1st Dist.] 2007), *citing Ethyl*, 725 S.W.2d at 707-08.

Consistent with its determination that there is no contractual basis for Hewitt's indemnification claim, the Court concludes that the ASA fails to satisfy the express negligence doctrine.  As the party that drafted the ASA and the party seeking indemnification from the consequences of its own negligence, Hewitt has failed to express clearly and in specific terms within the four corners of the contract the intent of the parties to the ASA to include a viable agreement to indemnify Hewitt for the results of its own negligence.

In *Dresser*, 853 S.W. 2d at 511, the Texas Supreme Court held that indemnity clauses must satisfy the criteria for conspicuousness in the Texas Uniform Commercial Code, Texas Business & Commerce Code Annotated § 1.201(10)(Vernon 2005) to

-38-

promote "certainty and uniformity" valid indemnity provisions:

> "Conspicuous" . . . means so written, displayed or presented that a reasonable person against which it is to operate ought to have noticed it.  Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
> (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
> (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks that call attention from surrounding text of the same size by symbols or other marks that call attention to the language.

Comment 10 to § 1.201(10) states in part, "Although these paragraphs indicate some of the methods for making a term attention-calling, the test is whether attention can reasonably be expected to be called to it."  The Texas Supreme Court has concluded that the test is an objective one. *Cate v. Dover Corp.*, 790 S.W.2d at 560-61. *See also, e.g., Amtech Elevator Services Co. v. CSFB 1998-P1 Buffalo Speedway Office, Ltd.*, 248 S.W.3d 373, 377-78 (Tex. App.--Houston [1st Dist.] 2007)(citing § 1.201(10) criteria for conspicuousness); *Dresser*, 853 S.W.2d at 511 ("When a reasonable person against whom a clause is to operate ought to have noticed it, the clause is conspicuous.  For example, language in capital headings, language in contrasting type or color, and language in an extremely short document, such as a telegram, is conspicuous."); *Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004)("Language may satisfy the conspicuousness

-39-

requirement by appearing in large type, contrasting colors, or otherwise calling attention to itself.").

The Court concludes that the indemnity provisions at issue here are not conspicuous because a reasonable person, in this case Enron, against whom it would operate, might well not have noticed them. The ASA is lengthy, with multiple sections and subsections, all uniformly set in the same font, typeface, and manner, with bold headings, so that the indemnity agreement "is no more visible than any other provision in the agreement and does not appear to be designed to draw attention of a reasonable person against whom the clause was to operate." *American Shield*, 201 S.W.3d at 185.

Although, as noted above, the Fourteenth Court of Appeals in Houston, not to mention others,[25] has concluded that demonstrating that the indemnitor had actual notice or knowledge of the indemnity provision relieves an indemnitee of showing only conspicuousness, but not of the express negligence doctrine, other courts, including the Texas Supreme Court and the Fifth Circuit, applying Texas law, have held that both fair notice requirements become irrelevant.[26]

---

[25] *See, e.g., Silsbee Hospital, Inc. v. George*, 163 S.W.3d 284, 293 (Tex. App.--Beaumont 2005, pet. ref'd).

[26] The conflict among courts about whether the actual notice or knowledge exception applies to the procedural requirement (conspicuousness), but not the substantive requirement (the express negligence doctrine) is discussed by Ryan C. Hudson, Aimee M. Minick, and Andrew B. Ryan in *When the Extraordinary Becomes Ordinary: Is the Express Negligence Rule Under Attack in Texas*, 60 Baylor Law Review 941, 947-53 (Fall 2008). They argue that the express negligence rule should not be subject to the actual notice

-40-

"[T]he fair notice requirements are not applicable when the indemnitee establishes that the indemnitor possessed actual notice or knowledge of the indemnity agreement." *Dresser*, 853 S.W.2d at 508 n.2, *quoted in American Shield*, 201 S.W.3d at 186.  Although the statement in *Dresser* was dictum, the Texas Supreme Court has since reiterated the rule.  *See Storage & Processors, Inc. v. Reyes*, 134 S.W.3d at 192 (2004)("[I]f both contracting parties have actual knowledge of the plan's terms, an agreement can be enforced even if the fair notice requirements were not satisfied.").  The Fifth Circuit has expressly accepted that rule.  *Cleere*, 351 F.3d at 647 & n.11 (Fifth Circuit concluded, "[W]e are convinced that the requirement of fair notice--both elements, i.e., express

_____

or knowledge rule for several reasons:  (1) the long established four corners rule of contract interpretation should control when the contract is unambiguous (*Ethyl Corp.*, 725 S.W.2d at 708 (Indemnity provisions that do not unequivocally state the intent of the parties within the four corners of the instrument are unenforceable as a matter of law)); (2) despite the dictum in *Dresser* footnote 2, the Texas Supreme Court has never applied the actual knowledge exception to the express negligence requirement, while the court in *Sydlik v. REEIII, Inc.* found no Texas decision that applied it, noting that "such as approach would fly in the face of our contract interpretation prudence" (195 S.W. 3d at 333-34); (3) the express negligence rule is a rule of contract interpretation by the court as a matter of law, but the affirmative defense of actual notice or knowledge "transforms an issue of law into an issue of fact."  *See Fisk Electric Co. v. Constructors & Associates, Inc.*, 888 S.W.2d 813, 814 (Tex. 1994) ("[t]he express negligence test was established by this court in Ethyl in order 'to cut through the ambiguity of indemnity provisions, thereby reducing the need for satellite litigation regarding interpretation of indemnity clauses': [t]he express negligence requirement is not an affirmative defense but a rule of contract interpretation . . . determinable as a matter of law.").

-41-

negligence and conspicuousness--is irrelevant in the face of Dominion's actual knowledge of the subject provisions of the Contract."), *citing Dresser*, 853 S.W.2d at 508 n.2, *Ethyl Corp.*, 725 S.W.2d 705, and *Enserch Corp.*, 794 S.W.2d at 8.   Thus bound by the Fifth Circuit's ruling and deferring to the Texas Supreme Court's pronouncements, the Court agrees with Hewitt and concludes that under the current controlling law, actual notice or knowledge excuses failure to satisfy the express negligence test as well as the conspicuous requirement.

Because the actual knowledge exception is in the nature of an affirmative defense to a claim of lack of fair notice, the burden is on the indemnitee to prove actual notice or knowledge.   *U.S. Rentals, Inc. v. Mundy*, 901 S.W.2d 789, 792-93 & n.8 (Tex. App.--Houston [14 Dist.] 1995, writ denied); *Interstate Northborough Partners v. Examination Management Serv., Inc.*, No. 14-96-00335-CV, 1998 WL 242448, *3-4 (Tex. App.--Houston [14 Dist.] May 14, 1998); *Douglas Cablevision*, 992 S.W.2d at 510.   The indemnitee might meet that burden with evidence of specific negotiation of those contract terms (e.g., by prior drafts), through prior dealings of the parties (e.g., evidence of similar contracts over a number of years with a similar indemnity provision), proof that the provision had been brought to the indemnitor's attention (e.g., by a prior

claim).[27]  Whether an indemnitor had actual notice or knowledge of
an  indemnity  provision  is  a  question  of  fact.   *Interstate
Northborough*, 1998 WL 242448, *4.

Hewitt  has  argued  that  Enron  had  actual  notice  of  the
indemnity agreement because its signatory read the contract when he
signed it.   "Something more is required to do away with the fair
notice requirements than mere evidence a party read the agreement
before  signing  it."   *Am.  Home  Shield*,  201  S.W.3d  at  186.
Additional circumstances may support the actual notice or knowledge
requirement.  *See Coastal Transp. Co. v. Crown Cent. Petroleum
Corp.*, 20 S.W.3d 119, 126-27 (Tex. App.--Houston [14th Dist.] 2000,
pet.  denied)(court  found  facts  sufficient  to  establish  actual
notice where president of Coastal who signed the agreement on
behalf  of  Coastal,  read  the  agreement  when  he  signed  it,  the
agreement was less that two and a half pages and contained eight
paragraphs, with the indemnity provision constituting the largest
paragraph in the agreement, and where the indemnity provision was
referenced in two other paragraphs of the agreement).   Since "by
signing an agreement, the party is presumed to have read it," "[t]o
hold  that  reading  the  agreement  is  enough  to  by-pass  the  fair

---

[27] *See, e.g., Alcoa v. Hydrochem Industrial Services, Inc.*, No.
13-02-00531-CV, 2005 WL 608232, *10 (Tex. App.--Corpus Christi Apr.
14, 2005)("Actual knowledge can result from prior dealings of the
parties, or if the indemnitee specifically brings the inconspicuous
waiver to the indemnitor's attention), *citing Cate v. Dover Corp.*,
790 S.W.2d 559, 561-62 (Tex. 1990).

-43-

notice requirements would allow the exception to swallow the rule and render the fair notice requirements ineffectual in all but the most rare instances." *Id.*

Nevertheless, Hewitt would be entitled to discovery before the question of fact as to whether Enron had actual notice or knowledge of the indemnification agreement may be raised by summary judgment or at trial.

However, because the Court has concluded that the ASA does not oblige Enron to indemnify Hewitt for damages to Hewitt resulting from Hewitt's own conduct, it also concludes that Hewitt fails to state a claim in its Declaratory Judgment Complaint, Third Party Complaint, and Counterclaim for indemnification against Enron for those damages.   Accordingly, the Court

ORDERS that Enron's three Rule 12(b)(6) motions to dismiss Hewitt's claims that it is entitled to indemnification for damages caused by its own conduct (#1411 in H-01-3913 and #40 in H-08-2699; #1412 in H-01-3913; and #1441 in H-01-3913) are GRANTED.

The Court further

ORDERS that the parties shall appear for a Rule 16 scheduling conference in Courtroom 9C on  May 15, 2009  at  2 p.m.

**SIGNED** at Houston, Texas, this 23rd day of April, 2009.


_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE